UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CARLTON WRIGHT,                    )
                                  )
          Plaintiff,              ) Cause No. 1:23-cv-00459-TWP-MKK
                                  ) Indianapolis, Indiana
vs.                               )
                                  ) February 17, 2026
SHANE NELSON,                     ) 8:50 a.m.
KRUL Lieutenant,                  )
GARD Captain,                     )
LEE Sergeant,                     )
                                  )
          Defendants.             )


Before the Honorable
TANYA WALTON PRATT

OFFICIAL REPORTER'S TRANSCRIPT OF
BENCH TRIAL


FOR THE PLAINTIFF:        Carlton Wright, 208902
                          APPEARING PRO SE
                          Westville Correctional Facility
                          5501 South 1100 West
                          Westville, IN  46391


FOR THE DEFENDANTS:       Joseph T. Lipps, Esq.
                          BBFCS ATTORNEYS
                          27 North 8th Street
                          Richmond, IN  47374
                          *jlipps@bbfcslaw.com*


COURT REPORTER:           Laurie Morgan, RPR
                          46 East Ohio Street, Room 301
                          Indianapolis, IN  46204
                          *laurie_morgan@insd.uscourts.gov*


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

**<u>INDEX OF EXAMINATION</u>**

                                                              PAGE

PLAINTIFF'S WITNESSES:

CAPTAIN GARD
Direct Examination By Mr. Wright: ........................23
Cross-Examination By Mr. Lipps: ..........................64
Redirect Examination By Mr. Wright: ......................66

JOSEPH LEE
Direct Examination By Mr. Wright: ........................68
Cross-Examination By Mr. Lipps: ..........................84
Redirect Examination By Mr. Wright: ......................88

KYLE BROWN
Direct Examination By Mr. Wright: ........................98
Cross-Examination By Mr. Lipps: .........................107
Redirect Examination By Mr. Wright: .....................112

SHANE NELSON
Direct Examination By Mr. Wright: .......................115
Direct Examination (Continued) By Mr. Wright: ...........165
Cross-Examination By Mr. Lipps: .........................188
Redirect Examination By Mr. Wright: .....................202

CARLTON WRIGHT
Direct Examination By Mr. Nielson: ......................215
Cross-Examination By Mr. Lipps: .........................303


DEFENDANTS' WITNESSES:

LASHAWNA DUNLAP
Direct Examination By Mr. Lipps: ........................316
Cross-Examination By Mr. Wright: ........................320

**<u>INDEX OF EXHIBITS</u>**

PAGE

1 ...............................................................315
2 ...............................................................96
3 ...............................................................244
4 ...............................................................294
7 ...............................................................118
9 ...............................................................224
12 ...............................................................329
13 ...............................................................97
14 ...............................................................256
15 ...............................................................247
16 ...............................................................283
17 ...............................................................301
18 ...............................................................285
19 ...............................................................172
20 ...............................................................302
22 ...............................................................44
24 ...............................................................261
25 ...............................................................297
27 ...............................................................261
39 ...............................................................210
42 ...............................................................97
55 ...............................................................329
58 ...............................................................134

4

*(In open court.)*

THE COURT: You may be seated. Good morning, everyone. We are on the record. This is Carlton Wright, plaintiff, versus Shane Nelson, Lieutenant -- Shane Nelson. Krul is an officer?

MR. LIPPS: Former lieutenant, Your Honor.

THE COURT: Okay. Former Lieutenant Krul. And then we've got Sergeant Lee and Captain Gard and Sergeant Seye. Those are the defendants.

Our case number -- did I leave someone out?

MR. LIPPS: I believe Sergeant Seye was actually terminated from the case at the pretrial conference, so it would be the first four.

THE COURT: All right. And our case number is 1:23-cv-00459. And we're on the calendar for a bench trial.

We'll begin by having counsel state your name and introduce those at your table, beginning with the plaintiff.

MR. LIPPS: Good morning --

THE COURT: Well, beginning with the plaintiff.

MR. WRIGHT: Good morning, Your Honor. My name is Carlton Wright. I'm a plaintiff in this case.

THE COURT: All right. Thank you, Mr. Wright.

MR. WRIGHT: Your Honor --

THE COURT: Sit down, Mr. Wright. We're going to talk about all that in just a minute.

And representing the defendants?

MR. LIPPS:  Good morning, Your Honor.  My name is Joseph Lipps and I represent the four named defendants. Sitting at the table with me is former Captain Gard.

THE COURT:  So before we begin our trial, there's some matters that we need to take care of.  The first is that the Court did take under advisement whether the plaintiff's hands could be uncuffed during the trial.

Are you able to navigate your paperwork?

MR. WRIGHT:  I haven't been able to look at none of my stuff yet.  I can't turn pages at all, barely.

THE COURT:  All right.  So because he is a pro se litigant and he's going to need his hands, Officers, I'm going to allow him to have his hands uncuffed during the trial only. So cuff him up, do whatever you need once we're not in the courtroom.  And for the record, my court security officer is also present.

And you told me before that you've been in prison 17 years?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  And you are getting out when?

MR. WRIGHT:  Soon, hopefully.

THE COURT:  Well, you told me you're not going to try to run away or do anything crazy.

MR. WRIGHT:  No, ma'am.  I want to take care of the

situation.

THE COURT: All right. So I need you to be on your best behavior. If there's any issues at all, we're going to cuff you back up. Okay? Because safety and security is number one.

MR. WRIGHT: I agree.

THE COURT: Okay. All right. So the next thing the Court is going to address is the defendants -- you need to get loose now?

MR. WRIGHT: Yes, because I want to be able to prepare for the motion and go through my exhibits and see if they all --

THE COURT: Are in order?

MR. WRIGHT: Yes, ma'am.

THE COURT: If we can uncuff him, that would be fine.

So the defendants did file a motion in limine on Friday, February 13th, at 4:00 p.m., which literally is on the eve of trial. We had a President's Day, so we were closed on Monday, but myself and the -- my law clerk, we did work because you filed that very belated motion.

Mr. Wright is a pro se litigant who likely has not had an opportunity to review that motion.

Have you been able to review that motion?

MR. WRIGHT: I just got it about ten minutes ago.

THE COURT: Okay. So I'm going to admonish you,

Mr. Lipps, because, first of all, you knew that there's a pro se prisoner litigant who likely would not have had an opportunity to review your motion, so you should have filed it earlier.

Mr. Lipps, the exhibits and objections were due by January 14th. And while you might say that you don't know all of Mr. Wright's exhibits until you were directed to create that combined exhibit list, Mr. Wright did provide a detailed list of all of his exhibits before the final pretrial conference. So you did have plenty of time to timely file motions in limine or any other objections to those exhibits.

Moreover, motions in limine perform a gatekeeping function and permit the trial judge to eliminate from further consideration evidentiary submissions that clearly are not to be presented to a jury, because they clearly would not be inadmissible for any purpose.

The movant, you -- in this case, you, the defendants, have the burden of demonstrating that the evidence is inadmissible on any relevant ground for any purpose. And because this is a bench trial, motions in limine are really not necessary to keep prejudicial evidence from a jury because there is no jury.

The Court did review your untimely motion, and the Court finds that the defendants have not shown that the exhibits at issue are clearly inadmissible for any purpose.

Defendants seek to exclude the following categories of evidence:  One, evidence that is not properly authenticated.

The defendants argue that they have stipulated to the authenticity of only one of the documents identified as exhibits by Mr. Wright.  Defendants, therefore, seek exclusion of the remaining exhibits.

This motion is denied because it is not possible to determine, before Mr. Wright seeks admission of the documents, whether they can be authenticated.  It appears that most of the exhibits listed by Mr. Wright are documents that were produced to Mr. Wright by the defendants.

So, presumably, many of the documents are either business records or can be authenticated by one of the witnesses in this case.  And Mr. Wright should be able to testify to the authenticity of many of the exhibits, including his own grievances and his own medical records.

So your next topic you wanted to exclude was hearsay evidence.

The defendants argue that many of the exhibits identified by Mr. Wright, such as affidavits, interrogatory responses, written grievance responses, medical records, and an e-mail, are inadmissible hearsay.

The motion in limine is denied as to these exhibits. Without information regarding the purpose of these exhibits, it's difficult to determine their admissibility in advance of

them being offered.

For example, while affidavits and interrogatory responses may not be admissible on their own, they may be properly used for impeachment purposes.

The third topic that you wanted to exclude was evidence lacking personal knowledge.

The defendants argue that Mr. Wright has not designated any witness with personal knowledge as to his case notes.  That's Exhibits 1, 3, 19, 43; the disciplinary hearing document, which is Exhibit 4; the STAND unit offender job description and completions, those are Exhibits 6 and 7; medical records, those are Exhibits 8, 24, 27, 28, 29, 30, 33, 34, 36, 37, and 38; video review forms, Exhibit 14; grievance responses, Exhibits 17, 18, and 48; protective custody unit policy, which is Exhibit 21; The GEO Group policies, Exhibit 22; written statement by nondefendant Lieutenant Outlaw, Exhibit 23; Pendleton, Indiana Department of Correction restrictive housing unit forms, Exhibits 31, 32, 33, 34, 35, 36, 37, and 38; and the RHU review, Exhibit 49.

See, that's another reason why -- you have given him no opportunity to -- you are trying to exclude all of his exhibits, and you should have tried a little bit earlier.

MR. LIPPS:  Yes, Your Honor.

THE COURT:  So this motion is denied as well.  While some of these documents may have been created by nonparties, to

the extent that parties have created others, those parties should be able to testify to them.

In addition to the extent the defendants seek exclusion of policies, presumably one or all of the defendants should be able to testify about those documents, and Mr. Wright should be able to testify about his own medical records and disciplinary hearing documents.

So for those reasons, the defendants' motion in limine is denied.

Why did you wait until the last minute?  You knew that it was late on a Friday and we were closed on Monday.

MR. LIPPS:  I accept the admonishment.  I apologize, Your Honor.  I should have done that sooner.  I definitely should have.

THE COURT:  All right.  Don't do that again.  Okay?

MR. LIPPS:  Yes, Your Honor.

THE COURT:  It's very inconvenient.

All right.  So, next, Mr. Wright, we need to talk about the order of proof.  We need to know which order will your witness be.

And witness Brown, who is an inmate at CIF, he's going to be available at 11:00 a.m.  So at 11:00 a.m., we're going to hear from Mr. Brown.

Who is going to be your first, second, third witnesses up until 11:00?  Are you going to be first?

MR. WRIGHT:  No, my initial witness is going to be Captain Gard.  I'd like to call him first.

THE COURT:  Okay.  Then who are you going to call next?

MR. WRIGHT:  Sergeant Lee.

THE COURT:  Sergeant Lee.

MR. WRIGHT:  And then that might be around 11:00, maybe.

THE COURT:  No, it's not.  You're going to get about five witnesses in before 11:00.

MR. WRIGHT:  Then we'll go to Lieutenant Krul.

THE COURT:  Lieutenant Krul?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Then who is next?

MR. WRIGHT:  If Mr. Brown isn't available, then Shane Nelson.

THE COURT:  Shane Nelson.

MR. WRIGHT:  And then I want to go last, if possible.

THE COURT:  Okay.  You can go last.  And so Mr. Brown at 11:00?

MR. WRIGHT:  That's fine.

THE COURT:  All right.

MR. LIPPS:  Your Honor, if I may, Lieutenant Krul has recently relocated to the state of Florida.  I believe he's at South Bay, I think it's Correctional Facility, or prison.  We

were unable to secure his presence for today.  The other witnesses listed were able to be located and are here and available.

THE COURT:  So is he going to be available tomorrow, or you just can't find him at all?

MR. LIPPS:  We found him.  We were able to talk to him on the phone.  He's available via phone only.  We weren't able to -- can't subpoena him either to get him up here.

MR. WRIGHT:  Am I able to respond when he say stuff?

THE COURT:  Yeah, go ahead.

MR. WRIGHT:  Your Honor, when did Mr. Lipps -- where is this information at that Mr. Krul was not going to be here?

I spoke to Mr. Lipps multiple times last week and the week before.  And he -- I didn't know if he was being serious, but he jokingly said, Well, how do you know the defendants are going to be there, you haven't subpoenaed them?

I said, Well, aren't they demanded things on the case?  Shouldn't they be there?  So he said, Well, it was your job to subpoena them for them to be there.

So I don't know if this was part of his ploy the whole time and he knew he wasn't going to be here, where he could have made me aware of the situation.

Even with the motion he filed, I spoke to Mr. Lipps also last week about this, and he could have then filed this stipulation.  Of course, I'm not an attorney so I don't know

13

all the tricks of the trade, but I'm quite sure these are strategic approaches for him to do stuff to --

THE COURT:  Well, I don't think he would strategically do anything like that.

So what happened with Lieutenant Krul?  You just couldn't find him, or...?

MR. LIPPS:  We found out on Friday that he's no longer at New Castle and is now in Florida.  Through tracking down different phone numbers, we got one that worked yesterday, and I was able to speak with him to find out that he's actually in South Bay.  Still doing corrections work, just no longer in Indiana.

THE COURT:  All right.  So if you can't get him here, I'll let you do an offer of proof of what you think his testimony would be, and then I'll take that under advisement whether or not I can accept it.  Okay?

MR. WRIGHT:  That's fine.

THE COURT:  All right.  So if you don't have Lieutenant Krul this morning, who else are you going to -- give me --

MR. WRIGHT:  Just the order I gave: Captain Gard, Sergeant Lee.

THE COURT:  Is that all your witnesses?  Come on.

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Then you will be finished.  You're going

to rest.

MR. WRIGHT:  No more witnesses.

THE COURT:  And then you will be last?

MR. WRIGHT:  Correct.

THE COURT:  Okay.  So you have five or six witnesses, depending on whether or not we can get Lieutenant Krul?

MR. WRIGHT:  Correct.

THE COURT:  So then you need to have all of your witnesses available this afternoon, Mr. Lipps.

MR. LIPPS:  I will, Your Honor.

THE COURT:  Okay.  Because we'll probably be able to finish it in one day.

MR. LIPPS:  Yes, Your Honor.

THE COURT:  All right.  Is there anything else?

I'll leave the bench and give you guys about five minutes to get organized.  Captain Gard will be our first witness.  You guys, I've given you five minutes each for your opening statements.  And then we'll get started.

Anything further for the plaintiff?  Anything else you need to address before we get started?

MR. WRIGHT:  If I could maybe have ten minutes to get organized, Your Honor?

THE COURT:  Sure.  I'll give you ten minutes to get organized.

Anything else, Mr. Lipps?

MR. LIPPS:  No, Your Honor.

THE COURT:  Okay.  We'll come back on the bench in ten minutes.

MR. WRIGHT:  Yes, ma'am.  Thank you.

THE COURT:  Okay.  Ten-minute recess.

COURTROOM DEPUTY:  All rise.

*(Recess taken from 9:04 a.m. to 9:28 a.m.)*

THE COURT:  You may be seated.  We are back on the record.  This is Carlton Wright, plaintiff, versus Shane Nelson; Lieutenant Krul, retired; Captain Gard; Sergeant Lee, defendants.  And, again, our case number is 1:23-cv-00459.

For the record, the plaintiff, Carlton Wright, is representing himself, so he's proceeding pro se.  And counsel for the defendant is attorney Joseph Thomas Lipps.

And so, Lawyers, the Court did say that you could each have -- Lawyers and Mr. Wright, the Court said you could each have five minutes for your opening statements.

And so, Mr. Lipps, you come up to the lecturn for presentations.

And you may testify from your table so that you don't have to get up and move around the courtroom.

All right.  Come on up, Mr. Lipps.  I'm sorry.

You may make your opening statement.

MR. WRIGHT:  I don't know whether this is the

appropriate time for us to ask before -- when you was --

THE COURT:  You can have a seat.  You don't have to stand.

MR. WRIGHT:  -- when you was considering Mr. Lipps' motion.

On the 12th, last Thursday, one of my summary judgments, as it relates to this case, came in, and I didn't have the opportunity until then to now.

Is there any way that an opinion of that could be included as, like, the reference to evidence, the opinion that came back from the summary judgment?

Because it does -- it includes some of the same defendants on this case from the one I just got passed on the 12th, and that opinion, I believe, is important as it pertains to this case.  Is that possible?

MR. LIPPS:  I would request the Court deny, I believe the requests for -- I don't even know what judge issued an order on a different case, to come into evidence.

THE COURT:  You're saying in a different case, you had a summary judgment ruling?

MR. WRIGHT:  Correct.  When I filed my initial lawsuit, I had clumped them together, and you told me to break them down to separate lawsuits, but it pertains to the same defendants.  So a summary judgment just came in on -- pertaining to a couple of my defendants.  I was wondering if

that opinion could be introduced, because it speaks to the --

THE COURT:  No.  No.  You can ask those witnesses questions.  Okay?

MR. WRIGHT:  No problem.

THE COURT:  All right.  You may testify from your table.  You can give your five-minute opening statement.  And you don't have to use your whole five if you don't want to. And you don't have to stand --

MR. WRIGHT:  Okay.

THE COURT:  -- because we want to make sure the court reporter can pick you up in that microphone.

MR. WRIGHT:  Good afternoon, Your Honor.

THE COURT:  Good morning.

MR. WRIGHT:  Good morning, Mr. Lipps.

It's simple.  I plan on presenting my evidence and presenting my facts of what happened to me.

I was incarcerated at New Castle 2019 to 2022.  And during my time of being there, the defendants, Captain Gard, Lieutenant Krul, Sergeant Lee, Mr. Shane Nelson, they failed to protect me on multiple occasions.

The first occasion I was failured [verbatim] to protect, I notified Shane Nelson multiple times of the potential attack on me, that I had been threatened.  I asked to be moved.  He denied that.  He disregarded that.  And as a result, I was attacked.  I have filed numerous grievances on

him, and I believe he did that out of retaliation of why he allowed me to be -- failure to protect me.

Captain Gard, Sergeant Lee, and Lieutenant Krul, they also failed to protect me.  I notified them ample amount of times that offenders had threatened me, to the harm me.  They didn't take my plea seriously, and as a result, I was also attacked by another offender.

And like I say, I'm not an attorney.  I don't know too much.  All I have is my facts and my evidence.  And I just plan on presenting to the courts, being honest, being truthful, and I hope that you're able to tell from my facts and my truth what really transpired that day.

THE COURT:  Okay.  Thank you.

Mr. Lipps, on behalf of the defendants, what's the defendants' version?

MR. LIPPS:  I'm sorry, Your Honor.  I was moving when you said that.

THE COURT:  I said you may give a brief opening statement on behalf of the defendants.

MR. LIPPS:  Thank you, Your Honor.

May it please the Court, today is the day the plaintiff has been preparing for since June 2, 2021.  Today is the day that the plaintiff must now prove the allegations in his lawsuit.  Before today, the plaintiff relied solely on mere allegations and arguments, but today he must establish evidence

and meet his burden of proof for the remaining claims against these defendants.

The plaintiff knows that his -- I'm sorry, the plaintiff knows what his own testimony will be; he wrote down his own questions.  The plaintiff also knows what the defendants and the defense witnesses will testify to, as he's already had the opportunity to conduct discovery, review their responses, read their affidavits, and prepare his own questions for them.

The plaintiff does not have any excuse for not meeting his burden.  He's chosen to pursue these claims without the assistance of counsel.  He's taken it upon himself to face today's challenges by himself as a pro se litigant.

First, the plaintiff claims that Shane Nelson, who is a former unit team manager at New Castle Correctional Facility, failed to protect him from a fight in which the plaintiff was involved in on June 2, 2021.

The plaintiff characterizes this fight as an attack, but he can't offer any proof to support this.  In fact, the evidence will show that this wasn't an attack, but it was a mutual fight, and the plaintiff never even asked to be kept away from the inmate, who he fought with, until one week later on June 9, 2021.

The evidence will show that the plaintiff received a conduct violation for engaging in this fight, and he accepted

his own time-served penalty that he received for that.

As a natural consequence of his fight, he was taken to the segregation unit where he was housed in a single-person cell without any contact with other inmates.

As is imaginable, the cells in this segregation unit are for inmates who cannot be housed with other inmates due to their disciplinary reasons. These cells hold the worst of the worst at their worst, and his own actions placed him there, not Shane Nelson or any of the other defendants.

The plaintiff will allege but not prove, for his second failure-to-protect claim, that another inmate assaulted him. His allegations are not supported in any way. He'll claim that inmate Brooks assaulted him with bodily fluids; however, the plaintiff will be forced to admit that none of these defendants were present at any time during this alleged assault.

His mere allegation is that they knew that inmate Brooks had a cuff port open. And then at some vague time later, a different officer transported the plaintiff by that inmate's cell, without any of them there, and that's when the alleged assault occurred.

The evidence shows that the plaintiff never made known any threats of harm from his fellow inmates prior to the risk materializing and certainly not to these defendants. The plaintiff's allegations are not substantial or persuasive and

they are also directly refuted.

For example, he knew that he could file a separatee on inmate Dorsey, because he did so after his fight with inmate Dorsey. The plaintiff, likewise, could have filed a separatee on inmate Brooks. And if his allegations were true, then he could have done so at the same time he did file the separatee on inmate Dorsey, which was weeks before this alleged second attack.

In reality, the evidence will show that the defendants did not actually know of any specific threats from inmate Dorsey or Brooks to the plaintiff. There were no warnings, and the plaintiff did not write any concerns down, despite being a prolific grievance filer. There was no actual awareness by the defendants.

Additionally, the defendants did not fail to act or ignore any risks whatsoever. None of these defendants were alleged to have been present during either incident. Not one of these defendants saw tension, prior incidents, or threats towards the plaintiff. The defendants could not be said to have been deliberately indifferent to risks that they were not aware of.

The other allegations allowed to proceed are that Shane Nelson retaliated against the plaintiff. And now the plaintiff will need to prove that Mr. Nelson placed him near inmate Dorsey in retaliation and that Mr. Nelson kept the

22

plaintiff in segregation beyond the time ordered by his disciplinary hearing, both of those out of retaliation, but the evidence will not show this to be the case.

The plaintiff will attempt to bolster his arguments, as a matter of fact, with a fellow inmate Kyle Brown's testimony, which will be shown to be, at best, inaccurate. Inmate Kyle Brown's testimony will be impeached based upon his own history of criminal forgery and falsification of PREA allegations.

What matters here are the elements to the retaliation claim.  First, there's no doubt, though, that his complaints and grievances are protected activities that would be counted in this instance.

The plaintiff will acknowledge that even though he was moved to the M-Unit on June 1, 2021, he had the ability to request a transfer.  He even did so one time in April, but this time, instead, he chose to engage in his fight with inmate Dorsey.

The evidence will show that bed moves were common and that the reasons for them were penological.  No evidence at all will show that the plaintiff's complaints resulted in his bed moves or his time in segregation were the result of retaliation.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Lipps.

GARD - DIRECT/WRIGHT                                     23

You may call your first witness.

MR. WRIGHT:  I would like to call Captain Gard to the stand, please.

THE COURT:  All right.  Captain Gard, if you would come up to the witness stand.

*(Witness sworn.)*

THE COURT:  You may examine your witness.

**CAPTAIN GARD, PLAINTIFF'S WITNESS, SWORN**

**<u>DIRECT EXAMINATION</u>**

BY MR. WRIGHT:

Q    Good morning, Captain Gard.

A    Good morning.

Q    Can you please state and spell your whole name for the record, please.

A    Captain Gard.  C-A-P-T-A-I-N.  G-A-R-D.

Q    Okay.  Thank you.  And are you aware of why you're here today?

A    I'm aware.

Q    And prior to today, have you been instructed or briefed on how to give your testimony by your attorney?

A    Can you make the question more specific?

Q    Okay.  Before today, has Mr. Lipps coached or advised you on how to give your testimony?

A    No.

Q    Okay.  Are you the same Captain Gard --

MR. WRIGHT: Your Honor, so when I'm referring to an exhibit, should I say what exhibit it is?

THE COURT: You can.

BY MR. WRIGHT:

Q    Okay.  Are you the same Captain Gard that gave this affidavit on March 28, 2025, which is Exhibit-- oh, it's no longer letters, it's numbers.

THE COURT: What's the exhibit number?  Is there a number written on it?

MR. WRIGHT: See, I'm still accustomed to -- it is a number attached to it.

THE COURT: This is in your joint trial exhibit binder?

MR. WRIGHT: Yes, ma'am.

THE COURT: Okay.

MR. WRIGHT: But when I originally gave it to him, I had letters attached to them.

THE COURT: Well, read the number that's on there.

MR. WRIGHT: I have to make the number that's attached to it.

THE COURT: Exhibit 1?

MR. WRIGHT: My apologies.  I'll come back to that. That's not a problem.  I can move forward with my questions.

MR. LIPPS: Could I assist, Your Honor, perhaps?

THE COURT: Yes.

MR. LIPPS:  Is it 41, his affidavit?

MR. WRIGHT:  Correct.

MR. LIPPS:  Thank you, Your Honor.

MR. WRIGHT:  Because you have an Exhibit I on yours.

THE COURT:  She's going to give you the index.

MR. WRIGHT:  Thank you.  I should have had this. Thank you very much.  That's way more convenient.  Okay.

BY MR. WRIGHT:

Q    I apologize, Captain Gard.

THE COURT:  Come on.  Ask your question.

BY MR. WRIGHT:

Q    Are you the same Captain Gard that gave this affidavit on March 28, 2025, and which is Exhibit 41?

     Would you like to review it?

THE COURT:  He doesn't -- what's your question?  Just ask him a question.

BY MR. WRIGHT:

Q    Did you give this affidavit on March 28, 2025?

THE WITNESS:  Can I see it to make sure he has the one that he did?

THE COURT:  Mr. Lipps, can you pull it up on the screen for him?

MR. LIPPS:  I can, yes, Your Honor.

THE WITNESS:  Is it in here?

THE COURT:  It's in the book.  Yeah, 41 is in that

book.  And we're going to put it up on the screen, also.

THE WITNESS:  The answer is yes.

THE COURT:  He answered yes.  Next question.

MR. WRIGHT:  All right.

BY MR. WRIGHT:

Q    Are you still employed at the New Castle Correctional Facility?

A    No.

Q    How long have you been employed at the New Castle Correctional Facility?  And what date did you start and what date did you stop working there?

A    I was employed for 11 years, roughly 19 -- 19 -- I don't even remember, to be honest with you.  '21 was my last year, I think.  '22.  I can't remember.

Q    Okay. All right.  And while you was employed at New Castle, what positions did you work?

A    A correctional officer, internal affairs, sergeant, lieutenant, and captain.

Q    So you ended as a captain; correct?

A    Correct.

Q    And you say you spent 11 years working at the New Castle Correctional Facility?

A    Yes.

Q    In various positions?

A    Yes.

GARD - DIRECT/WRIGHT

27

Q    All right.  Were you working in segregation on the date of June 24, 2021?

THE WITNESS:  I didn't work in segregation, so I don't know how to answer that question, Your Honor.

MR. WRIGHT:  I'll retract.

THE COURT:  All right.

BY MR. WRIGHT:

Q    Were you working in the O-Unit at the annex building?

A    Yes.

Q    Okay.  What is the annex building at the New Castle Correctional Facility?

A    Be more specific.

Q    Okay.  At the New Castle Correctional Facility, there's a building called the annex building; correct?

A    That's correct.

Q    Okay.  And how many housing facilities does the annex building hold?

A    Two.

Q    And which ones are there?

A    M and O.

Q    And M is what unit?

A    Protective custody.

Q    And O-Unit is what?

A    I don't -- transition unit, I think that's what it was called.

Q    Is O-Unit protective custody, also?

A    No.

Q    So it houses general population offenders; correct?

A    Also, no.

Q    So there are PC inmates in O-Unit?

     In a nonsegregation unit, in Units 1, 2, and 3 of O-Unit, are those general population units?

     THE WITNESS:  I'm not sure they're classified as general population, Your Honor.  They're in transition, so they're housed in a cell.  They're not in a GP setting.

BY MR. WRIGHT:

Q    But there's not protective custody in O-Unit outside of segregation; correct?

A    Correct.

Q    All right.  Thank you.  Is it a common practice for -- in a segregation unit, to house protective custody with general population offenders?

A    Yeah.

Q    All right.  As the captain at the New Castle Correctional Facility, are you familiar with what the New Castle Correctional Facility policy and procedure manual is?

A    Not anymore.

Q    Well, while you was working there, were you familiar with what it was?

A    To a degree, I guess, yeah.

Q    Because as a captain, I'm sure you had to go through certain training -- so as a captain, you didn't -- wasn't familiar with the New Castle Correctional Facility policy and procedure manual?

A    During my time there, I was slightly familiar with it, yeah.  There's no such special training.

Q    Okay.  And are you familiar with the chapter that covers the special management offenders?

A    No.

Q    Okay.  I'm going to give you a copy of it.

Could you please explain to the Court, what is a cuff port situation considered?  Do you know what that is?

A    I do know what it is.

Q    Could you please explain to the Court, what is a cuff port situation?

A    I don't know what a cuff port situation is.

THE WITNESS:  I don't know what he's asking.

BY MR. WRIGHT:

Q    All right.  Are M-Unit and O-Unit, are they set up identically?

A    Yeah.

Q    And how many ranges are on M-Unit?

A    I don't remember.

Q    Okay.  So if I said four, would that ring a bell?

A    Four ranges?

Q    Four ranges on each unit.

A    No.

Q    Okay.  So in O-Unit, that's where the segregation unit is; correct?

A    Correct.

Q    And what range is the segregation unit in O-Unit?

A    It's not called a specific range, if you will.

          THE WITNESS:  It's called a pod.  I'm going to help him out a little bit.

BY MR. WRIGHT:

Q    So range and pod's the same thing; correct?

A    No.

Q    So what's the difference between a range and a pod?

A    You have two ranges in each pod.

Q    Okay.

A    Upper range and lower range.

Q    Okay.  So a pod.  So which pod is segregation O-Unit?

A    Three.

Q    And you house -- it's strictly a segregation unit; correct?

A    Correct.

Q    Do you remember who offender Brooks is?

A    I do.

Q    And from your experience with dealing with offender Brooks, was he a protective custody inmate or was he a general

population inmate?

A    It wasn't protective custody.

Q    So he was being housed in O-Unit; correct?

A    Correct.

Q    All right.  From your experience with dealing with inmate Brooks, was he a known gang member?

        MR. LIPPS:  I'm going to object to the characterization of -- the plaintiff is trying to characterize somebody improperly through this witness.

        THE COURT:  I'm going to overrule.  He can answer it. Was he a known gang member?

        THE WITNESS:  Yes.

BY MR. WRIGHT:

Q    Was he known to be a combative inmate?

A    Yeah.

Q    I know it's been a while.  You may not remember it, but during the time of June 2021 when he was in segregation, was he back there for disciplinary behavior?

A    Everyone in segregation is there for disciplinary behavior.

Q    Okay.  Was he back there because him and another gang member jumped on another inmate?

A    I don't know that.

Q    Okay.  But he was known to be a combative inmate; correct?

A    Yes.

GARD - DIRECT/WRIGHT                    32

Q    Okay.  In your years of working at New Castle Correctional Facility, what does it mean when an inmate takes their cuff port hostage?

A    Typically, they stick something out so we can't shut it.

Q    Okay.  Is that an action -- is that a combative action?

A    No.

Q    It's not active aggression?

A    No.

Q    So how would you characterize it?

A    It's an act of defiance and immaturity.

Q    Okay.  But is it a violation of the policy and rules?

A    I guess.  I don't remember.

Q    Okay.  What is the procedure when an inmate takes their cuff port hostage?  Could you please explain to me, what is the procedure when an inmate takes their cuff port hostage?

     How do you go about -- could you please explain to me, what is the procedure when an inmate takes their cuff port hostage?

A    I don't remember the exact procedure.

Q    Well, from your recollection, if an inmate takes his cuff port hostage, what steps are you to take to regain control of the cuff port?

A    Try to talk him out of it.

Q    Okay.  And if that doesn't succeed, then what?

A    Wait.

GARD - DIRECT/WRIGHT                   33

Q    Okay.  Are there progressive steps that you take?

A    I never took any progressive steps, no.

Q    So what happens if an inmate never decides to surrender his cuff port, then what?

A    Wait.

THE COURT:  Does that mean the inmate is, like -- has something in their door so that you can't close his cell?  Is that what's going on?

THE WITNESS:  It's not in a door, Your Honor.  It's in a cuff port.  It's like a food slot where they get their food and commissary.  The door doesn't open.  It's like a little section in the door that opens.

THE COURT:  Okay.

BY MR. WRIGHT:

Q    So the cell doors in segregation, are they barred doors or solid doors?

A    Solid.

Q    Okay.  So the food slot is the opening to the solid door; correct?

A    The door is solid.  There is space between the doorframe and the door, though, yes.

Q    Okay.  But the food slot is where you make entry to give the offender their tray or anything; correct?

A    That's correct, yeah.

Q    So they're not bars.  So the main entry to the door is

through the food slot?

A    I don't understand that question.  The main entry -- I don't understand it.

Q    The main opening to the door to which you can communicate, communicate and hand stuff to the inmate, is through the food slot; correct?

A    Correct.

Q    Okay.  Is that considered a breach of security when an inmate holds their food slot hostage?

A    I don't recall that.  I don't know.

Q    Okay.  I'm going to have to refresh your memory for you.

So did you confirm that you was working in O-Unit on the date that the offender -- I mean, the day that Mr. Wright make the allegation he was assaulted by offender Brooks?

A    I worked in O-Unit, yes.

Q    Okay.  Did Mr. Wright get assaulted by offender Brooks on June 24, 2021?

A    I don't know that.

Q    So, to your knowledge, you don't know that he got assaulted?

A    I do not.

Q    No officer never relayed the message that he was assaulted?

A    No, sir.

Q    Okay.  Was Sergeant Lee also working with you that day on

June 24, 2021?

A    To be specific on that day, I couldn't tell you.  He worked a lot of overtime, I have no idea.

Q    Okay.  Was Officer Foley working that day on June 24 when the inmate was assaulted?

A    Again, I don't know.  I don't even remember Officer Foley.

Q    Okay.  Do you recall if inmate Brooks held his cuff port hostage on June 24, 2021?

A    That specific day, I do not.

Q    Do you ever recall Mr. Brooks holding his cuff port hostage, period?

A    Yeah.

Q    So he had a habit of doing this?

A    Sure.

Q    So whenever he held his cuff port hostage, you just let him hold it until he decided to give it up?

A    Yeah.

Q    Okay.  So, once again, he was considered a combative or known inmate to do combative behavior towards staff; correct?

A    Yeah.

Q    Okay.

        MR. WRIGHT:  I'm sorry, Your Honor.  I'm trying to find out where Mr. Lipps has this at right here.  I need to introduce this document.

        THE COURT:  What is the document?

THE WITNESS:  It's Exhibit V.  It's the New Castle Correctional Facility policy and procedure manual.

THE COURT:  Do you know where that is, Mr. Lipps, in the book?

MR. LIPPS:  Your Honor, I think it might be -- is it just page 2 for protective custody?

MR. WRIGHT:  No, no.  That's something different. This is four pages.

While you're looking for it, can I continue to ask him different questions, please?

THE COURT:  Yes.

BY MR. WRIGHT:

Q   In segregation, in an instant, if an offender brings to your attention that he feels threatened to be housed next to an offender, what are you to do as a captain?

A   You go to the case manager and talk to him about it.

Q   So you said, in segregation, they're isolated cells; correct?

A   They're isolated cells, that is correct.

Q   Okay.  So single-man cells in segregation?

A   Uh-huh.

Q   So by being single-man cells, would you take the word of someone being in danger serious, being in single-man cells?

A   No.

Q   What are you saying "no" to?

A    Ask me the question again.

Q    Okay.  I said, by there being single-man cells in segregation, if an offender brings to your attention that he feels threatened or in danger being housed next to someone, is that taken seriously?

A    I would say probably not; you are by yourselves.

Q    Okay.  So if someone brought it to your attention, it wouldn't be taken seriously because you think they can't get to one another; correct?

A    That's correct.  You can't get to each other; you are by yourselves.

Q    Okay.  So in an instant of someone asking you to be moved to a different cell location because they feel in danger, would you have moved them?

        MR. LIPPS:  I'm going to object, Your Honor.  He's asking speculation questions at this point.

        THE COURT:  I'll let him ask it.  Let him answer it.

        THE WITNESS:  I need to hear the question again.

        THE COURT:  He said if there was an incident, an inmate asking you to be moved to another cell because they felt they were in danger, would you have approved that?

        THE WITNESS:  I don't conduct bed moves.

        THE COURT:  He doesn't conduct bed moves.

        MR. WRIGHT:  Thank you.

BY MR. WRIGHT:

Q   But, however, as a captain, it is your job -- is it your job as a captain to keep -- is safety and security number one priority in a facility?

A   Yeah.

Q   And as a captain, is it your job to keep the inmate population as safe as possible?

A   Yeah.

Q   So if you are aware of a known danger, do you have the authority to either move an inmate or recommend for them to be moved?

A   Yes.

Q   Okay.  So if someone brought to your attention they was in danger and needed to be moved, you said you wouldn't move them?

A   It's not up to me to move them.

Q   But you say you wouldn't take it seriously because, typically, they can't get to one another?

A   That's correct, you can't get to each other.

Q   Okay.  So --

        THE COURT:  That's asked and answered.  Move on to another topic.  He's told me that three times.

        MR. WRIGHT:  All right.  Did you find where it was at, Mr. Lipps?

        MR. LIPPS:  I don't specifically know what you are referring to.  It might be number 7, the program completion.

MR. WRIGHT:  No, that's not --

THE COURT:  All right.  Why don't you -- Mr. Lipps, go get it and put it on the screen, then everybody can see it.

MR. LIPPS:  Number 7, Your Honor?

THE COURT:  Whatever he's got in his hand, and we'll just put it on the screen.

BY MR. WRIGHT:

Q    So in segregation --

THE COURT:  Hold on.  He's going to put that on the screen.  You can't put all four on at one time.  Just start with the first page.

MR. WRIGHT:  Is there any way -- because I want to have that when I'm speaking to him so I can refer to it.

THE COURT:  No, you look at it on the screen.

MR. WRIGHT:  Okay.  That's fine.  Absolutely.

THE COURT:  All right.

MR. WRIGHT:  I forgot I can see it on the screen.

THE COURT:  There we go.

So what's your question?

BY MR. WRIGHT:

Q    Do you see that, Captain Gard?  This is what I was referring to.  Have you seen this before, the New Castle Correctional Facility policy and procedure manual?

A    I'm sure I have.

Q    Because as a captain, you had to go through certain

training in order to become a captain; correct?

A     That's not correct.

Q     Okay.  As a captain, have you been through training of safety and security as it refers to segregation?

A     No.

Q     Okay.  So have you seen this before?

A     I have.

Q     Okay.  And could you read, what does under "Title" say? What does this policy cover?

A     "Restrictive Housing Units Personal Protective Equipment."

Q     Okay.  And restrictive housing unit is what 3-Pod in O-Unit was; correct?

A     That's correct.

Q     Where the offender -- I mean, where the plaintiff alleges his assault happened on; correct?

A     That's correct.

        MR. WRIGHT:  Is this scrolled up, Mr. Lipps?  How do I scroll it up to get to --

        MR. LIPPS:  Further down.

        MR. WRIGHT:  Just raise the page up.

        Okay.  Thank you.  We can start with this.  Okay. Thank you.

BY MR. WRIGHT:

Q     Do you see number 3:  "Definitions"?

A     Yeah.

Q    Okay.  Could you read what 3.1 says, "Cuff Port Situation"?  This is for clarity of what a cuff port situation is.

A    "Cuff port situation occurs when an offender refuses to remove an appendage from the cuff port when directed."

Q    Okay.  Could you read the next one, please, "Offender Posing a Safety Risk."

A    "Offender Posing a Safety Risk:  Any offender whose actions determine they pose a potential safety risk to staff and require the use of PPE.  This pertains to all offenders housed in the STAND, NCF, and NCP.  Those offenders posing a safety risk shall be recognized by identifiers on the cell door."

Q    Okay.  Correct.  Could you read number 4, "Procedure," please.  4.1.  It's at the bottom.

A    "Safety Risk:  Exposure:"  Or, 4.1, I'm sorry.  I thought you meant 3.41.

Q    That's correct.

A    "Whenever an offender shall be identified as posing a safety risk through previous actions and behaviors, identifiers shall be placed on the cell door.  Any time that..."

          MR. WRIGHT:  Could you go to the next page, please, Mr. Lipps.  Could you go to the next page.

          MR. LIPPS:  Yeah, just one second.

BY MR. WRIGHT:

Q    All right.  So you said that offender Brooks, he's had previous situations where he has held the cuff port hostage; correct?

A    I'm sure he has, yeah.

Q    Okay.  Was there any type of safety indicators on his door notifying staff or offenders that he posed a risk to staff or offenders?

I'm going to break that question down.  Was there any kind of safety indicators on his door that notified him as being a threat to staff or offenders?

A    I don't remember.

Q    Okay.  Well, according to the policy here, if an offender has previous combative behavior, he's supposed to have an identifier on his door; correct?

A    According to that.

MR. LIPPS:  Could I interject, Your Honor?  I know this is a bit unorthodox, I'm sorry, but when I go back to page 1 and notice that the effective date is for a date after the plaintiff's allegations, for that reason, I would like to just object to the plaintiff bringing in this exhibit and questioning the defendant -- or the witness on a policy that was not even in place during the time that's relevant.

THE COURT:  Do you have an answer to his objection?

MR. WRIGHT:  I have a reply, yes.  If you turn to

page 4, you will see the signed date of when this policy was signed.  If you could turn to the past page, on page 4, I believe it's June 18th, six days before the assault happened on the plaintiff, and that's from the facility administrator, Ms. Jennifer French.

MR. LIPPS:  I don't see that to be relevant.

THE COURT:  Well, he's not offered it into evidence. You can argue why it would be relevant in your findings of fact.

MR. WRIGHT:  I would like to offer this document into evidence.  Do I need to argue why I want it in?

THE COURT:  Do you want to offer it into evidence?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Any objection?

MR. LIPPS:  No objection, Your Honor.  Could I see what exhibit it is?

MR. WRIGHT:  Please, help me out so I can see what exhibit, because I want to be able to...

MR. LIPPS:  Twenty-two, is that the one you have?

MR. WRIGHT:  No, I don't believe that's the one.

MR. LIPPS:  Yeah, it's 22.

THE COURT:  Exhibit 22?

MR. LIPPS:  Twenty-two, Your Honor.

THE COURT:  Exhibit 22 is admitted into evidence without objection.

(*Exhibit 22 was received in evidence.*)

THE COURT:  Any other questions for this witness?

MR. WRIGHT:  Yes, ma'am.

BY MR. WRIGHT:

Q    So according to this policy, if an offender is known to have combative previous behavior, it should be identified on his door; correct?

MR. LIPPS:  And I'll object, Your Honor.  Now he's just testifying to what the exhibit says.  It's in evidence for the Court to review.

THE COURT:  And it's been asked and answered.

Next question.

MR. WRIGHT:  Okay.  No problem.

BY MR. WRIGHT:

Q    So for clarity, there was no indicators on Mr. Brooks' door; correct?

A    I do not remember.

Q    Okay.  Was the plaintiff, Carlton Wright, known to be a combative inmate?

A    You need to define "combative."

Q    The same -- the same foundation you went by when you said Mr. Brooks was a combative inmate.  You can use that same correlation.

A    Sure.

Q    Why was Mr. Wright known to be a combative inmate?

A    Very vocal.

Q    So being vocal is what made him a combative inmate?

A    That's correct.

Q    Did he ever receive any conduct reports for being vocal?

A    I don't know that.

Q    Okay.  So you have nothing to substantiate that Mr. Wright was a combative inmate?

        MR. LIPPS:  I object.  Argumentative, Your Honor.

        THE COURT:  You're asking his opinion.

        MR. WRIGHT:  Okay.  Correct.  I apologize.

        THE COURT:  He said you were very vocal and combative.

        MR. WRIGHT:  All right.

BY MR. WRIGHT:

Q    In segregation, do offenders have any opportunity to be -- to interact with one another?

A    Be more specific.

Q    In segregation, is there any physical -- any opportunity for physical contact for segregation inmates?

A    No.

Q    Okay.  So the only opportunity for Mr. Brooks to have had access to being in physical contact was through the opened cuff port; correct?

        MR. LIPPS:  I'm going to object.  That's speculation, Your Honor.  He's asking him a hypothetical question on this.

GARD - DIRECT/WRIGHT                                           46

THE COURT:  I'll let him answer it.  Is the only way you could -- someone could have physical contact would be through their open cuff port?

THE WITNESS:  I'm going to say no and give an explanation.

THE COURT:  If you would.

THE WITNESS:  In the shower, there's also a cuff port -- or not a cuff port, but a hole, because they're restrained when they go to the shower.  So, no, the answer is no.

BY MR. WRIGHT:

Q    So from behind a cell door, is through the cuff port the only physical possible interaction from behind a cell door?

A    Physical, yes.

Q    Okay.  Do you remember the plaintiff, Carlton Wright?

A    Yeah.

Q    Okay.  Thank you.  At any time while he was being housed in segregation, did he bring to your attention that offender Brooks was threatening him?

A    I don't remember if he did or not.

Q    So what is that you remember about Mr. Wright that stands out to you?

A    Very vocal and combative vocally, argumentative.

Q    Okay.  As to what?

A    Anything that doesn't go your way.

Q    Okay.  Was he ever disciplined for any of his combative behavior?

A    I've already answered that question.

Q    Okay.  When Mr. Wright was being housed in segregation, do you recall him being housed next door to offender Brooks?

A    Possibly could.  I don't really remember where you were housed at.

Q    I understand that.  Did Mr. Wright ever bring to your attention that he was in fear of his safety of being housed by offender Brooks?

A    You're asking me again.  I've already answered that question.

        THE COURT:  He doesn't recall.

        MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Did Mr. Wright ever ask to be moved to a different cell while he was in segregation?

A    I don't recall.  Probably, but I can't be for certain.

Q    Do you remember if he was ever moved to a different cell?

A    I don't.

Q    Okay.  On the day of June 24th, do you remember interacting with offender Brooks?

A    No.  I had multiple occasions I interacted with him.  That specific day, I do not.

Q    Okay.  So you don't quite remember that day, if that was

the day he had the cuff port held hostage?

A    I do not remember that date.

Q    Could you please tell me this:  What is the procedure when an inmate assaults another inmate?  What steps are there that the officer's supposed to take?

A    Separated, different cells.  Segregation, usually.

Q    Okay.  Does the inmate -- are there steps -- are there supposed to be pictures taken, medical treatment?

     Like, could you please explain to me the steps -- if you come across a situation where an inmate assaults another inmate with a weapon, what are you supposed to do?  What steps are you supposed to take per policy or per your training?

A    I take him to medical and have a medical examination done, yeah.

Q    Okay.  And the preservation of evidence; correct?

A    Uh-huh.

Q    All right.  Are there cameras on 3-Pod in segregation?

A    Yeah, there's cameras everywhere.

Q    Okay.  So cameras would have -- does cameras pick up the entire range?

A    No.

Q    Okay.  Does it pick up the range -- how could I word this?

     Does cameras cover the cell 214 and cell 215 in the segregation unit?

A    I do not remember what it covers, but I know there's blind

spots.

Q    Okay.  Do you recall Mr. Wright ever complaining about being assaulted by Mr. Brooks?

A    I do not.

Q    Okay.  Is assault with bodily fluids, is that an infraction?  Is that a violation of policy -- I mean, violation of rule at the...

A    Yeah.

Q    Okay.  And what kind of conduct report is that?

A    I'm not sure I can remember what the numbers are.

Q    Do you recall if Mr. Brooks was ever written up for assaulting an offender with bodily fluids?

A    I do not.

Q    Okay.  But if an offender assaults someone with bodily fluids, should he be written up?  I mean, is he written up?

A    If there's a witness, an officer witness, yes.

Q    Correct.  If you observe or if you're aware an offender assaults someone with bodily fluids, he will be written up; correct?

A    Your question is too vague.

        MR. WRIGHT:  Okay.  Your Honor, may I present something into evidence, please.

        THE COURT:  Yes.  What's the number?

        MR. WRIGHT:  Exhibit 16 and Exhibit 18.

        THE COURT:  Can you put them up on the screen,

Mr. Lipps, 16 and 18?

What's your question about 16?

MR. WRIGHT:  Your Honor, this is an offender grievance that the plaintiff, Carlton Wright, filed regarding the assault.

THE COURT:  What's your question?

BY MR. WRIGHT:

Q    Mr. Gard, could you read the highlighted area, please.

THE COURT:  He doesn't need to read it.  What's your question?

MR. WRIGHT:  I just want to enter into evidence that when the offender -- when the plaintiff, Carlton Wright, was assaulted, he wrote to the grievance specialist and asked her to preserve the camera footage of him being assaulted.  So I wanted to show this first.

THE COURT:  So what do you want to ask him about that?

BY MR. WRIGHT:

Q    Okay.  Exhibit 18, could you bring that up, and I'll ask my question.

THE COURT:  What's your question for the captain?

MR. WRIGHT:  I don't know how to word this.

BY MR. WRIGHT:

Q    Did any staff members that day on June 24th notify you that Mr. Wright had a complaint of being assaulted by

Mr. Brooks?

A    I don't remember.

Q    So there's no recollection of him ever being mentioned of him being assaulted?

A    No.

Q    No incident report was ever done?

A    I don't remember.

MR. WRIGHT:  Okay.  Well, Your Honor, I want to --

THE COURT:  Do you want to offer 16 and 18?

MR. WRIGHT:  Yes.  This is the response when the plaintiff wrote the grievance specialist regarding the attack and asked her to preserve the footage.  And her response to that was --

MR. LIPPS:  I'm just going to object, Your Honor.  This is hearsay.

THE COURT:  Through this witness, it's hearsay.

Do you have anything to do with these records, 16 and 18?

THE WITNESS:  No, I don't.

THE COURT:  So this is not the witness.

MR. WRIGHT:  Okay.  That's fine.  I can wait until I testify.

THE COURT:  Right.  You can get it in through yourself.

MR. WRIGHT:  Can you put up the previous exhibit?

MR. LIPPS:  Sixteen?

MR. WRIGHT:  No, the New Castle Correctional Facility policy and procedure manual.

THE COURT:  Twenty-two.  Twenty-two is in evidence. What's your question?

BY MR. WRIGHT:

Q    Could you turn to page 2, please.  Could you read 4.6, Captain Gard, "Cuff Port Situations."

A    I can't read it on the screen.

Q    Okay.  It's number 22, I believe.

THE COURT:  He's saying it's fuzzy.

THE WITNESS:  I'm trying to find it in this book.

BY MR. WRIGHT:

Q    I understand the struggle.  I believe number 22.

A    It's actually 23 in this book.  Which one?

Q    The exhibit number precedes the exhibit.  So if you pull it up, 22 should be behind it.

A    Which one you want?

Q    4.6, "Cuff Port Situations."

A    "Whenever an offender refuses to move an appendage from the cuff port, at no point should an officer try to force the offender to remove the appendage.  After verbal direction, if the offender continues to refuse to move, the officer backs away and notifies a supervisor.

     "If verbal directives continue to be ineffective,

permission to use chemical agents should be requested.  As indicated in the NCCF 08.013, Use of Force, planned use of force requires authorization from the facility administrator or designee.

"Prior to use of chemical agents, a video recorder shall be required to document the event.  If approved for use, chemical agents are to be utilized per training and use of force continuum."

Q   All right.  You testified that from your personal experience when offender Brooks has held his cuff port hostage, you just waited it out and you never took progressive steps to secure the cuff port?

A   That's correct.

Q   But according to the policy, there's supposed to be progressive steps taken to secure the cuff port if an offender refuses; correct?

MR. LIPPS:  I would object, Your Honor.  The question --

THE COURT:  Sustained.

Next question.

MR. WRIGHT:  Next question?

THE COURT:  Next question.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q   When an offender holds their cuff port hostage, per policy

GARD - DIRECT/WRIGHT                    54

and per training, are there supposed to be any other offenders out on the range, let out of their range?

A    I don't remember the policy.

Q    Okay.  From your recollection, if an offender holds his cuff port hostage, are you supposed to allow other offenders to come out of their cell while the cuff port is held hostage?

A    We have, yes.

Q    So when an offender holds their cuff port hostage, is he perceived as a threat to staff?

A    Perception is in the eye of the beholder.  So to me, no.

Q    Okay.  Is an offender supposed to hold a cuff port hostage?

A    No.

Q    So that's a violation of the rules; correct?

A    Correct.

Q    Okay.  And what reason do offenders hold their cuff port hostage?

          MR. LIPPS:  I'm going to object to the foundation, Your Honor.  This witness is not an offender.  He can't say why offenders do something.

          THE COURT:  I'll sustain.

          MR. WRIGHT:  "Sustain" mean keep going?

          THE COURT:  Keep going.

          MR. WRIGHT:  Okay.

GARD - DIRECT/WRIGHT                    55

BY MR. WRIGHT:

Q    One more question.  So just for clarity purposes, if an offender asked you to be moved in segregation, you would not move him; correct?

A    That decision is not up to me.

Q    You said you wouldn't take it seriously because they are segregated?

A    That's correct.

Q    And behind a door, you cannot physically interact with another offender or physically interact behind a cell door; correct?

A    Physically, yes.

Q    All right.  But through the cuff port being open, there's a possibility for physical interaction?

A    Sure, if you get close enough.

Q    Okay.  And how narrow are the ranges in segregation unit?

A    I don't know.

Q    You don't recall?  Okay.

A    I'm not a contractor, I have no idea.

Q    Okay.  Is it -- so if an offender have his cuff port held hostage, it's a possibility for them to throw stuff out of the cuff port; correct?

         MR. LIPPS:  I'm going to object.  Speculation, Your Honor.

         THE COURT:  Well, he can tell me.  If it's open, he

56

can throw something out through it?

THE WITNESS:  Yeah.

THE COURT:  Okay.  Next question.

BY MR. WRIGHT:

Q    Okay.  And if it's closed, he can't put nothing through the cuff port; correct?

A    Through the cuff port, correct.

Q    So if the cuff port is closed, he can't put nothing through it.  But if it's open, he's able to throw something through it?

A    Sure.

Q    Okay.  So do they take a cuff port situation serious -- when an offender hold his cuff port, is that considered serious?

A    I wouldn't say "serious," no.

Q    Okay.  But the possibility of assaulting another inmate while it's open, it's a possibility to assault another inmate while the cuff port is open?

A    Not with the shield in front of it that we put.

Q    Okay.  But you didn't -- you never said that was part of the steps you take.

A    You never asked.

Q    I asked you, are there steps you take to secure the cuff port once the inmate hold the cuff port -- what are the steps when an inmate takes the cuff port?

GARD - DIRECT/WRIGHT                    57

A    I've already answered this question.

THE COURT:  Well, tell me about the shield.  You can put a shield up sometimes?

THE WITNESS:  That's correct, ma'am.  There's a shield that covers the door so they can't get through it. Nothing can get through it.

THE COURT:  Okay.

BY MR. WRIGHT:

Q    So when is that decision made to implement the shield to protect the cuff port?

A    It's on a case-by-case basis.

Q    Have you ever used a shield before?

A    Yes.

Q    But didn't you just tell me that in every situation you just waited it and waited it out and waited it out?

A    How many times am I going to have to answer this question?

MR. WRIGHT:  I'm asking him again.

BY MR. WRIGHT:

Q    I ask, Captain Gard:  Have you ever personally used the shield as a step to stop -- I mean, in a cuff port situation?

MR. LIPPS:  I believe that was asked and answered, Your Honor.

THE COURT:  "Have you ever used a shield before?"  He said, "Yes."

So what's your question?

MR. WRIGHT:  Well, because previously I asked him --

THE COURT:  Then you put that in your argument, if you want to say that he's making inconsistent statements. Inconsistent answers.

What's your next question?

BY MR. WRIGHT:

Q    With offender Brooks, have you ever used a shield when he held the cuff port hostage?

A    Specifically offender Brooks, I couldn't tell you. Probably, since he did it a lot.

Q    Okay.

A    I can't verify that answer yes or no.

Q    Okay.  So what has to happen before you get to the step of putting a shield in front of someone's door?

A    I would say you try to have a logical conversation with the man.  And if he doesn't, you put it in front of it.

Q    All right.  Are there steps to process, like when a CO is passing out chow, a regular officer, and he can't get an offender to close his cuff port, what steps should that CO take?  Is there a chain of -- what steps should that CO take?

A    I mean, you need to be more specific because it's too vague of a question.

Q    No problem.  When a regular officer is passing out chow and an offender takes his cuff port hostage, could you please tell me each step -- what is that CO supposed to do?

GARD - DIRECT/WRIGHT                    59

A    He's supposed to stop feeding chow and get the supervisor.

Q    Okay.  So is there a chain of command, progressive steps, as to try to get the offender to surrender his cuff port?

A    Yeah.

Q    Okay.  And what is that?

A    Officer, sergeant, lieutenant, captain.

Q    Okay.  So basically officer, sergeant, lieutenant, captain.  So if the CO was unsuccessful with doing it, he would contact a sergeant; correct?

MR. LIPPS:  I'm going to object.  Asked and answered, Your Honor.

THE COURT:  Yeah, he just said "officer, sergeant, lieutenant," and then "captain."

BY MR. WRIGHT:

Q    Okay.  So if everyone else was unsuccessful, at some point they will contact you to come to the cuff port situation to defuse the situation?

A    That's correct.

Q    Okay.  And if you couldn't do it, are you last on the defense?

A    No.

Q    So what's the next step?

A    I have a boss I have to go to.

Q    Okay.  And who determines when is the appropriate time to use use of force to get an offender to close their slot?

MR. LIPPS:  I'm just going to object, Your Honor. This is irrelevant.  There was no use of force.

MR. WRIGHT:  That's the point I'm making.

MR. LIPPS:  That's an argument.

THE COURT:  But this is the incident with Brooks. This is not -- you don't have a use of force claim with Brooks. So I'm going to sustain the objection.  So your claim with respect to Brooks is retaliation.

MR. WRIGHT:  Pardon me, ma'am?

THE COURT:  Retaliation.

MR. WRIGHT:  Right.  Okay.  I respect what you're saying.

THE COURT:  So that's what you need to stay on point with.  Okay?

MR. WRIGHT:  Okay.

THE COURT:  All right.

BY MR. WRIGHT:

Q    Is use of force -- I mean, when an offender has a cuff port held hostage, is use of force an option to get the cuff port back -- closed?

A    Last resort.

Q    The last resort.  And what kind of use of force would you use to close an offender cuff port?

A    There's no specific one.  There's multiple.

Q    Okay.  And what is considered the last resort?

GARD - DIRECT/WRIGHT

A    You just asked me that question.  Use of force.

Q    No.  What stipulates [verbatim] to determine is it the last resort?

A    That's not verified by me.  That's verified above me.

Q    Okay.  Is it on a case-by-case basis?

A    Sure.

Q    Okay.  So if you are unsuccessful through the steps of command to get someone to close the cuff port, then you make a decision if you want to use use of force?

A    I don't.

Q    I mean, the process.

A    Yeah.  There's always a process.

Q    Okay.  So it's safe to say if offender Brooks had held his cuff port hostage that day and he refused to close it, it would have eventually reached your chain of command?

A    I have no idea.  That's a matter of opinion.

Q    Okay.  If the sergeant was unsuccessful to get him to close it, and if the lieutenant was unsuccessful to get him to close it, you're the next person to negotiate, as a word, with the offender?

A    Again, I've answered that question already.

Q    Okay.  All right.  If an offender is assaulted with bodily fluids in segregation, an incident report would be conducted; correct?  Or a conduct report issued; right?

A    Supposed to be, yeah.

Q    An incident report regarding the situation that happened, correct, it's supposed to be documented?

A    By a witness, yeah.

Q    Correct.  If it happens, it's supposed to be documented by an incident report; correct?

A    Yeah.

Q    Okay.  And is it a common practice for protective custody offenders to be housed in segregation with general population offenders?

A    We've already answered this question, too.  You're in segregation because you violated some kind of crime inside the prison, that's why you're in segregation by yourself.

Q    Okay.  That wasn't my question.  I said:  Is it a common practice at New Castle --

A    Yes.

Q    -- to house --

A    It's a common practice to put people in segregation that commit crimes inside the prison, no matter where they're from.

Q    Okay.  Correct.  Is 3-Pod in O-Unit, is that the only segregation unit at New Castle?

A    No.

Q    Where is the other segregation unit located at?

        MR. LIPPS:  I'm going to object.  There's just no relevance, your Honor.

        THE COURT:  Why is that relevant?

MR. WRIGHT:  It's relevant because --

THE COURT:  What are you getting at?

MR. WRIGHT:  Pardon me?

THE COURT:  What are you getting at?

MR. WRIGHT:  I'm getting at that there's separate segregation units to house different offenders according to their status.  There's not just one segregation unit they can choose from.

THE COURT:  All right.  Ask that question.

BY MR. WRIGHT:

Q    Are there more than one segregation units at New Castle Correctional Facility?

A    Yes.

Q    And other than 3-Pod in O-Unit, where is the other one located at?

A    It's up in general population.

Q    On the hill?

A    On the hill, yeah.  That's what your -- your terms would be "on the hill."

Q    Okay.  New Castle?

A    It's in New Castle.

Q    Right.  Okay.  And do you know how many ranges that segregation unit hold?

A    I do not.

Q    Okay.  But there's alternative cells besides just the

cells in 3-Pod; correct?

A    That's not determined by me.

Q    No, I didn't ask that.  I said, but are there alternative segregation cells other than in 3-Pod in O-Unit?

A    There's other segregation cells, yeah.

Q    So an offender -- well, you already answered that question.

        MR. WRIGHT:  That's it, Your Honor.

        THE COURT:  That's it?  Okay.

        Mr. Lipps, come on up to the lecturn, you may cross-examine the witness.

        And then you'll have an opportunity to ask any redirect.  Okay?

        Go ahead and cross-examine.

        MR. LIPPS:  Thank you, Your Honor.

                    **CROSS-EXAMINATION**

BY MR. LIPPS:

Q    Good morning, Captain Gard.  You're aware of the allegations specifically against you from Mr. Wright's lawsuit; correct?

A    Correct.

Q    You're aware that in his complaint he alleges that you did a walk-through on the 3-Range, and he complained to you about Brooks' harassments and threats as well.  You are aware of that allegation?

A    Allegedly, yes.

Q    Do you recall that ever occurring?

A    No.

Q    I want to ask you, as well, the plaintiff had hypothetically asked you if an inmate is assaulted, that an incident report should be created.  And you answered, I believe, in the affirmative that, yes, it should be; right?

A    It should be, yeah.

Q    If an incident report is not created, does that tell you that there was no incident?

A    That's exactly right.

Q    Okay.  The policy at Exhibit 22, that the plaintiff was referencing to you -- and I'm not going to ask you to read it or anything specific, but noticing that the effective date was July 1, 2021, does that mean that anything in this policy is inapplicable in June of 2021?

A    I can't verify that.  I don't know what's applicable and what's not.

Q    Sure.  Okay.  Fine.  And you -- I just want to make sure I'm clear because it sounds like -- the testimony went back and forth a little bit -- or the questioning, I should say -- you do not remember if Brooks held his cuff port hostage on June 24, 2021?

A    I do not.

Q    Okay.  Do you recall, at any time during Mr. Wright's stay

in the segregation unit, if he requested to be removed or moved to a different cell?

A    I do not.

Q    Okay.  And I -- I understand, you have no input on -- if he gets moved or not; correct?

A    I can have input, but I don't make the final decision.

Q    Understood.  You can only make a recommendation; is that --

A    Correct.

MR. LIPPS:  Okay.  No further questions, Your Honor.

THE COURT:  Any questions on those questions?

Mr. Wright, any questions?

MR. WRIGHT:  Yes, I have a question.

**REDIRECT EXAMINATION**

BY MR. WRIGHT:

Q    Mr. Lipps asked you if an assault would have occurred, an incident report have been produced.

Have there ever been, from your experience, where a situation has transpired -- is the incident report required when an inmate holds their cuff port hostage?

A    I don't know that answer.  I don't know if it's required or not.

Q    Have you ever issued an incident report pertaining to just a cuff port being held hostage?

A    No.

Q    So there's -- so it's safe to say that an offender can hold a cuff port hostage without an incident report being issued; correct?

A    That is correct.

THE COURT:  Anything else?

BY MR. WRIGHT:

Q    So --

THE COURT:  Sometimes you need to know when to stop.

MR. WRIGHT:  That's fair.

THE COURT:  You got the answer you wanted.

MR. WRIGHT:  I'm good.

THE COURT:  Right?

MR. WRIGHT:  I'm good.

THE COURT:  Any questions on those?

MR. LIPPS:  No, Your Honor.

THE COURT:  All right.  Thank you, Captain.  You may return to your seat.

*(Witness excused.)*

THE COURT:  And you may call your next witness.

MR. WRIGHT:  I'd like to call Sergeant Lee -- Sergeant Joe Lee to the stand, please, if possible.

THE COURT:  Okay.  Mr. Lipps, can you get Mr. Lee for us?  Is he in the back room, the witness room?

Sergeant Lee, if you would come right up here to the witness stand.

*(Witness sworn.)*

THE COURT:  You may have a seat.

Mr. Wright, you may examine your witness.

**JOSEPH LEE, PLAINTIFF'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. WRIGHT:

Q    Good morning, Sergeant Lee.  How you doing?

A    Good morning.

Q    Thanks for being here, I appreciate it.

Can you please state and spell your whole name for the record, please.

A    Joseph Lee.  J-O-S-E-P-H.  L-E-E.

Q    Okay.  Thank you.  Are you aware of why you're here today?

A    Just from what -- the paperwork they gave me.

Q    And what is your understanding of why you are here today?

A    Supposedly, you got gunned down or something.  They -- somebody...

Q    Okay.  What does the term "gun down" mean?

A    That means they mix bodily fluids together and put it on an inmate -- or an officer, too.  They do officers, too.

Q    And how does someone gun someone down?

A    Well, I guess they do it different ways:  They throw it on them, or they either -- spray it out of a bottle or something.

Q    Okay.  Prior to your testimony, have you been instructed or coached by your attorney, Mr. Lipps, on how to give your

testimony?

A    No, sir.

Q    Okay.  Are you still employed at the New Castle Correctional Facility?

A    No.

Q    How long have you worked at New Castle, approximately?

A    I guess I worked there, probably, four or five years, but I wasn't always a sergeant there.

Q    Okay.  Do you recall what year you started working there?

A    '20 or '21, somewhere in there.

Q    Okay.  So you was employed during June 2021; correct?

A    Yeah.

Q    Okay.  Besides being a sergeant, what other positions have you held at New Castle?

A    I was head of their maintenance facility -- their maintenance shop.

Q    Okay.  And then were you a regular officer before sergeant?

A    Yes.

Q    Okay.  And then you were a sergeant?

A    Uh-huh.

Q    So you ended New Castle as being a sergeant; correct?

A    Right.

Q    So you have some experience of being an officer and a sergeant?

LEE – DIRECT/WRIGHT

A    Yes.

Q    Okay.  Where is the segregation unit located in the annex building?

A    On the prison yard.  It's in its own fence.

Q    Okay.  O-Unit, is O-Unit part of the annex building?

A    Yes.

Q    Okay.  And within O-Unit, is there a segregation unit?

A    Yes, there is.

Q    Okay.  What pod is segregation O-Unit?

A    I think that's 3-Pod.

Q    Okay.  And where did you work at -- where was your job -- I mean, pardon me.  Where did you work at at New Castle?

A    I worked on the yard for a while as south side sergeant. And then I worked in the annex.

Q    Okay.  Were you the sergeant of O-Unit?

A    Yes, I was.

Q    Okay.  And inside of O-Unit is 3-Pod, which is segregation?

A    Right.

Q    So it's safe to say that you were the sergeant of segregation?

A    Yeah.

Q    Okay.  Do you remember who offender Brooks was?

A    Yes, I remember Brooks.

Q    Okay.  Was offender Brooks a combative inmate?

A     Yes, he was.

Q     Did he have -- was he known for assaulting inmates?

A     I don't -- I think there was one incident where he assaulted an inmate, yeah.

Q     Was he known for assaulting staff members?

A     Well, when there was -- he didn't go after officers, but when there was a -- I think one time when CERT was down there, he got into it with them.

Q     Have you -- have you personally had experience with offender Brooks, a physical altercation with offender Brooks?

A     Yes, I have.

Q     Okay.  And was that why he was in segregation?

A     Yes.

Q     Do you remember when that happened?

A     When what happened?

Q     When you had -- what kind of physical altercation have you had with offender Brooks in segregation?

A     In segregation, I mean, what got him into segregation?

Q     No.  I'll word it better.

      While Mr. Brooks was being housed in segregation, did you have a physical altercation with him while he was in seg?

A     I don't think I did.  I don't think I did.  No, it was out in the walk around the pods that we had our altercation.  Or in the room we had CAB, where he had his hearing.  I don't remember having one in the pod.

Q    Okay.

A    It's been so long, I can't remember for sure.

Q    I can understand that.

A    I had -- there was a lot of issues with Brooks.

Q    I can respect that.

THE COURT:  Next question.

BY MR. WRIGHT:

Q    Could you please tell me, what is a cuff port situation? I mean, first of all, what is a cuff port?

A    That's the slot on the door where you pass food through, or mail or whatever, like that.  That's where you pass your stuff through to the offender.

Q    Okay.  Are you familiar with what a cuff port situation is?

A    What do you mean, where they took a cuff port?

THE COURT:  Just say it.  Just tell him.

BY MR. WRIGHT:

Q    A cuff port situation -- okay.  Do you know what it is when an offender takes his cuff port hostage?

A    Yeah.

Q    What is that?

A    That's when they stick something in there -- usually their arms -- in the cuff port where you can't close the cuff port.

Q    Okay.  And when an offender does that, is that considered a breach of security?

A     Yeah.

Q     Why is it considered a breach of security?

A     Because he's not contained inside the cell.

Q     Is it considered a breach of security -- when an offender take his cuff port hostage, does he pose a threat to staff members or offenders?

A     Well, are you talking about in Pod 3, or are you talking about in any other pod?

Q     Okay.  Let me be clear.  All my questions is referencing the segregation unit.  In segregation -- well, whenever an offender takes a cuff port hostage, is he considered a threat or does he pose a threat?

A     Well, yeah, because he's not contained in the cell, but -- yeah.

Q     Okay. All right.

A     But he can't get to the other offenders because they're locked in their cells.

Q     Okay.  So if an offender takes his cuff port hostage, there should be no offenders coming out of their cell, because you said he can't get to another offender?

            MR. WRIGHT:  I'll make it clearer.

            THE COURT:  All right.  Ask questions.  Okay?

            MR. WRIGHT:  Correct.

BY MR. WRIGHT:

Q     When an offender takes his cuff port hostage, should there

be any offender movement around the cell in which the offender has taken his cuff port hostage?

A    Not around that cell.

Q    Why is that?

A    Because he could do exactly what you're saying happened, and he could reach out and grab somebody because he's not contained in the cell.

Q    Correct. Okay. Thank you. So when an offender holds his cuff port hostage, what steps are you to take to have the offender surrender his cuff port?

A    Well, first of all, you put a shield up.

Q    Okay.

A    That shield is in the way. Then you've got to try to get him to give that cuff port back.

Q    Okay. Are there progressive steps -- if an offender takes his cuff port hostage with a regular officer, what is that officer supposed to do, the chain of command?

A    Well, of course, he informs his sergeant the cuff port has been taken. And then we inform the DO the cuff port has been taken.

Q    And if the sergeant is unsuccessful at getting him to surrender the cuff port, what do you do then?

A    Well, then we ask the DO what they want to do about it, what they want to do to regain the cuff port.

Q    So do it go, like, the sergeant, then lieutenant, then to

the captain?

A     Right.

Q     Okay.  So it's a progressive -- okay.

A     Right.

Q     Okay.  Did offender Brooks have -- was he known for taking the cuff port hostage?  Did I ask you that yet?

A     He took some cuff ports.

Q     Okay.  Have you ever had to put the shield in front of his door?

A     Yes, we have.

          MR. WRIGHT:  Okay.  Can I please see Exhibit 22 again, please?

          Mr. Lipps, do you mind putting it up, please?

BY MR. WRIGHT:

Q     Do you remember -- you probably don't, it's been a while. Do you remember if Mr. Wright was ever housed next door to offender Brooks in segregation?

A     If who was what?

Q     Me, Mr. Wright.  Was Carlton Wright -- do you remember -- you probably don't remember.

A     I don't remember that.

Q     I can understand that.

A     I can't remember back that far.

Q     Do you have -- do you know who Mr. Wright is?  Are you familiar with who I am?

A    I do now.  Now that I see you, yes.

Q    Okay.  But prior to that, you have no history, like, off the top of your head of who I am?

A    I remember you being down there, yeah.

Q    Okay.

A    But I didn't really have any history with you.

Q    Okay.  Was Mr. Wright known to be a combative inmate?

A    No, he was never physical that I remember.

Q    So what -- he was what, vocal?

A    Yeah, he was vocal.

Q    Do you know what he was vocal about?

A    I can't tell you exactly what each incident was about, but it was usually about something he wanted or wasn't getting.

Q    Okay.  All right.  Thank you very much.  All right.

     Do you recall Mr. Wright being in segregation when he was working there?

A    Yes, I do.

Q    Okay.  Do you ever recall Mr. Wright bringing to your attention that he was being threatened by offender Brooks?

A    No, not that I remember.  Like I said, it's been a long time ago so I don't remember that.

Q    Okay.  So do you recall Mr. Wright ever asking to be moved to a different cell location?

A    No, I can't remember that, that's been too long ago and there's too many offenders there.

Q    I can understand that.  If an offender brings to your attention that he is being threatened by another offender in segregation, is that taken seriously?

A    Of course.

Q    Okay.  So can an offender in segregation have any physical interaction with each other?

A    No.

Q    Okay.

A    That's why they're locked individually in a cell.

Q    Okay.

A    And they're cuffed everywhere they go.

Q    Correct.  Okay.  Is it a two-officer escort every time an inmate leaves his cell?

A    There should be.  And, three, there's a sergeant -- we had a sergeant and an officer over there all the time, that stayed over there.  And then whenever he had to move anybody, another officer was sent there, or sergeant.

Q    Okay.  So if an offender brought to your attention that he was in danger of being housed in a cell, would you move him?

A    It matters on what the issue was.  Like I said, they're individually celled.  They can't -- one offender cannot get to the other offender because they're locked in a cell by themselves.

Q    Okay.  Except through -- if a cuff port is open, that's the only way he could reach out and be physical -- physically

interact with an inmate in segregation?

MR. LIPPS:  I'm going to object.  That's argumentative, Your Honor.

THE COURT:  Overruled.  He can answer it.

THE WITNESS:  If the offender was out and got in front of the door, but usually the offenders, when their cuff port was taken, that wasn't possible.

BY MR. WRIGHT:

Q   Right, because there's no offender movement when a cuff port is taken?

A   Right.

Q   Do you ever recall Mr. Wright complaining about being assaulted by offender Brooks?

A   No, I don't.

Q   Okay.  If an offender is assaulted by bodily fluids by an offender, what steps are you to take as a sergeant if you become aware of that situation?

A   Well, as far as I remember -- like I said, it's been so many years ago with the policies, but, of course, if he's been assaulted, you're going to remove him and take him to where medical can check him out and make sure he's okay.

Q   Okay.  Medical.  Are pictures taken to preserve evidence?

A   Yes.

Q   Is the offender allowed to have a shower upon being assaulted with bodily fluids?

A     Well, yeah.

Q     Do you remember who Officer Foley was?

A     I remember Foley.

Q     Okay.  Do you recall if Officer Foley ever interacted with offender Brooks with an open cuff port?

A     Like I said, I wouldn't remember that.

Q     Okay.  But if an offender was assaulted, it would be documented; correct?

A     Oh, yeah.

Q     And there would be an incident report taken?

A     Right.  And the offender that did that would be written up for it.

Q     So it's a violation of policy to assault another inmate with bodily fluids?

A     Oh, of course.  That's an assault.

Q     It's considered an assault; correct?

A     Yes.

Q     And it's taken seriously.  All right.  Are there cameras on 3-Range?

A     Yeah.

Q     Okay.  And do you remember where cell location 214 and 215 was, by the property room upstairs?

A     Yeah, that would have been second tier on the left side.

Q     And do cameras cover that section?

A     I believe so.  I don't believe there's any blind spots in

there.

Q    Okay.  All right.  Do you have the -- are you able to recommend -- wait.  Do you have authority to move somebody to a different cell in segregation?

A    Not without going through the counselor, because I have to check and make sure that he can be moved where he's being moved.  Now, 3-Pod is a little bit different.  If I have an open spot, I can move him.

Q    All right.  So as a sergeant on 3-Pod, you have the authority to move an inmate to another cell?

A    If I have an open cell.

Q    All right.  Okay.  So I just wanted to make sure you had the authority.  Okay.

From your recollection, if an offender is considered combative in segregation, are there supposed to be identifiers on his door or to alert staff members that this offender is a known combative inmate?

A    Not that I remember, because we knew the people down there, so -- like I said, when you're in 3-Pod, you're combative or you wouldn't be there.

Q    So all inmates are there for the same reason?

A    No, they're not there for the same reason, but, I mean, they're there for a reason.  They couldn't be with the other offenders in a regular pod.

MR. WRIGHT:  Okay.  Can you turn to page 3,

Mr. Lipps, please.

THE WITNESS:  I can't read that.  I don't have my glasses.

MR. LIPPS:  I'll make it bigger.

Mr. Wright, he's also got a book if you wanted to...

MR. WRIGHT:  Pardon me?

THE COURT:  He's got a hard copy.  He has a book.

BY MR. WRIGHT:

Q    Sergeant Lee, would it be better for you if you turn to Exhibit 22?

A    Where's that at in here?

Q    The red tablets [sic] identify the location and it precedes the document.  So whenever you see 22, you can pull it up and it should be under it.

THE COURT:  What's your question?

MR. WRIGHT:  I would like to have him read something.

THE COURT:  He doesn't need to read anything.

MR. WRIGHT:  Okay.  All right.  Well, according to --

THE COURT:  What do you want to tell him?  Ask him a question.

BY MR. WRIGHT:

Q    Are you familiar with this policy, Sergeant Lee, the New Castle Correctional Facility policy and procedure manual?

You can turn to page 1 and probably see the name of it. No, I mean, Document 22, the first page.  There's four pages.

LEE – DIRECT/WRIGHT                    82

Are you familiar with this policy?

A    I'm familiar with it, but, like I said, it's been years since I've seen it.

Q    Okay.  But while you was working as a sergeant, were you familiar with this?

A    Yes.

Q    Okay.  And page 2 -- page 3, identification -- I can summarize it.  It says whenever an offender is perceived to be combative, there's supposed to be identifiers placed on his door --

A    Okay.

Q    -- to notify staff.  Did Mr. Brooks ever have any identifiers placed on his door to notify staff?

A    I don't remember.  I don't remember that.  I don't remember if he did or not.

Q    Okay.  Is it a common practice in 3-Pod to house general population or protective custody offenders in segregation?

A    Well, that's a seg unit, so it doesn't really matter what your -- you are celled by yourself.

Q    Right.  But you can't get to one another except --

A    You're moved and cuffed everywhere you go.  If I take you out of the cell, you're going to the shower in cuffs, you're coming out of the shower in cuffs.  If you're going to the rec pad, you're in cuffs.  You're coming back to the cell in cuffs.

The only time you're not cuffed is when you're in your

LEE - DIRECT/WRIGHT                83

cell and the -- we bring the door down, you stick your hands through there, and we take the cuffs off so you're secured in the door.

Q    Do you recall Mr. Wright ever complaining to you about offender Brooks spitting on his cell door window?

A    I don't remember that.

Q    Have you ever witnessed offender Brooks threaten Mr. Wright?

A    Not that I remember.

Q    Okay.  I don't know if I asked you this already.  Do you recall if offender Brooks took his cuff port hostage on June -- I mean, you probably don't -- on June 24th?

A    No.

Q    I know.  Too specific; right?

A    Well, I don't remember any dates that he took his cuff port.  I wouldn't know what the date was.

Q    But you do remember he have [verbatim] taken the cuff port hostage before?

A    He took a cuff port before.

Q    Okay.  And why did he take his cuff port hostage?

A    That's just the way that the inmates do sometimes to get attention, I think.  I mean, you're asking my personal opinion, because there's really nothing they can do from that cuff port.

Q    Okay.

A    They're still locked in their cell.  I mean, it really

affects everything as far as there's not going to be any chow moved, there's not going to be meds run.

Q   So all movement should be shut down until you resecure the cuff port?

A   Or we put the shield up and stay away from that one door.

Q   Okay.

THE COURT:  Any other questions for this witness?

MR. WRIGHT:  No.

THE COURT:  Do you have ten minutes or less, because it's just about time to get on the call?

MR. LIPPS:  I believe I do, Your Honor.

THE COURT:  Okay.

**CROSS-EXAMINATION**

BY MR. LIPPS:

Q   Mr. Lee, I want to direct your attention to the plaintiff's complaint.  You've reviewed the allegations against you; correct?

A   Sure.

Q   They're not as vague, I don't believe, as you were asked on direct examination.  There's an allegation on page 41, paragraph 17, that you've reviewed:  "Sergeant Lee was escorting Brooks to the shower and he cursed, threatened, and spit on Wright's cell door window."

Were you present for any of that to ever have occurred?

A   I don't remember that, sir.

LEE – CROSS/LIPPS                         85

Q    Okay.  Would you remember if that happened?

A    I probably would, yes.

Q    Okay.  Now, you also said you were familiar with inmate Brooks.

A    Yes, sir.

Q    Have you had physical interactions with inmate Brooks?

A    Yes, sir.

Q    Describe to the Court when those first occurred.

A    The first day I worked down there, I had one altercation with him.  He was given six months without commissary, and he didn't like that, and he decided he wasn't going to go back to his cell.

Q    And by "altercation," do you mean a fight?  He fought you?

A    Yes, it was a physical fight.

Q    Okay.  Did you ever cut him any slack after that for any of his conduct or behaviors?

A    No.

Q    So that was the first hour you met Brooks?

A    He was really the first inmate I met.

Q    Okay.  So had you seen him curse, threaten, and spit on the plaintiff's cell door window, would those have been conduct violations you could have written him up for?

A    Oh, yeah.

Q    And would you have?

A    Oh, yes.

LEE - CROSS/LIPPS                                   86

Q    Okay.  You also said you recall Officer Foley, and he worked on that segregation range as well; correct?

A    I don't believe I ever -- he would have worked on it when we needed to escort somebody, because it's a two-man escort. He would have -- but I'm not sure that he ever was -- because I put one person in there at all times.

Q    Okay.

A    One officer would be in there.  One officer would be in the bubble.  One officer would be in there.  So I can't remember that I ever assigned him to that as his job for the day, but he might have went over there on an escort.

Q    Sure.

A    I don't remember.

Q    Okay.  Were you, at any time prior to June 24, 2021, informed of any threats of any kind towards the plaintiff?

A    No, sir.

Q    Did the plaintiff himself ever tell you of any fear or threats he's received from inmate Brooks?

A    If he did, I don't remember it.

Q    Okay.  Would you remember it?

A    It's been a long time ago.  But, I mean, I think I would have took it -- if somebody tells me something like that -- I mean, those people down there, a lot of them were about what they said they were about, so I would take it serious.

Q    Understood.  Did Brooks ever show any kind of indications

to you that he was going to assault Mr. Wright?

A    No, because, like I said, that would be almost impossible down there.

Q    So even if he had threatened Mr. Wright, he couldn't fulfill that threat, could he?

A    Oh, Brooks threatened everybody.

MR. WRIGHT:  Objection, Your Honor.  That's speculative.  That's hypothetical, correct, if it's not a statement?

THE COURT:  Objection overruled.  He can answer that question.

MR. WRIGHT:  All right.  Go ahead.

THE WITNESS:  Brooks was always threatening people.

BY MR. LIPPS:

Q    But if he threatened to harm anybody, he couldn't have done anything, he was locked in his cell; right?

A    Yeah, he -- like I said, he was handcuffed everywhere he went except in his cell.

Q    And do you have any -- strike that question.

Did you know of any specific threats from Brooks directly to Mr. Wright in any sort of way at any time?

A    No.

Q    So that's even before and after June 24th?

A    Correct.

Q    Okay.  Are you aware if Mr. Wright ever asked for a

separatee from offender Brooks?

A    What, to separate them from him?

Q    Yes, sir.

A    I don't remember them being housed close together.  I don't remember that.  But, like I said, in that unit down there, you're singled celled.  So I don't remember if he asked for that.

Q    Understood.  Thank you, sir.

        MR. LIPPS:  No further questions.

        THE COURT:  Any more questions?

        MR. WRIGHT:  Yes, I do.

**REDIRECT EXAMINATION**

BY MR. WRIGHT:

Q    You said offender Brooks was known for threatening people?

A    He threatened -- a lot of them do that.  A lot of the offenders are constantly threatening people.

Q    Has Mr. Brooks ever made good on any of his threats?

A    Actually, not any individual threats that I remember.  Not that I heard him say and that it happened, no.

Q    So offender Brooks was known for threatening people, to cause harm to people through his threats.  And how did you all deal with an offender who was known to threaten other offenders or staff members?  Was he dealt with any differently than any other inmate?

A    Well, I mean, without being -- it's not a yes-or-no

question.  What I said was the inmates down there, they're always threatening each other.  It's always -- they're always on either officers or -- that's what they do.

Q    So was offender Brooks' threats perceived serious or taken seriously?

A    Well, yeah.  Yeah, they're taken seriously.  But, like I said, he's in cuffs.  He was in cuffs in 3 all the time.  So he's only going to do what I'm going to let him do, and he's not going to do anything.  He's in cuffs.

Q    Okay.  You say you -- how often are officers supposed to make rounds on the segregation unit?

        MR. LIPPS:  I'm going to object.  That's outside the purview of the cross-examination, Your Honor.

        MR. WRIGHT:  Well, he said that he kept an officer on the range at all times, so I want --

        THE COURT:  Why is that relevant?

        MR. WRIGHT:  Huh?

        THE COURT:  Why is that relevant?

        MR. WRIGHT:  Because it speaks to how often the officers or Sergeant Lee came on the pod to be told of a threat that was given to him.  Like, he come on the range frequently, so the plaintiff had opportunity to tell Sergeant Lee that he was being threatened because he made so many frequent rounds or he'd keep an officer on the range, as he said.

        THE COURT:  So ask him that.

BY MR. WRIGHT:

Q    How often do you make your rounds on the range?

A    Well, I was over all four pods, so I would assume they're probably every couple of hours at least.

Q    So very frequently?

A    Very frequently.  And an officer was doing his rounds at least every hour.

Q    So you was accessible, as a word, to offenders to see you frequently throughout the day?

A    Of course.

Q    All right.

        MR. WRIGHT:  And I only can ask questions as it pertains to the cross-examination?

        THE COURT:  Well, you can ask an omitted question, if you have one.

BY MR. WRIGHT:

Q    Okay.  Do you know who Officer Everett Dunn is?

        MR. LIPPS:  I'm -- I'm sorry --

        THE COURT:  Go ahead.

        MR. LIPPS:  -- it's premature.

        THE COURT:  This is an omitted question.  What's your question?

BY MR. WRIGHT:

Q    Did he work in the segregation unit with you?

A    Yeah, he was down there sometimes.  Like I said, it was

whoever I assigned to that.

Q    Okay.

A    Are you talking about was he in the annex or was he in segregation?

Q    In O-Unit.

A    Yes, he was.

Q    Was he still employed there when you left?

         MR. LIPPS:  I'm going to object.

         THE COURT:  That's not relevant.  Get to the June -- what was the date?  June 24, 2021.  Ask questions about that date.

         MR. WRIGHT:  The purpose of me asking the question, Your Honor, because I filed grievances on Everett Dunn, his coworker, who eventually got let go for a PREA complaint against me.  And it just lays the foundation as to how they treated me because they looked at me in a certain light.

         So if offenders did threaten me or I did bring it to their attention, it would be taken lightly because, as they say, I'm very vocal and things of that nature and they don't care for me.

         THE COURT:  Okay.

         MR. WRIGHT:  That's why I was asking -- setting the foundation of do you know who he was, and the PREA complaints I filed on him got him dismissed.  So that's why.

         THE COURT:  All right.  That's not relevant.  Stick

LEE - REDIRECT/WRIGHT                              92

to what happened on June 24, 2021.

MR. WRIGHT:  Okay.

THE COURT:  Anything else?

MR. WRIGHT:  No further questions.  I appreciate you, Sergeant Lee.

THE COURT:  Okay.  Sergeant Lee, am I correct that if Mr. Brooks' cuff port was held hostage on that date, June 24, 2021, would he be able to spit or throw anything out of his port?

THE WITNESS:  If he had his cuff port down, he could throw something out of it, but the cells are side by side.

THE COURT:  Okay.

THE WITNESS:  So he could throw it out, but I don't know how he would be able to throw it into another cell.

THE COURT:  It would not go into a cell, it would go back in the hallway?

THE WITNESS:  Yes, ma'am.  Yes, ma'am.  It would go out on the floor.

THE COURT:  All right.  Okay.

THE WITNESS:  It's like if you had all the cell doors on this wall all the way around them, so there would be no way that -- I don't remember where they were celled.

THE COURT:  All right.  And if someone is throwing anything out, is that when you put up the shield?

THE WITNESS:  Yes.  And that's really to protect us.

Because, like I said, in O-3, they're all one-man cells and they're all cuffed when they come out.  And then we put that up to protect us, because we have to do a pod check every hour.

THE COURT:  All right.  So Mr. Wright would not have been out of his cell unless he was escorted by officers?

THE WITNESS:  Exactly.

THE COURT:  All right.  So who was escorting you, Mr. Wright?

THE WITNESS:  Officer Foley.

THE COURT:  Okay.  Officer Foley.  Okay.

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Well, you'll get to him soon.  Okay.  All right.  Anything else for this witness?

MR. WRIGHT:  No.  Thanks, Sergeant Lee.  I appreciate it, man.

THE COURT:  All right.  Can we let this witness go back to work or do you need him?

MR. LIPPS:  I'm not going to need him further, Your Honor, but your stuff is in there, sir.

THE COURT:  Thank you.

     (Witness excused.)

THE COURT:  Okay.  We're going to take a brief recess so that we can get Mr. Brown on the phone -- on the video.  I'll step out, and we're going to take about a three-minute recess to get the next witness.

Do you need to go to the bathroom or something?

MR. WRIGHT:  There's no way I can get no water?

THE COURT:  Can he have some water?  We'll give him a cup.  We'll give him a bottle.

TRANSPORT OFFICER:  That's fine, ma'am.

THE COURT:  Okay.  All right.  We'll take about a three- or five-minute recess until she gets Mr. Brown on the video.

COURTROOM DEPUTY:  All rise.

*(Recess taken from 11:04 a.m. to 11:14 a.m.)*

THE COURT:  All right.  You may be seated.  We're back on the record.  And we're going to start with another witness, and whenever the gentleman gets on, we'll stop and let him testify.

Who are you calling next?

MR. WRIGHT:  Your Honor, I have a question.  Lieutenant Krul is not here, so what did you say I can do in reference to his testimony?  Because he's not here, so how can I refer to his testimony?

THE COURT:  You can make an offer of proof, and then I'll determine whether or not I can consider it.

MR. WRIGHT:  Okay.  Offer of proof is just telling you what I believe is true?

THE COURT:  Do you have an affidavit or deposition testimony from this witness?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  So then you all can talk later and see if you can get the defense attorney to stipulate to his deposition testimony.  Okay?

MR. WRIGHT:  Okay.

THE COURT:  All right.

MR. WRIGHT:  Because he's the one who initially put me in the cell, the segregation cell.  I can prove that, though.

THE COURT:  Okay.  You might even be able to stipulate that he put you in the cell.

MR. LIPPS:  I think we can, Your Honor.  And if it helps with the timing, because I understand what's happening here, I can just stipulate 13 is Lieutenant Krul's interrogatory responses and 42 are his affidavits, if the plaintiff wishes to enter those into evidence.

MR. WRIGHT:  I would like to stipulate.  Because, remember, the one thing you stipulated to was bed move sheet.

Okay.  On 6 --

THE COURT:  What are you talking about?  Exhibit 6?

MR. LIPPS:  Exhibit 2 is what he's referencing, Your Honor.

MR. WRIGHT:  Exhibit 2.  This is the one thing he stipulated to prior to today.

THE COURT:  All right.  So you are going to stipulate

to the admissibility of Exhibit 2?

MR. WRIGHT:  I want to stipulate to something on Exhibit 2 that -- if he agree, because it has Lieutenant Krul's name on there.  I wanted to see if he wants to stipulate to that.

THE COURT:  Stipulate to what?  Say what it is.

MR. WRIGHT:  It's the third entry, on June 2, 2021, it says, "Custody Decision."  Then it says, "Authorized by Kruhl."  It's misspelled, but his name is Krul.  This has an H.

MR. LIPPS:  This whole exhibit is stipulated to.

MR. WRIGHT:  It's accurate?

MR. LIPPS:  It's admissible, authenticated, everything.

THE COURT:  All right.  So the defendants are going to stipulate to the admissibility of Exhibit 2?

MR. LIPPS:  Yes, Your Honor, and whatever he wants to stipulate regarding Krul, we'll stipulate as well.

THE COURT:  All right.  So Exhibit 2 is admitted into evidence pursuant to stipulation of the parties.

(*Exhibit 2 was received in evidence.*)

THE COURT:  What other exhibit do you want to offer?

MR. WRIGHT:  Well, I didn't know if I had to do it this second, right, because -- yeah.  I don't need nothing to stipulate to, I can just speak to the facts.

THE COURT:  You say Exhibit 6?

MR. WRIGHT:  No.

THE COURT:  No.  Mr. Lipps said Exhibit 6?

MR. LIPPS:  I misspoke if I did, Your Honor.  It's -- the interrogatories are 13, and the affidavit is 42.  Those would be the two relating to Krul.

THE COURT:  Do you want 13 in?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Okay.  Exhibit 13 is admitted into evidence pursuant to stipulation of the parties.

(*Exhibit 13 was received in evidence.*)

THE COURT:  And then the other one?

MR. LIPPS:  Forty-two, Your Honor.

THE COURT:  Forty-two is the affidavit of Michael Krul.

The defendant is willing to stipulate to 42.  Do you want 42?

MR. WRIGHT:  Yes, ma'am, Your Honor.

THE COURT:  All right, Mr. Wright.  Exhibit 42 is admitted into evidence pursuant to stipulation of the parties.

(*Exhibit 42 was received in evidence.*)

THE COURT:  Okay.  All right.  Now, do you have another -- who is your next witness?

MR. WRIGHT:  I want to call Shane Nelson.  Defendant Shane Nelson, please.

COURTROOM DEPUTY:  Is Mr. Brown there?

CORRECTIONS OFFICER:  He's on the way here.  He's going to be a minute.

THE COURT:  Okay.  Well, let's do Mr. Brown since he's almost here.

*(Off the record.)*

THE COURT:  We're back on the record.

Sir, are you Mr. Brown?

THE WITNESS:  Yeah.

THE COURT:  All right.  Mr. Brown, I'm going to swear you in, if you would raise your right hand.

*(Witness sworn.)*

MR. WRIGHT:  All right.  You're being called as a witness by Mr. Wright, Mr. Carlton Wright.

Mr. Wright, you may examine your witness.

**KYLE BROWN, PLAINTIFF'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. WRIGHT:

Q    Good morning.  Do you remember who I am?

A    No.

Q    Do you remember a guy named Jersey that you was locked up with in M-Unit back in 2021?  I was Parker's cellie.  We was on 1-Range.  I was downstairs.  Big dude with the dreads.

A    Okay.  Yeah.

Q    So I know it's been five years ago, and I haven't spoken to you since, so I can imagine you probably don't remember who

I am.

A    Yeah.

Q    So was you down in M-Unit back in 2021?

A    Yeah.

Q    Okay.  So the month of January, you was down there in M-Unit; correct?

A    Yeah.  You talking about Old School Parker?

Q    Yeah, Old School Parker with the bald head.  Yeah, the crazy --

A    I know who you're talking about.

        MR. WRIGHT:  Oh, am I supposed to do that?

        THE COURT:  Ask a question.

        MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    So you remember who I am, then?

A    Yeah.

Q    Okay.  Do you remember I was down there always complaining and filing grievances on staff members?

A    Yeah.

Q    Did you get a copy of this affidavit I got mailed to you?  Did you receive a copy of the affidavit?

A    I received it.  I mean, I received some paperwork, but they didn't give it to me because I wasn't on the unit, I was still on A and O then, but they told me I received it.

Q    So you haven't seen a copy of the affidavit?

A    No, I haven't seen it yet.  I've been waiting to get it back, because they couldn't find me because I was on the parole board.  They thought I was leaving, so -- but my counselor say he was going to give it back to me, find out where it's at.

Q    Because I wanted to give you an affidavit to refresh -- the affidavit that you gave, because I know it's been five years ago and I could imagine a lot has happened since five years, so you may not remember the affidavit you've given.  Okay.

Do you remember being -- we was down there in January together in 1-Dorm, M-Unit?

A    Yeah.

Q    Okay.

MR. LIPPS:  Your Honor, I'm sorry.  If I could just clear it up for the record on -- we're talking about January of 2021 at New Castle Correctional Facility's M-Unit, the annex?

MR. WRIGHT:  Correct.

MR. LIPPS:  I just don't think any foundation has been laid at all yet on that fact, Your Honor.

THE COURT:  Okay.  Get the exact date and the location in the prisoner.  Ask him.

BY MR. WRIGHT:

Q    In January of 2021, in the month of January, were you housed at New Castle Correctional Facility M-Unit?

A    Yes.

Q    So for the entire month of January 2021, you was housed at M-Unit at New Castle Correctional Facility?

A    Yeah.

Q    And while you was housed at New Castle Correctional Facility in January, were you housed around me?

A    Yeah.

Q    Okay.  I'm going to ask you do you remember events from five years ago.  Do you remember who counselor Jones was?

A    Yeah.

Q    Who was counselor Jones?

A    Jones was like the counselor in M-Unit who barely -- who talked down on people.  I mean, that's who Ms. Jones is.

Q    Okay.  Do you remember who Mr. Nelson was?

A    Mr. Nelson was a UTM at that time.

Q    And he was Ms. Jones' boss; correct?

A    Yeah, yeah.

Q    Okay.  Do you recall me getting to -- well, getting into it with Ms. Jones and Mr. Nelson about just different things, complaining about different stuff, me always complaining about stuff?

A    Yeah.

Q    Okay.  Do you recall me complaining a lot about being -- living in different cells with different people that I didn't like and me complaining to them about it?

102

A    Yeah.

Q    Okay.  On the date of January 13th, do you recall a conversation that I had with Mr. Nelson in the dayroom complaining to him in front of people about me moving to different cells?

A    Yeah, because he always used to move you around.

Q    All right.  You gave me an affidavit.

          MR. WRIGHT:  I don't know if he can see this to ask him if this is his handwriting.  Any way he can see this, to show him?

          THE COURT:  You can put it on the screen.

BY MR. WRIGHT:

Q    I would like to show you an affidavit from --

          MR. WRIGHT:  Your Honor, this is Exhibit --

          THE COURT:  Mr. Lipps can put it on the screen.

          What exhibit number is it?

          MR. WRIGHT:  This is Exhibit 10.

          THE COURT:  Exhibit 10.  And he should be able to --

BY MR. WRIGHT:

Q    And for the record, Mr. Brown, prior to today, we haven't spoken since New Castle, roughly five years ago; correct?

A    Yeah.

Q    All right.  Thank you for being here, too, I appreciate it.

          THE COURT:  What's your question?

BY MR. WRIGHT:

Q    I want to show you an affidavit that you gave me on January 15, 2021.  Do you see that?

A    Yeah.

Q    You see it?

A    Yeah.

Q    Is that your handwriting?

A    Yeah, that's my handwriting.

Q    Okay.  Take a minute to review it.  I want you to take a minute to review it so I can ask you about it.

THE COURT:  Just ask him.  Point him to the paragraph and he'll tell you if he said it or not.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Can you please turn -- all right.  First page, you wrote in your affidavit that you were standing -- hanging out at your cell door at roughly 3:00 p.m., and you heard some talking outside your cell.

You observed me speaking to Mr. Nelson complaining about my bed move.  I was having a conversation about that, why I was moved to yet another cell.

And then on page 2 --

MR. LIPPS:  I'm going to object.  That's not in the form of a question, Your Honor.

THE COURT:  So ask him did he -- does he recall

writing that.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Do you recall writing this affidavit?

A    Yeah, I recall writing the affidavit.  Yeah.  I mean, it was five years ago.  I've been out since then.  But I remember a glimpse of it when Mr. Nelson came to your door.

He was talking about -- talking to someone, and I was in my cell, and I guess he moved your property out, and you told him you didn't want to be in that area and he refused to move you.

Q    All right.  In this affidavit, you wrote on page 2 --

MR. LIPPS:  Can I ask, Your Honor -- or, sorry, can I object?  If Mr. Wright would just ask a question, I don't think I would have any basis to object, but he's just reiterating what the exhibit is.

MR. WRIGHT:  I mean, he hasn't seen the affidavit in five years.

THE COURT:  Ask the question.  Say "did you say" so-and-so.

MR. WRIGHT:  Okay.

THE COURT:  Read it.

BY MR. WRIGHT:

Q    In your affidavit, did you say -- you heard Mr. Nelson tell me, Mr. Wright, and I quote, "If I was you, I would stop

bitching and complaining about bed moves and telling me how to do my job, or I promise you, I will make your stay back here rough on you and a living hell."

Do you recall writing that, and do you recall hearing that?

A    Yeah, that's how Mr. Nelson is.  That's how he is to today, still.  I just left New Castle, like, last year.  That's how Mr. Nelson is.  But he's not -- he's a PREA coordinator now, but, yeah, I recall him saying that.  Ms. Jones used to talk like that, too.

Q    All right.  So you recall hearing Mr. Nelson tell me that?

A    Yeah.  When it come to safety and security concerns at New Castle, Mr. Nelson, he didn't really care about no one's safety.

MR. LIPPS:  I'm going to object, Your Honor.  It's a nonresponse.

THE COURT:  Okay.  Next question.

MR. WRIGHT:  I didn't ask that, that's fine.

THE COURT:  I'll sustain your objection.  And we'll strike that answer, there was not a question.

MR. LIPPS:  Thank you, Your Honor.

THE COURT:  Next question.

BY MR. WRIGHT:

Q    From your experience at New Castle, have you experienced, first, case manager Jones showing disregard towards inmate

safety and security?

A    Yes.

Q    From your experience at New Castle, have you experienced unit team Shane Nelson showing disregard for inmate safety and security?

MR. LIPPS:  I'm going to object to this question as well, Your Honor.  This witness was not designated to give this type of testimony, only testimony regarding what he allegedly heard Shane Nelson say.  Anything outside of that would be irrelevant to these proceedings.

THE COURT:  I'll overrule.

Next question.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Have you heard the plaintiff -- have you heard me complaining frequently to Mr. Nelson about bed moves or being in cells with problematic offenders?

A    Yes.

Q    And on this date, once again, when you gave this affidavit, you heard Mr. Nelson make this threatening comment to me about, "If I was you, I would stop bitching and complaining about bed moves and telling me how to do my job, or I promise you, I will make your stay back here rough on you and a living hell"; is that correct?

A    Correct.

Q    And you told the truth when you gave this affidavit; correct?

A    Correct.

Q    All right.

          THE COURT:  Any other questions?

          MR. WRIGHT:  No.  You can go ahead, Mr. Lipps.

          THE COURT:  You may cross-examine the witness.

          MR. LIPPS:  Thank you, Your Honor.

          THE COURT:  Come on up here so he can see you.

          MR. WRIGHT:  May I say one thing real quick?

          THE COURT:  Omitted question?

          MR. WRIGHT:  Yeah.

BY MR. WRIGHT:

Q    Have I asked you to do this?  Have I promised you anything to testify to this?  As a matter of fact, have I spoke to you in the last five years since New Castle?

A    No.  No.

          MR. WRIGHT:  All right.

          THE COURT:  Okay.  Come on up, because then he can see you.

                      **CROSS-EXAMINATION**

BY MR. LIPPS:

Q    Mr. Brown, on January 6, 2021, at 3:00 p.m., were you housed at the M-Unit in cell M1-116?

A    Yes.

Q    Okay.  Earlier when you began to testify, you stated that the dayroom is where this interaction that you're describing with Mr. Nelson and Mr. Wright took place; is that accurate?

A    Yes.

Q    Okay.  If you recall the affidavit that Mr. Wright pulled up for you, it says that you were in your cell, had to mute your television.  Why the discrepancy to today's testimony to what you had written?

         MR. WRIGHT:  Objection, Your Honor.

         THE WITNESS:  The dayroom at --

         THE COURT:  Hold on.

         What's your objection?

         MR. WRIGHT:  I'm going to let him -- because he's probably about to say what I'm about to say.  So I'm going to let him say it so it will be authentic.  Go ahead.

         THE COURT:  All right.  You may answer.

         THE WITNESS:  The dayroom and the cell, that's really considered the same thing when you at New Castle because the dayroom was right there, my cell was right there.  The dayroom is small so you can hear everything.

         So when I'm in my cell 116, you can hear everything that's in the dayroom.  The dayroom is not that big.

BY MR. LIPPS:

Q    And, sir, what day was it that you heard this interaction between Mr. Nelson and Mr. Wright?

MR. WRIGHT:  Objection.

THE WITNESS:  I can't recall.  I can't give you a specific date.  That's years ago.  I mean, that's five years ago.  I can't give you a specific date.  That's not -- I'm not going to try to give you a date because I don't remember the date.

THE COURT:  Next question.

THE WITNESS:  I can give you the date I seen on the paper if you want me to give you that date.

BY MR. LIPPS:

Q   Well, the day you signed that affidavit, it says on there that you signed it --

A   On the 15th.

Q   Yes.  Thank you.  And is that accurate, January 15, 2021?

A   I mean, as I said, I remember writing a statement, but I cannot say I remember signing it.  I remember what day it was.  So if I signed it, that's what day it was.  I don't remember signing the date I signed it.

Q   Thank you.  That was my question.  But the day you signed it, you signed the accurate date, is what I'm asking?

A   Correct.  Correct.

Q   Thank you.  Sir, were you sentenced for a felony conviction of fraud on --

MR. WRIGHT:  Objection, Your Honor.

THE COURT:  It's admissible.

MR. WRIGHT:  Okay.

THE COURT:  He's trying to impeach your witness.

MR. WRIGHT:  Okay.  All right.

BY MR. LIPPS:

Q    Sir, were you sentenced for a felony conviction of fraud on August 17, 2016, out of Adams County, Indiana, in Cause No. 01D01-1604-F6-0067?

A    Yeah.

Q    And that is an Indiana violation of law under Indiana Code 35-43-5.4 as a level 6 felony; correct?

A    Yes.

Q    Okay.

MR. LIPPS:  One second, Your Honor.

BY MR. LIPPS:

Q    And sir, since January of 2021, you've been released from prison as well; correct?

A    Correct.

Q    And then at some point, you returned back to the Indiana Department of Corrections?

A    Correct.

Q    And do you know approximately when that was?

A    I just came back recently, a month ago.

Q    Okay.

A    I came back a month ago.

Q    Okay.  Were you incarcerated at the New Castle

Correctional Facility in August of 2025?

A    Yeah.

Q    And during that period of time, was Shane Nelson the PREA investigator?

A    Correct.

Q    And during that period of time, did you make false PREA accusations that you received conduct for?

        MR. WRIGHT:  Objection, Your Honor.

        THE WITNESS:  No.

        MR. WRIGHT:  I would like to see the form that he's referring to.  Do you have proof of it?

        THE COURT:  He said no.

        MR. WRIGHT:  Okay.

        THE WITNESS:  No.  No, that's not accurate.  Nelson knew I was filing a federal lawsuit about him because I reported something about a situation, a PREA situation, and he left me in that situation.

        In order for me to go home like I wanted to go home, he said, You either going to plead guilty for it and drop your lawsuit or you're going to get a year of good time tooken [verbatim].  So I chose to plead guilty of it.

        And the lawsuit stood in the federal court, because I have plenty of witnesses that know that he made me make a deal with him.

        THE COURT:  Any other questions?

MR. LIPPS:  I need to clarify now, Your Honor.  I'm sorry.

BY MR. LIPPS:

Q   Sir, you denied that you pled guilty --

A   No, I'm telling you I pled guilty for it, but I pled guilty under certain circumstances.

MR. LIPPS:  Okay.  I think that's what I was trying to establish, Your Honor.  So, no further questions.  Thank you.

THE COURT:  Do you have any other questions for Mr. Brown?

MR. WRIGHT:  Yes, I do.

THE COURT:  Mr. Brown, what's your first name?  We didn't get your full name for the record.

**REDIRECT EXAMINATION**

BY MR. WRIGHT:

Q   Would you please state your name.

A   Kyle.

Q   Would you please spell your name for the record, please.

A   K-Y-L-E.  B-R-O-W-N.

Q   All right.  Thank you, Mr. Brown.  I have another question.  From your personal experience at New Castle in 2021, is Shane Nelson known to treat black offenders differently?

MR. LIPPS:  I'm going to object, Your Honor.  That's, one, irrelevant; secondly, it's outside of this witness's

called-for testimony; and, third, it's just slander as to this defendant.

THE COURT:  I'll let him answer it.

BY MR. WRIGHT:

Q    You're allowed to answer.

A    Yes.

THE COURT:  All right.  Next question.  Do you have any more?

MR. WRIGHT:  Yes, I do.

BY MR. WRIGHT:

Q    From your experience at New Castle in 2021, when an offender is complaining about Shane Nelson, was he known to retaliate towards offenders?

MR. LIPPS:  I'm going to object, Your Honor.  This is unfounded opinion.  This question is calling for this witness's opinion.

MR. WRIGHT:  I asked his experience.

THE COURT:  I'm sorry, go ahead.

MR. LIPPS:  The question is calling for an opinion, Your Honor.  It's outside of his personal knowledge without the proper foundation.

THE COURT:  All right.  I'll sustain.  You may ask him.  He said he doesn't have personal knowledge.

BY MR. WRIGHT:

Q    Do you have any personal knowledge from your own personal

experience of Mr. Nelson doing retaliatory acts against you for filing complaints about him?

A    Yeah.  I'm dealing with it right now in federal court right now.

Q    From your personal experience in 2021 while you was at New Castle M-Unit, have you witnessed Mr. Nelson deal unprofessionally with you?

        MR. LIPPS:  I'm going to object.  That's irrelevant, Your Honor.

        THE COURT:  That is irrelevant.  What about dealing with you?  Any more questions?

        MR. WRIGHT:  No.  I appreciate you coming today.

        THE COURT:  You have no more questions?

        MR. WRIGHT:  No, I don't have any more questions, Mr. Brown.

        THE COURT:  Any recross?

        MR. LIPPS:  No questions, Your Honor.

        THE COURT:  Thank you, Mr. Brown.  You may be excused.

     *(Witness excused.)*

        THE COURT:  All right.  Let's get your next witness, Mr. Nelson, let's get him started.

        Mr. Nelson, if you would come up to the witness stand.

     *(Witness sworn.)*

THE COURT:  You may have a seat.

And Mr. Wright, you may examine your witness.

**SHANE NELSON, PLAINTIFF'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. WRIGHT:

Q    Could you please state and spell your name for the record, please.

A    Shane Nelson.  It's S-H-A-N-E.  N-E-L-S-O-N.

Q    And prior to today, have you been coached or advised by your attorney, Mr. Lipps, on how to testify and answer these questions?

A    No.

Q    Okay.  All right.  Do you remember who I am?

A    I do.

Q    Okay.  And where are you currently employed at, Mr. Nelson?

A    New Castle Correctional Facility.

Q    How long have you been employed at the New Castle Correctional Facility?

A    My initial hire date was May of 2013.  I left for about six months, and then I can't remember what my adjusted date of hire is, but around 12 years.

Q    Okay.  So you've been working at New Castle for approximately 12 years.  In them 12 years at New Castle Correctional Facility, what positions have you held there?

NELSON – DIRECT/WRIGHT                          116

A    I started out as a correctional officer.  I was a reentry specialist.  I was a (indiscernible) coordinator.

THE REPORTER:  Could you repeat that, please.

THE WITNESS:  Sorry?

THE COURT:  Could you repeat that answer.

THE WITNESS:  Yeah, I was a correctional officer, reentry specialist, a reentry coordinator, a case manager, unit team manager, the grievance specialist, and now the PREA compliance manager.

BY MR. WRIGHT:

Q    Okay.  So you've worked in multiple different positions at New Castle?

A    Correct.

Q    Okay.  In 2020 -- were you a case manager between either 2019 and 2022?

I apologize.  Were you a unit team manager between 2019 and 2022 at New Castle Correctional Facility?

A    I believe so, yes.

Q    Okay.  And where were you the unit team manager at?

A    When I was a unit team manager, the only area I worked was over the annex at protective custody and transition unit.

Q    Okay. So what is the annex building -- how many units are in the annex building?

A    Two buildings.

Q    Which units are there?

A    M-Unit, which is protective custody.

Q    Okay.

A    O-Unit, which is -- it's called the transition unit or the step-down unit.

Q    Is it general population, O-Unit?

A    It is considered general population.

Q    Okay.  All right.  How do you -- well, hold on.

Do you remember -- when is the first time you met the plaintiff, Mr. Wright?  I'm just calling myself Mr. Wright.  When is the first time that you met Mr. Wright, do you recall?

A    In O-Unit.

Q    In O-Unit.  A general population unit; correct?

A    Correct.

Q    When Mr. Wright was in O-Unit, did he hold a job as a program aide slash mentor?

A    I believe so.

Q    Okay.  And as a unit team manager, were you the so-called supervisor or the boss over the program aide mentors or who we reported to?

A    I don't -- I don't really recall.

Q    Okay.  Okay.

MR. WRIGHT:  Your Honor, may I enter Exhibit 7 into...

THE COURT:  Do you want to pull up Exhibit 7?

MR. WRIGHT:  Yes, ma'am.  I would like to enter it

into evidence, if possible.  And just so I establish he was my boss and he signed off on paperwork cerning me being a mentor.

BY MR. WRIGHT:

Q    At the bottom, is that your signature?  "S. Nelson, Unit Team Manager," is that your signature?

A    Yeah, that is.

Q    And this is a form that you typed up just speaking to the different classes I completed and taught; correct?

A    That's correct.

Q    Okay.  All right.

        THE COURT:  Any objection?  He's offering Exhibit 7.

        MR. LIPPS:  None, Your Honor.

        THE COURT:  Exhibit 7 is admitted into evidence without objection.

    (*Exhibit 7 was received in evidence.*)

BY MR. WRIGHT:

Q    All right.  What was the program aide and mentor's job responsibilities as a mentor in O-Unit?

        MR. LIPPS:  I'm just going to object to relevance at this point, Your Honor.  There's no point to the jobs.

        MR. WRIGHT:  Just the foundation of the -- to the character because, as I give my testimony -- I don't want to reveal my strategy, but it's just to the foundation of the character of the individual prior to --

        THE COURT:  His character or your character?

MR. WRIGHT: My character.

THE COURT: Okay. All right. I'll allow it. You may ask a question.

BY MR. WRIGHT:

Q   As the mentor or program aide, did I teach classes to other offenders? Or "facilitate" is the word.

A   I don't recall the scope of the classes.

Q   Okay. Do you mind reading the very first line where Carlton Wright's name is at?

A   "Carlton Wright arrived to NCN transition unit on 3/8/2019. During his time at this facility, he has completed several offender-facilitated classes and has facilitated multiple himself."

Q   Okay. So you wrote that I have facilitated multiple classes, teaching other inmates classes; correct?

A   Correct.

Q   Is being a mentor considered a prestigious job position?

A   That would have been a good job, yeah.

Q   Okay. And in order to be a mentor, you have to have good conduct history. Anybody just can't be a mentor; correct? There's certain qualifications to be a mentor?

A   There would have been criteria as far as conduct is concerned, yes.

Q   Conduct. How you get along with other inmates; correct?

A   Correct.

Q    How you get along with other staff members; correct?

A    Correct.

Q    Okay.  So while Mr. Wright was being housed in O-Unit, do you ever recall having any problems with Mr. Wright personally?

A    I do not recall any negative interactions while he was housed in O-Unit.

Q    Okay.  Did Mr. Wright ever file any grievances on you while he resided in O-Unit?

A    That, I do not --

Q    You don't recall?  Okay.

A    -- remember.

Q    Do you recall if Mr. Wright ever filed any grievance on any other staff members while he was in O-Unit?

A    I don't remember.

Q    Okay.  Do you recall why Mr. Wright requested to leave O-Unit and go to protective custody?

        MR. LIPPS:  I would object.  That would be outside of this witness's knowledge why Mr. Wright did something.

        MR. WRIGHT:  No, it's not, but...

        THE COURT:  So you're going to withdraw the question?

        MR. WRIGHT:  It's okay.  I'm going to ask something else.  It's fine.

        THE COURT:  Okay.

        MR. WRIGHT:  I withdraw.

        THE COURT:  He's withdrawing the question.

Next question.

BY MR. WRIGHT:

Q    As a unit team manager, are you the unit team manager of M-Unit and O-Unit?

A    The unit team manager is over M and O-Unit.

Q    Right.  Correct.  And as the unit team manager, if a person requested protective custody, is your recommendation required one way or the other?

A    I'm not sure I understand the question.

Q    Okay.  If an offender in O-Unit requested protective custody, does the unit team manager give a recommendation?

A    Yes.

Q    Okay.  So you met Mr. Wright in O-Unit, and he eventually ends up in M-Unit; correct?

A    Correct.

Q    So in order for me to get to M-Unit, did you give a recommendation for him to receive protective custody?

A    It would have been a recommendation -- I would have had one part of the recommendation.

Q    Did you give some part of the recommendation for him to go to M-Unit?

A    Yes.

Q    So when you gave that recommendation, you acknowledged it was some type of reason this offender needed protective custody; correct?

A    Correct.

Q    All right.  Do you recall when Mr. Wright moved to M-Unit?

A    I don't recall anything specific.

Q    Okay.

A    But I do know that he went from O-Unit to M-Unit.

Q    I understand.  Okay.  In December of 2020, who was the case manager in M-Unit?

     In December 2020, was case manager Jama Jones the case manager of M-Unit?

A    I would be guessing.

Q    I understand.  I know it's been a while, but I can refresh your memory for you.

     MR. WRIGHT:  I would like to enter Exhibit K into evidence, please.

     THE COURT:  You may.

     MR. LIPPS:  There's not a K.

     MR. WRIGHT:  I apologize.  I'm so used to the lettering.  Where's my reference sheet?  It's the response to the plaintiff's first set of interrogatories by defendant Nelson.  I apologize.

     MR. LIPPS:  Exhibit 11?  Is that what you're seeing, 11?

     MR. WRIGHT:  I haven't got there.

     Correct.  Exhibit 11, please.

     MR. LIPPS:  Okay.

BY MR. WRIGHT:

Q    Could you please turn to page 8 of 11.  Okay.  Do you recall giving this response to the plaintiff's first set of -- first set of interrogatories to the defendant?  Do you recall giving this?

A    Yes.

Q    Okay.

A    I know that she was a case manager there.  I just don't recall the specific dates that she was the case manager.

Q    Okay.  Was she a case manager at the time Mr. Wright was housed in M-Unit?

A    Yes.

Q    Okay.  And as a case manager, what is her job responsibilities?

A    Referring to programs, bed assignments or recommending bed assignment changes, developing a case plan, and assisting with day-to-day issues that they may encounter.

Q    So you say she also handled recommended bed assignments within M-Unit; correct?

A    Correct.

Q    And as a unit team manager, do you have authority to authorize bed moves in M-Unit?

A    Yes.

Q    So you have -- so are you part of the process of approving bed moves as a unit team manager?

A    Yes.

Q    Okay.  So is your decision needed in order for bed approval to be -- a bed assignment to be approved?

A    Can you repeat that?

Q    As the unit team manager of M-Unit, is your approval needed for bed assignment to be authorized?

A    Is it absolutely necessary?  No.  You know, if the case manager requested a certain move or if a sergeant requested a move and somebody above my authority said that that move was authorized, then, you know, it wouldn't require my approval.

Q    As the unit team manager, do you have the authority, for whatever reason, to deny a bed move that a case manager suggests?

A    Yes.

Q    Okay.  What do you remember about the plaintiff at M-Unit?  Is that a vague question?

      From your recollection of Mr. Wright, you say you remember who I am, what stands out about the plaintiff that you remember?

      Maybe I can help you a little bit.

A    Yeah, that's vague.

Q    That's okay.  Do you recall the plaintiff being complaintive and filing grievances often?

A    I wouldn't really have knowledge of any grievances, you know, unless they were sent to me by the grievance specialist.

Q     Okay.  Do you recall the plaintiff -- I'll come back to that.  Do you recall the plaintiff frequently complaining about bed moves?

A     Not that I -- maybe.  I mean, there was a lot of offenders in M-Unit that complained about bed moves.

Q     Okay.

      MR. WRIGHT:  Am I allowed to put an exhibit up and then come back to this exhibit later?

      THE COURT:  Yes.

      MR. WRIGHT:  Okay.  Could you please put up Exhibit 2, I believe it is, the offender history.

      MR. LIPPS:  If I could just have one second.

      MR. WRIGHT:  Oh, sure, no problem.

BY MR. WRIGHT:

Q     If you can refer to the bottom, because that's the way it goes, up.  On 12 -- on December 2, 2020, the plaintiff was moved to cell 214A in M-Unit; correct?

A     Correct.

Q     And then 13 days later on December 15, 2020, the plaintiff was moved again to cell 209 in M-Unit; correct?

A     Correct.

Q     And then again on December 23, 2020, the plaintiff was moved to cell 112 in M-Unit; correct?

A     Correct.

Q     And then about 13 days later, on January 6, 2021, he was

also moving in to cell 103 in M-Unit; correct?

A    Correct.

Q    All right.  And then on January 13, 2021, he was moved to cell 206 in M-Unit; correct?

A    Correct.

Q    So that's five bed moves within December 2nd to January 13th; correct?

A    Correct.

Q    So do you consider that frequently?

A    Yeah, that would be frequent.

Q    Is that common for you to move offerers that frequently?

A    In M-Unit, there were frequent bed moves.

Q    Okay.  Do you ever recall the plaintiff complaining about these frequency of bed moves to you?

A    Not that I -- nothing specific that I can recall.

Q    Okay.  Do you recall the plaintiff filing a grievance on you concerning these bed moves in January, multiple grievances on you?

    Do you recall the plaintiff filing a grievance on you and case manager Jones in January regarding these bed moves?

A    Not that I remember.  If the grievance was on me, the grievance would have been sent to my supervisor to answer.  I really shouldn't know about the grievance if it was filed on me.

Q    Do you recall you ever personally responding to a

grievance concerning the plaintiff complaining about you moving him around frequently?

A    I do not remember.

Q    Okay.  Do you remember -- I'm good.

MR. WRIGHT:  Can I have Exhibit...?

THE COURT:  Did you want to offer 2?

MR. WRIGHT:  I'd like to offer Exhibit 58, please.

THE COURT:  Did you want to offer Exhibit 2?

MR. WRIGHT:  Oh, yes, ma'am.

MR. LIPPS:  Your Honor, I believe that one is stipulated to.

THE COURT:  Well, what are your stipulations?

MR. LIPPS:  To the authenticity and admissibility of Exhibit 2.

THE COURT:  All right.  Well, you all didn't put that on the record.

MR. LIPPS:  I'm sorry, Your Honor.

MR. WRIGHT:  I would like to stipulate to it, please.

THE COURT:  All right.  So 2 is in evidence pursuant to stipulation.  Are there any other exhibits that you stipulated to admissibility?

MR. LIPPS:  The two Krul ones are the only other ones.

THE COURT:  Well, those are already -- I put those in evidence.

MR. LIPPS:  Yes, Your Honor.

BY MR. WRIGHT:

Q    All right.  Before I pull this up, you say you don't recall ever responding to a grievance concerning Mr. Wright complaining about you frequently moving him?

A    Not that I can remember.

Q    Okay.  Did you consider Mr. Wright to be a problem or problematic while he was on the M-Unit?

A    I do recall him, you know, being confrontational with staff.

Q    Okay.  Could you elaborate.  What does "confrontational with staff" mean?

A    Nothing specific stands out.  Just I recall there always being, you know, something wrong.

Q    Complaining?

A    Right.

Q    So, confrontational.  Do you recall if Mr. Wright received any conduct reports with being confrontational with staff?

A    Not that I recall.

Q    Okay.  So have you ever referred to Mr. Wright as being a problem?

A    I don't know if I have.

Q    Okay.

MR. WRIGHT:  First I'm going to introduce this one. I'm going to come back to that.

Could you please introduce -- do you know where this response to the interrogatories -- it's from the Shane Nelson, Lieutenant Krul, Ndiaye case. It's in here, you didn't object to it.

MR. LIPPS: I don't know what you're talking about.

THE COURT: What's the exhibit number?

MR. LIPPS: Is it the one that has "K" written on it? Is that the one you're talking about?

MR. WRIGHT: Yes, the original Exhibit was 55, but I ran out of letters.

THE COURT: Is it in the book? Look in the book.

MR. WRIGHT: Yes, ma'am. I'm quite sure it is.

THE COURT: Who is it of?

MR. WRIGHT: It's defendant Shane Nelson, it's the response that he gave -- that one right there. Right there.

BY MR. WRIGHT:

Q   Mr. Nelson, so you said you don't recall if you ever referred to offender Wright as being a problem?

A   Not that I remember.

Q   Okay. And are you the Shane Nelson that gave this sworn document that's on the screen right there?

THE COURT: Put the exhibit number on the record.

MR. WRIGHT: It's Exhibit -- what number is it, Mr. Lipps?

MR. LIPPS: It's 50.

MR. WRIGHT:  Exhibit 50.  I'd like to introduce Exhibit 50 to evidence, please.

MR. LIPPS:  I just would object because there's been no foundation yet.  It also appears to be from a totally different case as well.  So I'm not sure if it's being used for impeachment.  Or, actually, I don't know why --

THE COURT:  I think he's trying to impeach the witness.

MR. WRIGHT:  It is.  Because it asks the question here, has he ever -- may I show him?

THE COURT:  He can look on the screen, Exhibit 50.

BY MR. WRIGHT:

Q    Mr. Nelson, would you please look at page 13 of 15, please.

MR. LIPPS:  I don't know how to rotate.

MR. WRIGHT:  It's in your book, Mr. Nelson.

MR. LIPPS:  Here we go.

BY MR. WRIGHT:

Q    Could you please read number 12, the question to number 12.

A    The question or the answer?

Q    I want you to read the question first, and then you can read the response, the answer that you gave.

A    "Can you please tell me, as you being UTM of M-Unit, since Mr. Wright arriving to M-Unit in approximately November of

2020, have Mr. Wright been known by you to be a problematic inmate to the staff and/or housing in M-Unit?"

Q   Okay.  And what is the answer that you gave to that question in answer A?

A   I answered "yes".

Q   Okay.  So in this document that you have under -- that you've sworn to, you have referred to me as being a problematic inmate?

MR. LIPPS:  I'm going to object, Your Honor, because it doesn't show that.  It shows the plaintiff referring to himself as a problematic inmate and Mr. Nelson saying yes.

MR. WRIGHT:  I said, "Have Mr. Wright been known by you."

THE COURT:  You can't talk at the same time.  Go ahead and finish what your objection is.

MR. LIPPS:  It's a mischaracterization of what is being shown and what's been testified to.

THE COURT:  All right.  You can clarify it on your cross.  Okay?

MR. LIPPS:  Yes, Your Honor.

THE COURT:  Okay.  Your next question.

BY MR. WRIGHT:

Q   Okay.  So, yes, you have referred to Mr. Wright as being a problematic inmate?

THE COURT:  Answer out loud.

THE WITNESS: Yes.

MR. WRIGHT: I'd like to -- I'll come back to that. I'd like to insert Exhibit 58 into evidence, please.

THE COURT: You are offering 58?

MR. WRIGHT: Yes, ma'am.

THE COURT: Any objection to 58?

MR. LIPPS: Objection as to foundation, at this point, Your Honor.

MR. WRIGHT: Would you like me to tell you?

THE COURT: You have to get a foundation.

MR. WRIGHT: Yes, this is speaking to the credibility and to verify -- this is a statement that Mr. Nelson -- e-mail he sent from himself where he could authenticate that he sent, where he's saying that Mr. Wright has continued to be the problematic cellmate, et cetera, et cetera. That was given in 2021, a different occasion he referred to me as being a problematic cellmate. So this is for the purposes of --

THE COURT: Impeachment?

MR. WRIGHT: Pardon me?

THE COURT: You're trying to impeach him?

MR. WRIGHT: Yes, to show that he has referred to me on multiple occasions being a problematic cellmate more recently when this stuff was going on and stuff happened.

THE COURT: Well, clarify that he, in fact, wrote that. Ask him.

BY MR. WRIGHT:

Q    Mr. Nelson, do you see Exhibit 58?

A    I do.

Q    Do you know what that is?

A    That would be an e-mail from myself to the grievance specialist.

Q    So are you verifying that you sent this e-mail to the grievance specialist?

A    The e-mail is from me.

Q    Okay.

        THE COURT:  All right.  You may ask your question.

BY MR. WRIGHT:

Q    Can you read, I guess it would be the second line -- the second paragraph.  What does that say in an e-mail you wrote to the grievance specialist?

A    "He has continued to be the problematic cellmate, which is the reason for each bed move."

Q    Okay.  What date did you send that?

A    February 5, 2021.

Q    So each bed move that Mr. Wright just spoke of, the frequency of it, was that the reason he was moved frequently?

A    According to this e-mail, it must have been.

Q    All right.  I'm going to come back to that.

        THE COURT:  Do you object to the admissibility of 58?

        MR. LIPPS:  No longer.  No longer an objection.

THE COURT:  Fifty-eight is admitted into evidence without objection.

(*Exhibit 58 was received in evidence.*)

BY MR. WRIGHT:

Q    So is it true that each time Mr. Wright was moved, five times in less than two months, it's because he was a problematic cellmate?

MR. LIPPS:  I'm going to object.  It was asked and answered, Your Honor.

MR. WRIGHT:  I don't recall the answer.

THE COURT:  He can answer it.

THE WITNESS:  There could have been numerous reasons for moves.  It could have been you requested a move; it could have been there were problems on that range; it could have been to accommodate for, you know, new intakes.  There's numerous reasons why a bed move could have happened.

BY MR. WRIGHT:

Q    I'm just going by what you said.  You said he's a "problematic cellmate, which is the reason for each bed move."  So I just wanted to get clarity on -- so, all right.

THE COURT:  Is that a question?  Ask your next question.

BY MR. WRIGHT:

Q    So you say you don't recall Mr. Wright filing a grievance about you -- frequent bed moves.  Do you recall responding to a

grievance regarding him frequently -- about bed moves?

A    Well, now I remember.

Q    Okay.  So that's -- what is this e-mail for?

A    When a grievance -- when the grievance specialist needs a response to a grievance, they'll reach out to certain parties to gather information.  So she would have asked me for, you know, information about whatever the grievance was about.

Q    Okay.  So this validates that at some point prior to 2/5, a grievance was filed on you by Mr. Wright pertaining to bed moves, and this was your response; correct?

A    Right.

Q    Okay.  So in February of 2021, you were aware that Mr. Wright had been filing grievances on you?

          THE COURT:  You may answer.

          THE WITNESS:  I was.  I mean --

BY MR. WRIGHT:

Q    There's no right or wrong answer.

A    -- I don't remember it, you know -- like, I remember it now that, you know, there's the e-mail.

Q    I don't know if I'd remember it now if I referred --

          THE COURT:  Mr. Wright, stop commenting.  Just ask questions.

          MR. WRIGHT:  Okay.

          THE COURT:  Okay?  Because the court reporter can't --

MR. WRIGHT:  Okay.  I apologize.

THE COURT:  -- transcribe when people are talking -- like when I'm talking now, that means be quiet.  She can only transcribe one person at a time.  Okay?

MR. WRIGHT:  All right.

THE COURT:  So slow down and breathe before you ask each question.  Next question.

BY MR. WRIGHT:

Q    So at this time on February 5, 2021, you were aware that I had filed a grievance on you?

A    I must have been aware because I responded to the grievance specialist.

Q    Okay.  Do you recall if this is the only grievance that you recall responding to that Mr. Wright filed on you?

A    I don't know.

Q    Okay.  So from this grievance, do you recall Mr. Wright complaining about living with his cellmates with -- what do you recall from this grievance that he was complaining about, from your response?

A    There's, I mean, not much that I remember about it at all.

Q    All right.  Do you recall Mr. Wright not getting along with his cellmates and wanted to live in different cells?

A    I can't remember anybody specifically, but, you know.

Q    Okay.  All right.  Could you read the next line, the third paragraph.

A    "He and his current cellmate have requested to live together and meet capability requirements.  There should be no reason for future complaints from him."

Q    Okay.  So from that response you gave, it indicates that I was complaining to you about bed placement, because that was the response you gave.

A    The statement, "There should be no reason for future complaints," would likely be me referencing the grievance that was just submitted.

Q    All right.  Pertaining to bed placement?

A    Right.

Q    Okay.  And this was on February 5, 2021.

Do you remember an offender named Elijah Dorsey?

A    Yes.

Q    And what do you remember -- how do you remember Elijah Dorsey?  Because I know in M-Unit there's a lot of people and it's been years ago.  What stands out about Elijah Dorsey that you remember him?

A    He was being held in M-Unit as a safekeeper.  He had not yet been sentenced.

Q    And why was he being held in M-Unit on safekeeping?

A    Due to the nature of his crime.

Q    And what is the nature of his crime or was at that time?

A    He was -- I can't remember the location, but killing a police officer.

Q    So he was charged with the crime of killing a police officer, Indianapolis police officer, that was the allegation?

A    I believe so.

Q    Okay.  And so he was -- he stood out due to his case, the nature of his case?

A    He stood out to me because, as him being a safekeeper, you know, I had to keep a list of those that were in M-Unit.

Q    What is a safekeep?  What does a safekeep mean?

A    Basically just they haven't been, you know, convicted of their crime yet.  They're being housed in DOC, in the Indiana Department of Corrections, instead of in the county jail.

Q    Okay.  Are safekeep inmates and sentenced inmates allowed to physically interact with each other?

A    He wouldn't have been sent to a two-man cell environment in M-Unit if he wasn't able to.

Q    Okay.  All right.  Do you ever -- I'll come back to that. Strike that question.

          MR. WRIGHT:  Could I please go back to Exhibit 2, please.

BY MR. WRIGHT:

Q    So on the date you gave this -- you gave the e-mail on 2/5/21.  You said there would be no reason for Mr. Wright being -- a bed move.  Okay.  Do you recall why Mr. Wright was moved on April 5, 2021?

A    No.

Q    Did he request a bed move that you recall?

A    Not that I recall.

Q    Okay.  And April 5th is after February 5th, after I filed that grievance on you; correct?

A    Correct.

         MR. WRIGHT:  Okay.  I would like to show Mr. Nelson Exhibit -- I believe it's 1.  Yeah, Exhibit 1.

BY MR. WRIGHT:

Q    Do you know what this is, Mr. Nelson?

A    Case notes.

Q    Do you know what this document is?

A    It looks like a report of case notes from Oracle.

Q    Okay.  And who entered these case notes?

A    Anyone with access to Oracle could enter those case notes.

Q    Okay.  Have you ever made any case notes as a unit team manager pertaining to any offender, let alone Mr. Wright?

A    Yes, I've made case notes in Oracle.

Q    Okay.  So you have made case notes before on -- Case Notes 2; correct?

A    Yes.

Q    From your recollection, this is an authentic document?

A    Yes.

Q    Okay.  And who has the ability to review case notes made by different counselors and unit team managers?  Are you able to see other notes made by other counselors and unit team

managers?

A    Yes.

Q    So you have the ability to see that; correct?

A    Yes.

Q    All right.  And you yourself have also made case notes on here about Mr. Wright.  I got that established, right.

From your knowledge, do you remember where offender Dorsey was housed at M-Unit?  I know you probably don't, but...

A    Pod 1.

Q    Okay.  So do you know you're here for the allegations that Mr. Wright claims that you failed to protect him from being assaulted by Mr. Dorsey; correct?

A    Correct.

Q    And I'm making the allegations that you were aware of the danger and you failed to protect me.  And you're opposing that you didn't know; correct?

A    Correct.

Q    Prior to it happening.  So just for the record -- I'll show you the documentation, but Mr. Wright was attacked by offender Dorsey on June 2, 2021.  And you say you was never made aware -- were you ever made aware that Mr. Wright expressed fear or danger of offender Dorsey?

A    If we would have -- if you would have told us that there was an issue with Dorsey, we would have had you all separated.

Q    Were you ever made aware -- did Mr. Wright ever make you

aware that he was in fear or in danger of being around offender Dorsey?

A      Not that I recall.

Q      Has any staff member ever made you aware that he was afraid and in fear of being attacked around offender Dorsey?

A      Not that I remember.

Q      Were you ever made aware by any source that you were -- that Mr. Wright was afraid and in danger of offender Dorsey?

A      Prior to these -- prior to the fight?

Q      Prior to the incident, were you ever made aware of that?

A      Not that I remember.

Q      All right.  Could you please read where it says -- the bottom --

MR. LIPPS:  I'm going to object.  He's asking this witness to read a hearsay statement that appears to be prepared by Wesley Clark.

MR. WRIGHT:  Okay.

MR. LIPPS:  I don't believe that's appropriate.

THE COURT:  I'll sustain the objection.

MR. WRIGHT:  Do I get to argue why it's relevant?

THE COURT:  Go ahead.  He's saying it's hearsay, inadmissible hearsay.

MR. WRIGHT:  Okay.  Well, I'm going to ask him to confirm it.  He said that he has access -- this is the accurate document; correct?  He said this is the accurate document.  And

this is a case note that's entered by counselors as well as him that he has observation to.  So I'm asking him, could he read a document that he uses, a system that he uses, that is an official document.

I didn't ask him did the person say this.  I asked him, could he read the statement that he testified this is an authentic document that's crucial to the -- that they was made aware, prior to the fight, Mr. Wright complaining about his concern and safety.

THE COURT:  I can't read it because mine is blacked out.

MR. WRIGHT:  He said he was not made aware prior.

THE COURT:  So you are trying to impeach the witness?

MR. WRIGHT:  Correct.

THE COURT:  All right.  You read it.

MR. WRIGHT:  Okay.

THE COURT:  And ask him did he -- was he familiar with this statement.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    So you said this is an official document, the case notes; correct?

A    Correct.

Q    Okay.  And this is -- the case notes is something that you have access to and you --

THE COURT:  You don't have to ask him that.  Ask him -- read what it says and ask him if he's familiar with that.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    It says -- on April 5, 2021, the entry says, "Prepared by counselor Wesley Clark."  Who is Wesley Clark?

A    Former case manager in M-Unit.

Q    He was a counselor in M-Unit; correct?

A    Correct.

Q    Okay.  And it says, "While moving from M1-206 to M1-116, offender Mr. Wright told Officer Foley that he was in fear for his life being moved into cell M1-116," with offender Dorsey.  "Officer Foley placed Wright into the 1-Range shower for safekeeping until Lieutenant Krul could be contacted to advise on the situation.  Officer Foley came to the case manager's office in M-Unit to advise case manager Clark and case manager Jones of the situation.  Officer Foley was advised, too, that he had done the right thing placing offender Wright in the shower while awaiting Lieutenant Krul's assistance and advice on the situation."

THE COURT:  So your question is was he familiar with that.

BY MR. WRIGHT:

Q    Were you familiar with -- have you ever seen this?

A    I don't remember reading that case note.

Q    Okay.  But you have access to the case notes?

A    I would have had access to the case notes.

Q    Okay.  So you weren't aware prior to June 2nd that Mr. Wright had voiced his complaints of being afraid of offender Dorsey?

A    Not that I recall.  I don't remember reading that case note.

Q    Okay.  So in a situation where an offender does have a complaint of fear of being around an offender, what does he do?

A    He would report it to staff.

Q    He would report to the prison officials?

A    Uh-huh.

Q    And what would happen in that case?

A    They review the situation and see if the offender needs -- you know, needs a move to another range.  Maybe the other offender needs moved for separation.  I mean, the key would just be to keep the two separated.

Q    Okay.  In your e-mail you sent to Ms. Winingham, you said that I was with a compatible cellmate, there should be no reason for future complaints of bed moves.  Do you recall why, three months later, you decided to move offender Wright to cell 116 with offender Dorsey?

A    That is saying that I personally, you know, had you placed in that -- requested that you be placed in that cell.  I

wouldn't personally plan out any bed moves.

MR. WRIGHT: Okay. Could you please pull up Exhibit 2, again, please.

MR. LIPPS: Yes.

BY MR. WRIGHT:

Q   Okay. The first entry of 4/5/21, do you see that entry, to cell 116A?

A   Yes.

Q   Who authorized that bed move to 116A?

A   So, yeah, that sheet says that, you know, I authorized that bed move, but more goes into authorizing a bed move. Security looks at it, OII looks at it. Multiple people look at these bed moves before --

Q   Did you authorize this bed move on April 5, 2021, to cell 116A? Is that Mr. Nelson's name? Did you authorize that move according to this document we stipulated to?

A   According to that.

Q   Okay. And the very next entry, 4/5, on the same day, it shown I was moved to cell 206-A; correct?

A   Yes.

Q   That's within a short time period, within hours; correct?

A   Correct.

Q   So do you know why Mr. Wright was moved out of that cell within a few hours?

A   No.

Q   So when an inmate moves out of the cell within a few hours, what does that represent or what does that speak to?  I mean, is it common for an offender to move into a cell and move out within a couple of hours?

A   No.

Q   Does that suggest that maybe they wasn't getting along, for him to move that quick?

A   It could show that.

Q   Okay.  Were you ever made aware that Mr. Wright -- were you ever made aware of why Mr. Wright left cell 116 within a few hours of being in there?

A   I don't remember why.

MR. WRIGHT:  Okay.  I'd like to offer into evidence Exhibit 5, first.

MR. LIPPS:  You said 5?

MR. WRIGHT:  Yes, sir.

THE COURT:  Any objection to Exhibit 5?

MR. LIPPS:  If a foundation is laid, I won't, Your Honor.  I don't know what this is, though.

MR. WRIGHT:  I'll explain to you, sir.

THE COURT:  You going to explain it through this witness?

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q   So you say you wasn't made aware of why Mr. Wright left

116A within a few hours and was moved on the 5th of April; correct?

A    Correct.

Q    Okay.  This is a letter from case manager Jama Jones that was written to offender Wright, and it says, "Please review the BITS guidelines included.  To temporarily offset conflict, you will remain on case manager Clark's caseload.  Due to your issues in the other pods, it is apparent that Pod 2 will be appropriate to house you for the time being."

And the date on this is April 12, 2021, a week after Mr. Wright asked to be moved out of the cell with inmate Dorsey.

THE COURT:  What's your question to this witness?

BY MR. WRIGHT:

Q    Did Ms. Jones ever convey to you why I was moved out of the cell with Mr. Dorsey?

A    Not that I remember.

Q    Okay.  But do you recall that Mr. Wright once lived in a cell with offender Dorsey?

I can clear it up for you.  Do you recall assigning Mr. Wright to the cell with Mr. Dorsey on April 5th, where you authorized that move?

A    I recall seeing that bed history where you were assigned to that cell.

Q    Okay.  So you authorized me to live with Mr. Dorsey, okay.

MR. LIPPS:  Was that a question?

BY MR. WRIGHT:

Q    Did you authorize me --

MR. WRIGHT:  You can pull it back up.  I'm going to go back to Exhibit 2, please.

BY MR. WRIGHT:

Q    On 4/5/21, according to this bed roster that we authenticated to us as facts, did you authorize Mr. Wright to live in a cell with Mr. Dorsey on 4/5/21?

A    I don't remember approving that move, but --

Q    Is your name on there?

A    My name is on that bed move sheet.

Q    Okay.  The very next entry, who authorized that move out of the cell a couple hours later?

A    To M2-206?

Q    Yes.

A    Captain Dorn.

Q    Okay.  So you didn't authorize that move; correct?

A    Correct.

Q    Okay.  So when an offender moves overnight like that, to a different cell, are the case managers and counselors notified that the offender has been moved?

A    Not always.

Q    So a bed move that you put someone in, and then you come back to work the next day, would you be made privy that of new

bed assignment?

A    Possibly.

MR. WRIGHT:  Can I see Exhibit 3, please?  Exhibit C, if you don't mind.

MR. LIPPS:  Three?

MR. WRIGHT:  Yes.

I would like to enter this into evidence, if possible.

THE COURT:  Any objection to 3?

MR. LIPPS:  No foundation, Your Honor.

THE COURT:  Explain what 3 is.

MR. WRIGHT:  Okay.  Well, I just asked Mr. Nelson about the bed move to Pod 2.  And this is the case manager sending an e-mail speaking on, "Offender Wright refused housing on night shift and was moved to Pod 2," speaking to the bed move right here, to show that, once again, it was put out there that he refused housing and was moved to Pod 2 on the night that this happened.

THE COURT:  So you're asking the witness is he familiar with this?

MR. WRIGHT:  Yeah.

BY MR. WRIGHT:

Q    Have you seen this where Mr. Wright was moved, refused housing?

A    I did not make it a habit to review those notes daily, so

I don't remember.

Q    Have you seen this e-mail right here?

A    I don't remember if I've seen it.  I see it now.  But I don't remember seeing it in the past.

Q    Do you know if Mr. Wright refused to be housed in cell 116 that night while he got moved?  Did you move him out of the cell once you moved him in there?

A    No.

Q    So for him to get moved, does that mean he refused to live in the cell?

        MR. LIPPS:  I'm going to object.  This is asking for speculation, Your Honor.

        THE COURT:  Do you know, sir, why he was moved?

        THE WITNESS:  Well, based on this note, he refused his housing assignment that night and was moved out.

        MR. LIPPS:  I would move to strike.  That's based on this document, which it's clear hearsay.

        THE COURT:  We'll let it in.  We'll let it in.  I'm going to let it in.

        Next question.

        MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    From your experience as a unit team manager on M-Unit, why is it that offenders refuse housing?

A    Sometimes they just don't -- they just don't get along

with the person they live with.  You know, maybe one person is very clean and the other person is very dirty.  There's a laundry list of reasons why somebody doesn't want to live in the same cell as another person.

Q    But sometimes they do it because they don't get along for whatever reason?

A    Right.

Q    Has Mr. Wright been known to refuse housing before?

A    I don't know.

Q    I'll accept that.  Okay.  Once Mr. Wright was moved to cell 206, he remained there until he was moved to cell -- hold on.

Prior to June 2nd, did Mr. Wright ever speak to you or bring to your attention an issue with him and Mr. Dorsey?

A    I don't remember if he did or not.

Q    Okay.  So prior to June 2nd, you had no recollection from any source that Mr. Wright had an issue with Mr. Dorsey?

A    I really don't remember.

Q    Okay.  I want to take it back for a second.  Mr. Wright made the allegation that on June 6, I believe it was -- I mean, January 6, I believe it was, that -- January 13th, that he had a conversation with you in the dayroom area.  And during that conversation, he expressed different complaints about bed moves and things of that nature.  Do you recall that conversation?

A    No.

Q    Mr. Wright makes the allegation that you threatened to make his life a living hell if he didn't stop complaining.  Do you recall anything of that nature?

A    No.

Q    Did Mr. Wright complaining about whatever frustrate you?

A    That would be, you know, speculative.

Q    I'm asking you personally.  Did Mr. Wright's frequent complaining about whatever, was it annoying?

A    Every day was annoying in that unit.

Q    I'm speaking specifically Mr. Wright, because I can't speak for nobody else.  Did his constant complaining about whatever, was that frustrating to you?

A    I don't remember.  I don't really get frustrated easily.

Q    Okay.  But for some reason he was being deemed problematic by you on multiple occasions?

        MR. LIPPS:  Objection.  Argumentative, Your Honor.

        THE COURT:  It's not argumentative.  You can answer that.  Did you think he was argumentative?

        THE WITNESS:  Yes, I would say he was argumentative and, you know -- with both staff and other inmates.

BY MR. WRIGHT:

Q    Do you recall the thing he was argumentative about?

A    No, I don't remember anything specific.

Q    So was it to the point that he ever received conduct reports of his argumentativeness or combativeness or

disruptiveness?

A    I don't know.

Q    Okay.  But you do agree that you have referred to Mr. Wright on multiple occasions being a problematic inmate?

A    I recall that now from seeing the e-mail.

Q    All right.  As a unit team manager, is safety and security of the utmost to you?

A    Yes.

Q    Is it your responsibility as a unit team manager to keep inmates safe?

A    It's everybody's duty to keep them safe.

Q    Okay.  From your job training as a unit team manager, what are you to do if an offender brings to your attention he doesn't feel safe living in a certain environment in M-Unit?  What steps do you take, or what is the alternative for that?

A    Probably a move away from that situation.  Whatever, you know, the problem is, you know, keeping separation from that.

Q    All right.  So when Mr. Wright moves out of the cell 116A, what pod is that?  What pod is M1-116 cell located at?

A    Pod 1.

Q    And he was moved to Pod 2 that night?

A    Correct.

Q    And then on 5/27/2021, Mr. Wright was moved back to Pod 1 in cell 212; correct?

A    Correct.

Q   And who authorized that move?

A   Well, my name is on the, you know, bed movement.

Q   So you authorized that move; correct?

A   I don't recall authorizing.

Q   But according to the paper, you authorized it?

A   According to the paper, I did.

Q   Okay.  And M-212, is that upstairs or downstairs?

A   Upstairs.

Q   That's upstairs.  And M1-116A where offender Dorsey lived at, was that upstairs or downstairs?

A   Downstairs.

Q   Okay.  Hold that thought, please.  In M-Unit, how many pods are there?

A   Four pods.

Q   What, 1, 2, 3, 4?

A   Correct.

Q   And each pod has two ranges; correct?

A   Correct.

Q   And each range, is that a separate rec line?

A   Yes.

Q   And what does that mean to be a separate rec line?

A   It would mean, you know, the top range would be out for recreation during a specific time, and then the bottom range would be out during a specific time.

Q   Okay.  So that means that the top and the bottom rec lines

don't interact with each other because they're separated; correct?

A    Correct.

Q    Okay.  And there's four ranges in M-Unit and two pods per range; correct?

A    Say that again.

Q    There's four ranges in M-Unit, Pod -- I mean, Pod 1, 2, 3, 4; correct?

A    Yes, four pods.

Q    And then there's two ranges per pod?

A    Correct.

Q    So that's essentially eight different rec lines?

A    Correct.

Q    All right.  So June 1, 2021, Mr. Wright was moved to cell M1-114A.  Where is that located at?  Is that --

A    Bottom range of M1.

Q    Downstairs on 1-Range in cell 114; correct?  And is cell 114 on the same rec line as cell 116?

A    Yes.

Q    So that mean they come out together and interact?

A    Correct.

Q    And who approved that bed move, according to this paper?

A    According to this paper, I approved the move.

Q    You approved the move.  All right.  Are you aware that on June 2nd, Mr. Wright was attacked by offender Dorsey?

A    Can you say that again?

Q    Are you aware that on June 2, 2021, Mr. Wright was attacked by offender Dorsey?

A    I am aware of a fight that occurred between Wright and Dorsey.

Q    Okay.  Whatever you want to call it.  Are you aware that Mr. Wright and offender Dorsey had a physical altercation?

A    Yes.

Q    And where did that take place at?

MR. LIPPS:  I'm going to object.  There hasn't been a foundation of personal knowledge of that fight.

THE COURT:  Ask him does he have personal knowledge.

BY MR. WRIGHT:

Q    Do you have any personal knowledge where that fight transpired at?

A    It occurred on the recreation pad.

Q    In 1-Range?

A    M1.

Q    And if an offender doesn't live on the same rec line as another offender, they don't go to rec together; correct?

A    Correct.

Q    So they have no physical interaction; correct?

A    Correct.

Q    So if Mr. Wright didn't live on 1-Range on a bottom pod, around offender Dorsey, he could have not gotten into a

physical alteration with him, unless they lived around each other; correct?

A    If they were not on the same recreation line, then, no, they wouldn't have been around each other.

Q    To be able to get into a physical altercation; correct?

A    Correct.

Q    Has Mr. Wright ever complained to you about anybody -- him being afraid of anybody before?

A    I mean, yes.  When -- the reason for his protective custody.

Q    I mean -- correct.  In M-Unit, had Mr. Wright ever complained of being afraid of an offender in M-Unit?

A    Not that I remember.

Q    Would you have taken this seriously if Mr. Wright would have brought it to your attention, a need to be protected from a certain offender?

A    Absolutely.

Q    When Mr. Wright got to the fight with offender Dorsey, was he taken into segregation?

A    Yes.

Q    Okay.  Is it a common practice in segregation to house general population offenders with protective custody offenders in segregation?

A    The segregation unit was in O-Unit, so it would have had both M-Unit and O-Unit offenders in single cells in the same --

you know, on the same range.

Q    Okay.  Is there another segregation unit at the New Castle Correctional Facility?

A    Yes.

Q    Where is that located at?

A    It is located in our general population.  It's considered under our --

Q    Is it on the hill?

A    NCF.  On the hill, yes.

Q    Okay.  Do you know who offender Brooks is?

A    Yes, I recall Brooks.

Q    How is it -- what do you recall about offender Brooks that stands out to you?

A    Assaultive towards staff.

Q    I didn't hear you.  What did you say?

A    He was assaultive towards staff.

Q    Okay.  Was he assaultive towards offenders, also?

A    I would be guessing if I said.

Q    Okay.  But he has a history of assaultive behavior?

A    Correct.

Q    Being combative; correct?

A    Correct.

Q    Do you recall Mr. Wright being housed next door to offender Brooks when he went to segregation?

A    I don't remember where you -- the two of you would have

been housed.

Q    Okay.  Do you recall Mr. Wright ever complaining to you about being housed around offender Brooks?

A    No.

Q    Do you recall Mr. Wright ever complaining about being assaulted by offender Brooks while he was in segregation?

A    No.

Q    Okay.  Do you recall the sanction Mr. Wright received for his involvement or his physical altercation with offender Dorsey?

A    Do I remember what the sanction was?  No.

Q    Okay.

        MR. WRIGHT:  May I -- Exhibit 4, please.  May I please put up Exhibit 4.

BY MR. WRIGHT:

Q    Do you know what this is, Mr. Nelson?

A    "Report of Disciplinary Hearing."

Q    Okay.  And do you see the sanction that Mr. Wright was given under "Non-Grievous Loss"?

A    Time served.

Q    And what date was this paper signed?

A    It has different signatures on it.

Q    The one where it was signed where my name is at and it's got the check where -- yeah.  Well, you can give me both dates. What dates do you see on there?

NELSON - DIRECT/WRIGHT                              160

A    I see Ms. French's signature dated 6/18/21.  And then I see signature of offender Carlton Wright dated 6/16/21.

Q    And it says "time served"; correct?

A    Yes.

Q    And what does "time served" mean?

A    It means that the time that the person has spent in RHU is -- they're not getting any additional disciplinary segregation time.

Q    So does it mean that their time served is completed?

A    Yes.

Q    Are you aware that Mr. Wright filed another grievance on you on June 2, 2021?

A    I don't remember.  Not that I remember.

Q    That's okay.  I'm going to show it to you, sir.

     Okay.  I apologize.  It was actually June 8th.

     MR. WRIGHT:  Mr. Lipps, I have this exhibit to respond.  Do you know where the grievance --

     MR. LIPPS:  What number is it?

     MR. WRIGHT:  Huh?

     MR. LIPPS:  What grievance number is it?

     MR. WRIGHT:  128906.

     MR. LIPPS:  Oh, yeah, 25.  Is this the one?

     MR. WRIGHT:  Correct.

BY MR. WRIGHT:

Q    All right.  Have you seen this grievance before?

MR. WRIGHT:  May I enter it into evidence, please?

THE COURT:  He's going to offer 25 into evidence.

MR. LIPPS:  I would just have to object to the foundation of it through this witness, at least, Your Honor.

MR. WRIGHT:  This is the grievance that was filed personally on Mr. Nelson after I was in segregation prior to him prolonging my stay in segregation.  It's to determine the foundation of he had a reason to further hold me in seg out of retaliation because I filed a grievance prior to he did it.

MR. LIPPS:  This witness doesn't have any personal knowledge of this.

MR. WRIGHT:  Yes, actually, I have his response to the grievance I'm getting to next.

MR. LIPPS:  I was speaking to the judge.

MR. WRIGHT:  Okay.  My bad.  I apologize.

THE COURT:  All right.  You know, you can get these in when you testify, but you can ask him about it.

BY MR. WRIGHT:

Q    Mr. Nelson, do you recall seeing this grievance that was filed on you on June 8th regarding you and Ms. Jones' deliberate indifference towards me and me getting into a fight with offender Dorsey?

A    I don't remember this grievance specifically, no.

Q    What's the date on that grievance that was filed?

A    The date at the top right corner is 6/8/21.

Q    Okay.  And you don't recall -- and the grievance number is what?

A    128906.

MR. WRIGHT:  Okay.  Will you please pull up Exhibit 17, please.  I would like to enter Exhibit 17 into evidence, please.

BY MR. WRIGHT:

Q    And do you know what this is, Mr. Nelson?

A    It's a grievance response report.

Q    Okay.  And what's the grievance number for this?

A    Sorry, I was reading.  Say that again.

Q    Do you know what the grievance number is for this response?

A    Grievance No. 128906.

MR. WRIGHT:  For the record, Your Honor, I would like to -- Mr. Lipps verified that this is the response grievance to the prior grievance I just showed.  This is the response to that grievance.

MR. LIPPS:  I'm going to object.  It can't be authenticated.  It's clearly through somebody named H. Winingham.  So this witness does not have knowledge.

BY MR. WRIGHT:

Q    Okay.  Mr. Nelson --

THE COURT:  Hold on.  Let me make a ruling.  Where did you get this document from?

MR. WRIGHT:  This is the response from my grievance.

THE COURT:  Who gave you these?  Are these your documents, or were those given to you by the defendants?

MR. WRIGHT:  By the grievance specialist.

THE COURT:  Okay.  All right.  You can probably get it in during your testimony, since he's objecting.

MR. WRIGHT:  Well, can I ask him a question?

THE COURT:  Sure.  You can ask the witness a question.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Mr. Nelson, is your name in the response part on this grievance?

A    Yes, it is.

Q    Unit team Nelson.  So is it accurate that this is your response you gave to this grievance?

A    I don't remember giving this response, but it has -- according to this document, it has my name on it.

Q    So according to this document, you responded to this grievance; correct?

A    Correct.

Q    And this is the grievance that was filed on June 8, 2021; correct?

A    It's the same grievance number.

Q    Okay.  So you were aware, around June 8, 2021, that I had

filed a grievance on you concerning my complaints regarding Dorsey; correct?

A     Correct.

Q     All right.  I just wanted to establish that.

          MR. WRIGHT:  Could you -- where did it go?  Could you please -- Mr. Lipps, do you know where this is at, Exhibit S?  It has Case Notes 2 by Shane Nelson.

          I apologize for not being more organized.

          MR. LIPPS:  What is it?

          MR. WRIGHT:  It's the case notes by Shane Nelson, two entries.

          MR. LIPPS:  Is it 19?

          THE COURT:  Maybe this is a good time to stop for our lunch break.

          MR. LIPPS:  Yes, Your Honor.

          THE COURT:  And then you need to be organized when we come back.  Okay?  Make notes so you can get your things in.  We'll go ahead and take our lunch hour.  It is 12:46.  We'll start back at 1:40.  Okay?

          MR. WRIGHT:  Do I have to take a lunch?  I can't sit here and organize or I have to take a lunch?

          THE COURT:  Well, they're going to put you where they hold you, and everybody needs to take a break.  So we're on a lunch break.  We'll see you back in the courtroom at 1:45.

          COURTROOM DEPUTY:  All rise.

NELSON – DIRECT/WRIGHT

165

*(A lunch recess was taken from 12:47 p.m. to 1:55 p.m.)*

THE COURT:  You may be seated.  We're back on the record.  Carlton Wright, plaintiff, versus Shane Nelson, Krul, Lee, and Gard, defendants.

And where is our witness?

MR. LIPPS:  He's back here.

THE COURT:  Go get the witness.

Mr. Nelson, if you will return to the witness stand.

And Lawyers and Mr. Wright, we're going to try to finish today.  Okay?

So, Mr. Wright, I need you to just ask the question once, because you get your answer, and then you want to ask the same thing three or four times.  You don't have to do that. Once you've got that answer, it's going to be in the transcript.

MR. WRIGHT:  I have a problem being redundant.  My bad.

THE COURT:  Okay.  So try to do better so we can move a little quicker.  Okay?

All right.  Okay.  We're back on the record.  And you may resume your direct examination of the witness.

**SHANE NELSON RESUMED THE WITNESS STAND**

**DIRECT EXAMINATION (CONTINUED)**

BY MR. WRIGHT:

Q   How you doing, Mr. Nelson?

A    Good.  And yourself?

Q    I'm all right.

THE COURT:  Make sure you talk in the microphone.

BY MR. WRIGHT:

Q    I can't remember exactly where we left off at, but we was -- so you recall Mr. Wright getting into a physical altercation with --

THE REPORTER:  Mr. Wright, could you slow down, please.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Do you recall Mr. Wright getting into a physical altercation with offender Dorsey that led to him going to segregation?

A    Yes.

Q    Okay.  Do you recall if Mr. Wright received any seg time?

A    We discussed it was time served.

Q    Okay.  We got to that point.  Okay.  Time served.

All right.  And "time served" mean that your seg time is over and you're due to be released?

A    Correct.

Q    Okay.  And we've already established that on June 8th, I have filed another grievance on you concerning the attack of Mr. Dorsey on me.  And I showed you the -- I believe I did.  I showed you the exhibits to where you responded to it correctly.

MR. WRIGHT:  Do I need to show him again?

BY MR. WRIGHT:

Q    Exhibit -- I'll make it brief.  Exhibit 17 is where you responded to it.

Exhibit 25 is when I filed it, and Exhibit 17 is when you responded to it; correct?

A    Correct.

Q    Okay.  And that was June 8th, prior to you putting in for me to stay in segregation longer.  All right.  I just wanted to make sure we got that covered.

MR. WRIGHT:  I would like to enter into evidence Exhibit 19, I believe this is, please.

BY MR. WRIGHT:

Q    Can you see it, sir?

Could you tell me what this document is, please.

A    Oracle case notes.

Q    Okay.  Case notes is an entry that counselors and case managers do with regard to that specific offender; correct?

A    Correct.

Q    Do you see your name on here to have made some entries on this particular document?

A    Yes.

Q    And what date -- did you make this document?

Is that your name?

A    Yes.

Q    Did you make this entry?

A    Yes.

Q    Okay.  What is the date of the first entry prepared by Shane Nelson?

A    The activity date -- the date that I entered it in was June 18, 2021, from the RHU meeting that occurred on June 16th.

Q    Okay.  Now, you are aware that one of the plaintiff's allegations is that you held me in segregation longer than my time served date due to retaliation.

         MR. WRIGHT:  Do I need to ask a question?  Okay.

BY MR. WRIGHT:

Q    So could you please read that entry that you entered on June 18, 2021?

A    "On 6/16/2021, the RHU Multidisciplinary Review Committee met and reviewed the status of offender Carlton Wright.  The decision was made for the defender to remain in RHU under administrative hold.  Offender Wright has been recommended to be removed from protective custody and submitted for transfer."

Q    All right.  And you made that entry.

         All right.  You made this entry on June 18, 2021, approximately ten days after I filed a grievance on you; correct?

A    Correct.

Q    All right.  Why was Mr. Wright placed on administration hold?

A    Well, this reads as the RHU committee was looking to remove your PC status and submit for transfer.

Q    Okay.  But you personally made this entry; correct?

A    It is typical for the case manager to enter the note.  For whatever reason, I made the note for the case manager just summarizing what had occurred at the RHU review meeting.

Q    Are you on the RHU -- at that time, were you on the RHU Multidisciplinary Review Committee?

A    Yes.

Q    So you had input into this decision?

A    I would have had an input.

Q    Okay.  So did you initiate Mr. Wright being held on segregation past his out date?

A    Not that I remember.

Q    Okay.  Do you recall the document -- I had it up there, I believe.  It's the conduct report where it had the two dates time served, one was the 16th, one was the 18th.  Do you recall that?

A    Yes.

Q    Do you think it's coincidental that on the day, June 16th, when I'm due to get out of segregation, this come up on June 16th to further detain me in seg?

A    Say that again.

Q    All right.  On the conduct report, June 16th, it says time served.  That mean my time is up.  However, as soon as my time

was up, this entry was made.  Is that coincidental, when my time from seg was time to leave, you had input or recommended me be held in seg longer?

A    I wouldn't know.

Q    Okay.  But it did transpire on the same date, correct, on the 16th?

A    Correct, same date.

Q    Okay.  Next question:  Why was Mr. Wright recommended to be removed from protective custody?

A    He was involved in a physical altercation with another offender.  There have been times where, you know, if an inmate exhibits violence, maybe he doesn't need to be on protective custody.

Q    So one fight, which I claim I was attacked or whatever the case may be.  Have any other offender on protective custody been removed for having a fight?

A    I don't know.

Q    So one fight was sufficient enough to remove my protective custody?

A    I don't know how to answer that.

Q    Okay.  Once again, earlier, you're the one who recommended me to be on protective custody.  So does that mean you acknowledge there was a need for me to be protected?

A    Yes.

Q    So does one fight, which I claim I was attacked,

constitute me no longer needing protection?

A    That would have been a decision made by the committee as a whole, not one individual.

Q    But you played a part?

THE COURT:  You can answer it.  Did you play a part in that decision?

THE WITNESS:  Yes, I would have played a part in that decision.

BY MR. WRIGHT:

Q    Okay.  Did you ask for me to be removed from protective custody out of retaliation towards me?

A    No.

Q    Did you ask for me to be placed under administration hold for retaliation towards me?

A    No.

Q    Okay.  Could you read the next entry, please.

A    "On 6/23/21, the RHU Multidisciplinary Review Committee met and reviewed the status of Offender Carlton Wright.  The decision was made for the offender to be released from 0-3 to the population of M-Unit.  He will remain on protective custody status and will work with the unit team staff to complete appropriate BITS and CAREY guides to improve his behavior and attitude towards staff and inmates."

Q    Couple things.  This entry was made by you; correct?

A    Correct.

172

Q     And this entry was made when?

A     The entry was entered on June 25th to summarize activity that occurred on June 23rd.

Q     So, basically, a week apart from where you entered it -- like the same thing, a week apart where you actually typed -- so about a week apart.  Do you recall what happened within seven days that the decision was automatically made to keep me on protective custody?

A     The committee meets once a week.  And I don't recall, you know, why the decision changed.

Q     Because, I see it's a week apart, and that's a big decision.  So I'm just trying to ask you if you know why it happened or -- so you don't know why a week later they decided to keep me on protective custody?

A     I don't remember why the decision changed from one week to the next, no.

Q     Okay.

          MR. WRIGHT:  Can I show Exhibit 46, please?  May I commit this to evidence?  I don't know.

          THE COURT:  You want to offer which one, 19?

          MR. WRIGHT:  Yes, ma'am.

          MR. LIPPS:  Without objection, Your Honor.

          THE COURT:  Exhibit 19 is admitted into evidence without objection.

          (*Exhibit 19 was received in evidence.*)

NELSON - DIRECT/WRIGHT

173

MR. LIPPS:  And then, I'm sorry, what number?

MR. WRIGHT:  Forty-six.

BY MR. WRIGHT:

Q   Okay.  Mr. Nelson, do you see this exhibit?  And what exhibit is this, please?

A   It's a report from Oracle that appears to be program referrals.

Q   I'm talking about just the overall document.  These are the case notes that's entered by counselors and unit team managers; correct?

A   Counselors, unit team managers.  I see Rodney Pentecost's name.  He was, you know, over rescue and recovery.

Q   Okay.  The same thing of the past few documents I done show concerning inserts from counselors.  Okay.  All right.

    Could you refer to the last entry.

MR. LIPPS:  I would just object, Your Honor.  This is going outside the scope of any relevance for this case.

    It also appears to be just hearsay written by a nonparty, non- -- Jama Jones, somebody that's never been called as a witness in this case.  So I think the proper foundation would be for Mr. Wright to go about this differently.

MR. WRIGHT:  Ma'am?

THE COURT:  You may respond.

MR. WRIGHT:  It is very relevant because this date of entry from this counselor was a week prior to his entry where

they said I should remain on protective custody status.  So I was just laying a foundation that a week prior -- or, actually, a day prior to me filing my grievance, I was recommended to stay on protective custody, on June 7th.  And then on June 8th, after I filed a grievance, then came June 16th removal from protective custody, so --

THE COURT:  Well, why don't you ask him did he know that?

MR. WRIGHT:  Okay.

THE COURT:  Because your exhibit is not getting in as hearsay.  You can ask him did he know whatever information.

BY MR. WRIGHT:

Q   Did you know, Mr. Nelson, that my last review, I was recommended to remain on protective custody?

I'll make it easier for you.  Prior to you asking -- prior to you contributing to ask to have me removed from protective custody, had I been reviewed to be removed prior to that?

A   You had been reviewed prior to that, yes.

Q   To be removed from protective custody?

A   No, to remain on protective custody.

Q   Correct.  So the 16th was the first time -- the date of June 16th was the first time I was initiated to be removed from protective custody?

A   Correct.

Q   Okay.  I just wanted to establish that because --

THE COURT:  All right.  Next question.

MR. WRIGHT:  All right.

THE COURT:  Don't comment.  Questions only.

MR. WRIGHT:  Okay.  Thank you.

BY MR. WRIGHT:

Q    Have I asked you this:  Is there another segregation unit -- did we talk about this -- at New Castle prior -- I mean, other than --

A    We did talk about that.

Q    Okay.  So -- and they house people on the hill, too, in seg.  Do they house offenders on the hill in segregation, too?

A    They do.

Q    Okay.  So we can either be housed on the hill or in 3-Pod in segregation?

A    Correct.

Q    Okay.  If an offender brings to your attention in segregation that they're having a problem with another offender, would you consider moving them to another location, seg location?

A    Yes, we could.

Q    Or is it because we're behind doors, and that's not taken seriously because we can't really get to one another?

     I can rephrase it for you.  Is the threat of danger taken seriously in segregation due to the physical separation of two inmates?

A    Yes.

Q    It's still taken serious?

A    Yes.

Q    And why is that if I can't get to the next offender in segregation?  If we're physically separated, why is that danger taken serious?

A    Well, the safety has to be taken serious, you know, regardless of the circumstance.

Q    Okay.  So if you are aware of a threat, regardless the probability of something happening, it should be taken seriously; correct?

A    Correct.

Q    All right.  While Mr. Wright was in segregation, do you know if he was housed around offender Brooks?  You probably don't remember.

A    At that time, I don't recall that.  After speaking to the -- yeah, I know now that you were housed next to him.

Q    Okay.  So it's correct that Mr. Wright was housed next door to offender Brooks in segregation?

A    Correct.

Q    All right.  Did Mr. Wright ever complain to you -- how often do you do your rounds in segregation?

A    I don't recall the frequency.

Q    Approximate.  Do you walk around multiple times a week in seg?

A    It's likely that I would have.

Q    Are you able to be contacted through request form if an offender needs to write a request for whatever reason?

A    Yes.

Q    All right.  Is Mr. Wright very vocal about complaining about issues, in your experience with dealing with him?

A    Yes.

Q    Did Mr. Wright ever complain to you about having problems with offender Brooks while he was in segregation, as his neighbor?

A    Not that I remember.

Q    Okay.  But you was accessible to be spoken to on the range because you come through frequently?

A    Correct.

Q    All right.  Have you ever heard Mr. Wright make the allegation, prior to this lawsuit, that he was assaulted by Mr. Brooks in segregation?

A    No.

Q    You've been an officer before; correct?

A    Correct.

Q    Okay.  And what does it mean when an offender holds their cuff port hostage?

A    It would mean that the food tray slot is down and they're refusing to allow the staff to raise that food slot.

Q    Is that considered a breach of security?

A    It would be.

Q    And why is that?

A    It interrupts the rest of the, you know, daily activities that would occur on that range.

Q    Does that mean, as long as an offender has his food slot held hostage, there should be no offender movement in that area?

A    Correct.

Q    So if an inmate has his food slot held hostage, per policy, there should be no inmates in that immediate area around him outside of his cell; correct?

        MR. LIPPS:  I'm going to object to cumulative questioning and answers, Your Honor.  There's been several witnesses that have been asked --

        THE COURT:  Well, he can ask each witness.

        Let me see, did he answer?  He's already answered, "Correct."

        MR. WRIGHT:  Okay.  All right.

BY MR. WRIGHT:

Q    Have you known Mr. Brooks to hold his cuff port frequently, in segregation?

A    I don't remember.

Q    Do you remember why Mr. Brooks was in segregation at that time?

A    I don't recall the specific reason.

Q    Do you recall if Mr. Brooks was a gang -- gage affiliated?

A    Yes, he was.

Q    Do you recall that -- was he in segregation at that point in time for him and one of his gang brothers jumping another offender?

A    I don't remember.

Q    Okay.  Have you ever heard offenders refer to Mr. Wright as a rat or a snitch, in segregation, during your walk-throughs?

A    Prior to Wright being put on protective custody, yes. After he was already on protective custody, I mean, no, not that I remember.

Q    So prior to protective custody, you heard other offenders say that?

A    Right.

Q    Okay.  So --

        THE COURT:  He already answered.  Next question.

BY MR. WRIGHT:

Q    Is it accurate to say that that rumor could have circulated to other offenders?

        MR. LIPPS:  Objection.  Calls for speculation.

        THE COURT:  He wouldn't know.  Next question.

        MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    So when Mr. Wright was in O-Unit, prior to M-Unit, that's

when you heard them calling -- the rumors of him being a rat or a snitch; correct?

A    Correct.

Q    So Mr. Wright went back to segregation after the fight to O-Dorm -- O-Unit.  Although in segregation, it was still in O-Unit; correct?

A    Correct.

Q    And in O-Unit segregation, are there offenders in there from O-Unit general population, also?

A    Yes.

Q    So Mr. Wright would be housed around other general population offenders from O-Unit, the place that he came from that circulated the rumor of him being a snitch?

A    Correct.

Q    Okay.  So there's a great possibility -- I'm going to reword it.

     It's reasonable to believe -- or it's reasonable that he could have been in danger due to the rumors of him being labeled -- is being labeled a rat and a snitch a dangerous thing, in prison, from your experience?

A    Yes.

Q    And that can bring on possible danger; correct?

A    Correct.

Q    Do you know -- I asked you that.

     Offender Brooks, was he a protective custody inmate?

A    No.

Q    Was he a general population inmate?

A    Yes.

Q    And did he come from O-Unit?  Did he come from O-Unit population?

A    Yes.

Q    Have you ever heard Mr. Brooks threaten Mr. Wright?

A    No.

Q    Couple more questions, and I'll let you go.  When an offender is assaulted with bodily fluids, is that considered assault with a weapon?

A    I don't know for sure.

Q    Is there a rule and policy that stipulates assault with a weapon could be with bodily fluids, also?  It's no big deal.

A    I would be guessing.

Q    It's no big deal.

A    I would have to read the conduct -- or the --

Q    If an offender assaults another offender with bodily fluids, is that a violation of the rules?

A    Yes.

Q    And would he receive a conduct report if he does that?

A    Yes.

Q    And it should be documented in an incident report, too; correct?

A    Correct.

Q    If an assault transpires, do pictures supposed to be taken to preserve evidence?

A    Yes.

Q    Do inmates supposed to receive medical treatment?

A    Yes.

Q    If an inmate -- when an inmate is assaulted with bodily fluids, are they allowed to receive a shower?

A    Yes.

Q    Okay.  So Mr. Wright's prolonged stay in segregation was strictly clerical, pending administration hold?

A    I wouldn't call it "clerical."

Q    I mean, I don't know if that's the correct word.

A    Based off the notes, it was simply under review to remove the protective custody.  The committee met the next week, and he was not removed from protective custody.

Q    When Mr. Wright returned to protective custody, was he involved in any more physical altercations?

A    I don't know.

Q    To your knowledge?

A    Not to my knowledge.

Q    Did Mr. Wright -- you spoke on it before.  Did Mr. Wright ever request from you a separatee on offender Dorsey?

A    I believe we've already --

Q    It's not a trick question.  After the incident transpired, did Mr. Wright request a separatee on offender Dorsey?

A    Yes.

Q    And did you personally say that you would insert the paperwork for the separatee on offender Dorsey?

A    That was the response to the grievance.

Q    Okay.  That was your response; correct?

A    Correct.

Q    Did you ever insert the separatee on offender Dorsey?

A    I don't recall.

       MR. WRIGHT:  Your Honor, I would like to enter something into evidence, please.  Where did you go?

BY MR. WRIGHT:

Q    You say you don't recall if you ever made a request for separatee from --

A    I don't specifically remember doing it.  If I responded to the grievance that I said I was going to, I would have done it.

Q    But you recall Mr. Wright requesting it?

A    No, I don't recall any of that, but based off my response to the grievance.

Q    Okay.  All right.

       MR. WRIGHT:  I just had it.  Mr. Lipps, help me out one more time, please.  I just had it.  It's the request form. I just had it.  I apologize.  It's the request form.

       MR. LIPPS:  For what?

       MR. WRIGHT:  It's an AMRE [phonetic] request form I wrote to classification inquiring about my separatees.  I just

had it.  I apologize, Your Honor.

BY MR. WRIGHT:

Q    Were you a case manager in 2022, still?

A    I don't remember.  I would not have been a case manager.

Q    I mean -- I apologize.  A unit team manager?

A    I don't remember.

Q    Okay.  Are you aware that Mr. Wright was placed back around offender Dorsey in January of 2022?

        MR. LIPPS:  I'm going to object, Your Honor.  This is outside the scope of relevance for this case.  June 2nd to June 24th is all the --

        MR. WRIGHT:  No, I said January 22nd.

        MR. LIPPS:  Of '22, I believe.

        MR. WRIGHT:  Yeah, the following year after '21.

        THE COURT:  And I'll sustain the objection.

        MR. LIPPS:  Thank you, Your Honor.

        THE COURT:  We're not going to talk about what happened the next year.  That's your other lawsuit.

        MR. WRIGHT:  No, no.

        THE COURT:  That's not in your other lawsuit?

        MR. WRIGHT:  I'm not even suing for that.  Because I asked a separatee.  Mr. Nelson say he was going to put it in.  I'm trying to find the paper now where they say I did not have a separatee, as if he never put it in.

        THE COURT:  Well, ask him that.  Just ask him.

MR. WRIGHT:  And then they put me right back around Mr. Dorsey again.

THE COURT:  Ask him that, if that happened, does he recall.

BY MR. WRIGHT:

Q   Do you recall -- I've got to show you, because you say you don't recall putting in a separatee for me?

A   I don't remember specifically doing that, no.

Q   But do you recall telling the grievance specialist that you were going to do it?

A   Yes.

Q   Okay.  But don't -- okay.

MR. WRIGHT:  Mr. Lipps, did you find it?

MR. LIPPS:  I don't know what you're asking for, but he's answered you.

MR. WRIGHT:  No, I'm going to show the paper to where it says I don't --

MR. LIPPS:  What number is it?

MR. WRIGHT:  Because I wrote classification asking do I have any separatees, and they wrote me back and said, No, you do not have any separatees, because I was placed around offender Dorsey, once again, a couple months later after I got out of segregation.

We can go with this.  This is Exhibit 23.  We'll go with this, Exhibit 23.

BY MR. WRIGHT:

Q    Do you know what this is, Mr. Nelson?

A    "Notice to Lay Advocate/Witness" statement.

Q    Okay.  And is this a witness statement pertaining to a conduct report?

MR. LIPPS:  Your Honor, I'm just going to object to this line of questioning.  It's from a February of 2022 conduct that the plaintiff had.  It's got no relevance in this case.

MR. WRIGHT:  I can explain the relevancy.

THE COURT:  When you testify, you can explain it.

MR. WRIGHT:  Okay.

THE COURT:  Okay?  He doesn't remember any of this.

MR. WRIGHT:  Okay.  That's fine.

THE COURT:  So I'll sustain the last objection.

BY MR. WRIGHT:

Q    Mr. Nelson, are you a defendant in any other of Mr. Wright's cases?

MR. LIPPS:  I'm going to object to relevance, Your Honor.

MR. WRIGHT:  I can ask that?

THE COURT:  You can ask that.

MR. WRIGHT:  Huh?

THE COURT:  Yes, you may answer that.

THE WITNESS:  Yes.

BY MR. WRIGHT:

Q    And are you aware -- and what are the allegations in Mr. Wright's other cases pending towards you?

A    I can't remember right now.  I would need to pull the specific cases.  I'm involved in many.

Q    When Mr. Wright was released from seg on June 29th, did you authorize his housing to --

        MR. WRIGHT:  Can I see Exhibit 2, please, so he can see it?

BY MR. WRIGHT:

Q    On 6/29/2021, Mr. Wright was -- on June 29, 2021, June 29th, Mr. Wright was placed in cell M1-113A; correct?

A    Correct.

Q    And who authorized the housing?

A    According to this document, I did.

Q    And when Mr. Wright was in there, do you recall him complaining about the cell you put him in?

A    Not that I remember.

Q    Well, it pertains to the other lawsuit you're involved in. Do you recall if that cell was malfunctioned [verbatim] and broken?

        MR. LIPPS:  I'm going to object to relevance, Your Honor.

        THE COURT:  He can answer.  Was 113A broken and malfunctioning?

THE WITNESS:  I don't remember.

BY MR. WRIGHT:

Q    Well, do you recall Mr. Wright complaining about it being malfunctioning and broken?

A    Not that I remember.

THE COURT:  Okay.  Next question.  He says he doesn't remember.

MR. WRIGHT:  All right.  Thank you.  I can't find the paper I was looking for.  That's all, Your Honor.

BY MR. WRIGHT:

Q    That's it, Mr. Nelson.  I can't find what I'm looking for. That's fine.

THE COURT:  All right.  You may cross-examine.

MR. LIPPS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. LIPPS:

Q    Good afternoon, Mr. Nelson.

A    Good afternoon.

Q    Let's start with, for Mr. Wright, I believe you testified earlier you are the individual who recommended him to be placed on protective custody; is that correct?

A    Correct.

Q    Did you do that out of retaliation against him?

A    No.

Q    Was that out of his own request?

NELSON - CROSS/LIPPS                                189

A    Yes.

Q    Okay.  And approximately what time period did you recommend him for protective custody?

A    I don't recall the time period.  While he was housed in O-Unit would have been the time period.

Q    Okay.  I want to draw your attention to what's on the screen right now, Exhibit 2.  And where I see the plaintiff has asked you several times about bed moves that show that you authorized the bed move, not even half of them are yours, but there are other individuals who authorized the other ones.  Is that common for this many people to be involved in all these bed moves?

A    Yes.

Q    Okay.  And then Mr. Wright had alluded to his complaints of being moved, I think it was five times in the first several months of him being on protective custody in the M-Unit.  Out of those, it looks like you only moved him one of those times.

     The one time that you did it, December 23rd of 2020, did you move him on that bed move for any retaliatory reason?

A    No.

Q    Did you know of any reason why you should have or could have retaliated against him during that time period?

A    No.

Q    Okay.  Can you explain to us the process of what -- of how a bed move is made, if there is one, even?

A    They can occur for, you know, many reasons.  They can be offender initiated, they could be staff initiated.  Typically, the case manager, who I supervised, would be the one to arrange certain bed moves.  In order to accommodate, you know, a move from one pod to another, other moves may have to happen to combine cells or move other individuals around to match compatibility.

Q    Okay.  So it doesn't really go on whether the plaintiff likes the cellmate he's with and wants to stay with him only; correct?  It's what the facility needs, am I correct?

A    Correct.

Q    Okay.  Is it process quick?  Can it be done quickly?

A    There are times when it can be done quickly and there's other times when it can take a lot of time to figure out these moves.

Q    Okay.  And from looking at Exhibit 2 and from your knowledge about Mr. Wright during this period of time, is it your understanding that some of these bed moves were initiated by his request even?

A    They could have been.

        MR. WRIGHT:  Objection, Your Honor.  He has nothing to substantiate what he's saying.

        THE COURT:  Hold on one second.

        MR. WRIGHT:  He's asked his opinion and he has nothing to substantiate what he's saying.  I don't know if I

can object to that.

THE COURT:  I'll overrule.  He can answer that question.

MR. LIPPS:  Thank you.

BY MR. LIPPS:

Q    Did you understand the question?

A    Can you say that again?

Q    Not a problem.  Were some of the bed moves initiated by the plaintiff himself?

A    I don't know, but they could have been.

Q    Okay.  Fair enough.  The allegations against you for the retaliation portion, at least, stems somewhat from grievances that the plaintiff could have filed against you.

When he files a grievance against somebody and specifically you, in this instance, do you get notified right away that he's filed that grievance?

A    No.

Q    So what is the process, then?

A    Well, I was the grievance specialist.  I'm familiar with the process.  The grievance gets submitted to the grievance specialist.  They review it and they have a certain amount of days to issue a response.  So they may not even reach out to staff for a response for a week.

I can't recall the specific time frames because of the policy changes, but, no, the day that the grievance specialist

gets the grievance, they do not typically reach out for a response that same day.

Q    Sure.  And then so you're not even aware of every grievance that's ever been filed against you, if I'm hearing correctly?

A    No.

THE COURT:  But since you were grievance specialist, if this grievance was made, wouldn't it have gone to you?

THE WITNESS:  I was the grievance specialist at a later time.

THE COURT:  Not at that time?

THE WITNESS:  Not at that time.

THE COURT:  Okay.

MR. LIPPS:  Thank you, Your Honor.

MR. WRIGHT:  Can I object?  I don't know if I can. Or wait -- I can wait until cross [sic] maybe.  Maybe it's not the right time.

THE COURT:  Okay.

BY MR. LIPPS:

Q    Did the plaintiff, at any time prior to his fight with inmate Dorsey, tell you that he was afraid of inmate Dorsey?

A    No, not that I remember.

Q    Okay.  Had he told you he was afraid of inmate Dorsey, what would you have done?

A    Ensure that they were -- remained separated.

Q    Okay.  Did inmate Dorsey ever make any threats to you directly about Mr. Wright?

A    No, not that I can remember.

Q    Had you ever heard of any staff or other inmates talking about threats that Dorsey had made against Mr. Wright?

A    Not that I can remember.

Q    What about other staff members or inmates talking about Mr. Wright's fear of inmate Dorsey, did you ever hear about that?

A    Not that I remember.

Q    Okay.  Were you responsible for the plaintiff on June 2, 2021, being moved from the M housing unit to the segregation unit after his fight?

A    No.

Q    And that looks like it was a different individual.  So did you have any role in where offender Wright was placed when he went into that segregation unit?

A    No.

Q    Okay.  When the plaintiff went into the segregation unit, were you aware that he was going to be housed in the vicinity of inmate Brooks?

A    No.

Q    Okay.  In his lawsuit, the plaintiff makes a couple of different references to where his cell was in relation to inmate Brooks.  And then today he's been saying it's right next

door to it.  But do you know which cell or how far away his cell was from Brooks?

A    I don't recall what cell either of them were in.

Q    Okay.  The --

        MR. WRIGHT:  (Indiscernible.)

        THE COURT:  You can -- redirect.

BY MR. LIPPS:

Q    I want to now talk about the recommendation for the plaintiff to be removed from the PC status, protective custody status.  Do you know if you're the one that made that recommendation or if it was another person on the committee?

A    I don't remember.

Q    If it was you, did you do it out of any retaliatory reason, make that recommendation?

A    No.

Q    Was the plaintiff, in fact, ever removed off of protective custody?

A    No.

Q    Okay.  The approximately two weeks, maybe 15 days, that the plaintiff served in the segregation unit past his time served to when he gets moved back to -- it looks like on June 29th to cell M1-113, for those two weeks to 15 days, did you do anything that caused him to remain in that segregation unit for that period of time?

A    No.

Q    Did you have any say if he would be held in that segregation unit or released somewhere else?

A    I would have been a part of the committee to decide for him to remain in the segregation unit.

Q    Okay.  You had earlier testified about inmate Dorsey being a safekeeper.  Does that mean he was in protective custody units or was that a different designation for an inmate?

A    I would have to read the policy on it, but safekeepers are essentially when a person hasn't been found guilty of their crime yet but they're not housed in the county jail.  For whatever reason, they're sent to the Department of Correction.  And, you know, we've had safekeepers in PC unit, we've had safekeepers in different parts of our facility.

Q    Understood.  So it's not specific, then, to PC, is what I was asking.

     All right.  Mr. Wright complained about threats to you before, but that was when he was in the O-Unit; correct?

A    Correct.

Q    And those threats weren't from Brooks or Dorsey, were they?

A    No.

Q    The complaints or expressions of fear that the plaintiff had given you before, you did take action on those, correct, by putting him in a -- protective custody?

A    Correct.

Q    Was -- the plaintiff being sent to segregation after his fight with inmate Dorsey, is that normal standard procedure?

A    Yes.

Q    The plaintiff had asked you about another segregation unit as well.  On the hill, I believe, is how he referenced it.  Is he eligible to go to that other segregation unit, or was he only allowed to go to the O units?

A    Yes, but it requires a facility transfer approval from Central Office to move from -- because they're technically different facilities even though they're all on the same grounds.

        MR. WRIGHT:  Object.  Could he give clarity to that answer, because he gave -- I don't understand.  He said "yes," and then he gave a "but."  So can he ask him in a clear manner?

        THE COURT:  You write it down, and when you get an opportunity to cross-examine, you ask him to clarify.  Okay?

        MR. WRIGHT:  Okay.

BY MR. LIPPS:

Q    So, Mr. Nelson, if I understand correctly, then, although there is another segregation unit on New Castle Correctional Facility grounds, the plaintiff would only be able to go there if IDOC approved it?

A    Correct.

Q    Okay.  You couldn't unilaterally put him in that other segregation unit?

A    No, it takes a permission.

Q    Okay.  Let's talk about that review committee a little bit as well.  So once the plaintiff was in segregation, there's a review committee that looks over his status.  That committee meets once a week?

A    Correct.

Q    How many individuals are on that committee?

A    Around 10, maybe more.  More than 5, but less than 12, I think.

Q    And everybody is able to give input on the PC status and the location of where these inmates are housed?

A    Correct.

Q    Okay.  The plaintiff was -- was he the only inmate that was being reviewed by that committee?

A    Every inmate being held in restrictive housing, both O-3 and on the hill, are reviewed on the weekly basis.

Q    Okay.  The plaintiff had asked you if it was coincidental with the conduct report being June 18th and then your review committee's note, as well, about his PC status, being on that same day.

     So based on the review committee meeting only once a week, that's not a coincidence at all, is it, that's just the way the calendar lined up?

A    That's just the way the days lined up.

Q    Okay.  Had the plaintiff ever given you a specific reason

to know that he was in fear of offender Brooks when he was in the M-Unit pod?

A    Not that I remember.

Q    How about a specific fear of some type of harm that offender Dorsey was going to harm him?  Had he ever told you about that?

A    No, not that I remember.

Q    Okay.  Do you know an inmate by the name of Kyle Brown?

A    Yes.

Q    Kyle Brown, is he suing you?

A    Yes, he is.

        MR. WRIGHT:  Objection.  Is that hearsay?

        THE COURT:  No.  You can object that it's irrelevant.

        Why is that relevant?

        MR. LIPPS:  To impeach the prior witness testimony against this defendant.

        THE COURT:  I'm not understanding.

        MR. LIPPS:  The prior witness, Kyle Brown, had testified and made statements against this defendant, so I was going to ask him the questions about that.

        THE COURT:  Okay.  I'll allow it.

        MR. LIPPS:  Okay.  Thank you, Your Honor.

BY MR. LIPPS:

Q    So, sir, is Kyle Brown suing you?

A    Yes.

Q    Has he filed grievances against you?

A    I don't know for sure.  It's likely.

Q    Okay.  Do you keep track of who files grievances on you?

A    No.

Q    No.  Okay.  Is it not a big part of -- does it affect your job at all when they file grievances against you?

A    No.

Q    Okay.  So with Kyle Brown, he alleges that he had heard you make statements to Mr. Wright --

     MR. LIPPS:  If I could have just one second, please.

BY MR. LIPPS:

Q    -- that went to the effect of you were going to make Mr. Wright's life a living hell.  Had you ever made those comments to Mr. Wright?

A    No.

Q    Okay.  You're currently the PREA investigator; correct?

A    My current title is the PREA compliance manager, so I oversee the PREA investigator.

Q    Thank you.  As part of that, have you found that Kyle Brown makes false allegations, false PREA allegations?

     MR. WRIGHT:  Objection, Your Honor.  That's opinionated.  He have no facts to substantiate his answer.

     THE COURT:  What is the PREA officer?  What is that?  So what's PREA?

     THE WITNESS:  PREA, the Prison Rape Elimination Act,

NELSON - CROSS/LIPPS                                           200

and our department investigates allegations of sexual abuse and sexual harassment involving incarcerated individuals.

THE COURT:  Okay.  So what's your question?

MR. LIPPS:  So my question is regarding Mr. Kyle Brown.  He had testified earlier that he had been found guilty of making those false allegations, false sexual allegations, and Shane Nelson is the person that he blamed for that so I'm just connecting those dots.

THE COURT:  So what's your question to this witness?

MR. LIPPS:  To Mr. Nelson?

THE COURT:  Uh-huh.

MR. LIPPS:  If he has found that Mr. Kyle Brown, inmate Kyle Brown, has made false allegations against other individuals.

THE COURT:  Against other individuals?

MR. LIPPS:  Yes, Your Honor.  Because the false sexual PREA complaints were not against Mr. Nelson, but in his investigation, his department has found that he just makes these allegations up.

MR. WRIGHT:  That's hearsay.

THE COURT:  Well, then, ask him that.

MR. LIPPS:  Yes, Your Honor.

THE COURT:  Has his department, in their investigation...

MR. LIPPS:  I will, Your Honor.

MR. WRIGHT: May I object?

THE COURT: You may object.

MR. WRIGHT: May I object to hearsay because this department is not here to testify to it, nor did he have documentation that he substantiated or he found him to lie, whatever. So that's hearsay because I can't cross-examine his department or the paperwork that he presents. That's hearsay.

THE COURT: I'm going to overrule. He can talk about the investigation that he's done.

MR. WRIGHT: Okay.

MR. LIPPS: Thank you.

BY MR. LIPPS:

Q So, sir, have you investigated Kyle Brown as the inmate for making false allegations against individuals?

A Yes.

Q And those are related to your PREA position that you're currently in; correct?

A Correct.

Q Okay. Have you substantiated that he has falsified allegations against people?

A Yes.

MR. WRIGHT: Objection, Your Honor.

THE COURT: Overruled. And I'll give that evidence the appropriate weight. Okay?

MR. WRIGHT: Okay.

THE COURT:  All right.  Next question.  Move on.

BY MR. LIPPS:

Q    Okay.  I'm going to end on this part here.  Looking back at Exhibit 2, where you can see on April 5, 2021, the plaintiff moved into cell M1-116A.  That looks like that was approved by you.  Does that mean you were physically present when he plaintiff was moved into that cell?

A    No.

Q    And were you physically present when the plaintiff was moved into that cell?

A    Not that I remember.

Q    Okay.  Later that evening, it looks to be about 7:30 -- or 7:29, actually, he was moved out for another reason to a different cell.  Were you even at the facility at that time or would your shift have already been over?

A    No, I would not have been there.

Q    Okay.  So you had no involvement in -- or any reason to know why he left on April 5th?

A    Correct.

        MR. LIPPS:  Okay.  No further questions, Your Honor.

        THE COURT:  All right.  You may ask any redirect.

**REDIRECT EXAMINATION**

BY MR. WRIGHT:

Q    Mr. Nelson, I have a couple of questions for you.  You said that when an offender files a grievance on you, that

NELSON - REDIRECT/WRIGHT

doesn't affect your job or doesn't affect you?

A    I said that.

Q    Correct, you said that.  Okay.  Is that a yes?

Okay.  When an offender files a grievance on you, does that affect your job?

A    It could.

Q    Does that affect how you perceive an inmate if he files a grievance on you?

A    No.

Q    Mr. Lipps asked -- well, did you threaten to make the plaintiff's life a living hell?

A    No.

Q    Okay.  Did the plaintiff file a grievance saying you said that?

A    I don't know.

Q    I mean, I can show you.  I'll show it to you, but -- so if an individual -- if an offender, say, lies to you on a grievance or says something that's not true, does that make you upset?

A    No.

Q    Okay.  So any grievance that's filed, it doesn't affect you regardless?

A    No.

Q    Okay.  And you said that you're not aware of every grievance that's filed on you?

NELSON - REDIRECT/WRIGHT                    204

A    No, I would not be aware of every grievance that was filed against me.

Q    So if an individual files a grievance on somebody, doesn't the person they filed it on have to give a response one way or the other?

A    If it were filed against me, typically that person's supervisor would be the one to issue a response.

Q    So if a grievance is filed against you -- no matter how many times it is, if it's filed against you, it warrants some type of response yea or nay?

A    Some kind of a response, yes.

Q    Okay.  So every grievance that's filed upon you, you are made aware of because it warrants your response; is that correct?

A    The response would not always be from me.

Q    I'm unclear of that, but, all right.  You testified earlier when I asked you, were you -- in segregation, was I neighbors with Mr. Brooks, and you answered yes.  Do you recall that?

A    If that's what I said.

Q    I'm asking you.

A    I don't remember.

Q    In segregation, was the plaintiff neighbors with Mr. Brooks?

A    You were in close -- I don't remember what cells -- I

don't remember what cell he was in.  I can see here that you were in 214, but I don't remember what cell he was in.

Q    Okay.  I'm just asking because you told me yes.  Okay.

THE COURT:  Next question.

BY MR. WRIGHT:

Q    You wasn't aware initially that I was being placed in segregation next to Mr. Brooks initially; right?  You didn't have nothing to do with that initially; correct?

A    No.

Q    Okay.  But whether I was in close proximity or his neighbor, you eventually became aware that I was next to Mr. Brooks?

A    Right.

Q    Okay.  And although you didn't authorize me to go into cell 214, you still have the authority over bed moves to move offenders; correct?

A    Yes.

Q    Because you're unit team manager?

A    Yes.

Q    So you could have moved me from cell 214 if you wanted to?

A    I could have.

Q    Okay.  Mr. Lipps asked you about the reviews you did on the 16th being coincidence.  You said you do a weekly review; correct?

A    Correct.

Q    And that review on the 16th was when they came up with administration hold and removal from PC, correct, on the 16th?

A    Correct.

Q    So you do a weekly, and it was -- so the week prior, you had a week review, also; correct?

A    Yes.

Q    Which would have been a week prior to the 16th, whatever.

So that could have been done in that review on the 7th to admin hold me or remove me from PC, because since you have them weekly, it could have been done the week before?

A    Could have.

Q    Okay.  But it's just coincidence, after the 8th, the following review, I was put in to be removed?

A    I think that's just the way that the days lined up.

Q    Okay.  Do you know what changed between the 7th review and the 16th review that --

        MR. LIPPS:  I'm going to object, Your Honor.  This has already been asked and answered.

        MR. WRIGHT:  Well, he spoke on this, so I'm just bringing it back up.

        THE COURT:  Go ahead.

BY MR. WRIGHT:

Q    Do you know what changed between the 7th -- the review on the 7th and the review on the 16th that made you decide to give your input to remove me from PC and admin hold me?

A    No, I don't know.

Q    I'm speaking directly, not everybody else's decision.

        THE COURT:  He said he does not know.

        MR. WRIGHT:  Okay.  Don't remember?  Okay.

BY MR. WRIGHT:

Q    All right.  You said Mr. Wright did complain at one point in time about being afraid of inmates when he was in O-Unit; correct?

A    Correct.

Q    And you recommended PC?  You protected him; correct?

A    Yes.

Q    At that time in O-Unit, had Mr. Wright filed any grievances on you when he was in O-Unit?

A    I don't know.

Q    I may have to show that.  To your knowledge, had Mr. Wright filed any grievance on any staff when he was in O-Unit?

A    Prior to protective custody?

Q    Correct.

A    I really don't know.  I don't remember.

Q    Okay.

        MR. WRIGHT:  Let me make sure I got it asked the way I want to.

BY MR. WRIGHT:

Q    So prior to going to PC, when he was in O-Unit, you made

sure he was safe and recommended protective custody.  And at that time when he was in O-Unit, he was the mentor, correct, and he worked for you, or...?

A    Worked for the unit team staff.

Q    And he was not -- you never deemed him a problem in O-Unit?

A    No.

Q    Okay.  Now, you said that Mr. Wright's bed moves could be for any reason; correct?  Is that what you told Mr. Lipps?

A    Correct.

Q    Okay.  In your e-mail, is it true that you said that every bed move Mr. Wright was involved in is because he was a problem?

          MR. LIPPS:  I'm going to object.  This is asked and answered, Your Honor.  It's also outside the scope of cross-examination.

          MR. WRIGHT:  He said that -- he asked him about the bed moves, is it frequently, is it coincidental, the five bed moves, why was he being moved, and he said there could be a plethora of reasons.  So I'm trying to see which one is it, because in his affidavit he said it's to accommodate new intakes, but then in this he says every bed move is because he was the problematic cellmate.

          THE COURT:  Okay.  Well, ask him that.

BY MR. WRIGHT:

Q    Was Mr. Wright's bed moves due to accommodate new intakes?

A    They could have been.

Q    Okay.  But did your e-mail response say that each bed move was because Mr. Wright was a problematic cellmate?

A    Could I see that again?

Q    Sure.

         MR. WRIGHT:  Mr. Lipps, can I see Exhibit 58, please.

         THE COURT:  You have it in the book, also.  Look at 58 in the book.

         MR. WRIGHT:  Exhibit 58, please.

         Well, can we -- can you do 19 first?

         THE COURT:  Now, you told him to look at 58.  He's looking at 58.  Now you want 19?

         MR. WRIGHT:  Did I say 19?

         MR. LIPPS:  You said 19 first.

         MR. WRIGHT:  Okay.  I meant his affidavit.  Maybe I had the wrong number.  Mr. Nelson's affidavit.

         MR. LIPPS:  What number is that?

         MR. WRIGHT:  Thirty-nine.  And could you go to the last page, please.  I believe it's the last page.  Okay.  Page 3, please.

         MR. LIPPS:  I'll just stipulate, if you want.  This can just come in.

         MR. WRIGHT:  Huh?

MR. LIPPS:  I can just stipulate with you this comes in.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q    Did Mr. Nelson say in his affidavit that --

THE COURT:  Hold on.  Are you going to stipulate to the admissibility of Exhibit -- what number is that?

MR. LIPPS:  It's 39, Your Honor.

THE COURT:  Thirty-nine.  Do you agree to the stipulation?

MR. WRIGHT:  I mean, it could be allowed, yes, ma'am.

THE COURT:  Exhibit 39 is admitted into evidence pursuant to stipulation of the parties.

(*Exhibit 39 was received in evidence.*)

BY MR. WRIGHT:

Q    Mr. Nelson, could you read line 13 and 14, please.

MR. LIPPS:  I'm -- can I just object to that being cumulative at this point, Your Honor.  It's in evidence.  It speaks for itself.

MR. WRIGHT:  I want it to be on the record.

MR. LIPPS:  It's on record.  It's in evidence.

THE COURT:  It's on record.  I gotcha.

MR. WRIGHT:  Okay.

THE COURT:  Okay?

MR. WRIGHT:  All right.

Can I speak to it?

THE COURT:  Do you have another question for him?

MR. WRIGHT:  Yes.

BY MR. WRIGHT:

Q    Did you say in your affidavit that you did not move the plaintiff at any other time, for any other reason, except for the need to accommodate new intakes?  Number 14.

A    I don't recall saying that.

Q    Is this your affidavit?

A    Yes, this is my affidavit.

Q    Can you turn to page 4, please?  And this is your signature; correct?

A    That's my signature.

Q    And you gave that affidavit on March 20, 2025?

A    Correct.

Q    Last year.  Okay.  More recently --

THE COURT:  Okay.  You got it in evidence.

BY MR. WRIGHT:

Q    Last thing, Exhibit 58, please.  Did you say in this e-mail that, "He has continued to be the problematic cellmate which is the reason for each bed move"?

A    That's what the e-mail says.

Q    So which one is it?  Is it --

THE COURT:  Don't ask him that.

MR. WRIGHT:  Oh, I can't?

THE COURT:  No, you don't need to.

MR. WRIGHT:  Okay.  All right.

BY MR. WRIGHT:

Q    I have a couple more questions, Mr. Nelson.  You said that the segregation -- the other segregation unit is on the hill; correct?

A    Correct.

Q    The facility doesn't have the authority to send an offender up there from the annex?

A    They can send someone up there, but they have to get approval from IDOC Central Office through a transfer authority.

Q    How many housing units of segregation are there on the hill?

MR. LIPPS:  I'm going to object.  It's just not relevant, Your Honor.

MR. WRIGHT:  It is, because it speaks to the frequency that they send people to the hill, because there's 85 cells up there.  There's only 30 in 3-Dorm.  So they're constantly sending people up there.  It's not as hard as he's trying to make it seem.

THE COURT:  Okay.  You can ask him that.

BY MR. WRIGHT:

Q    How many cells are there on the hill of segregation? Well, how many ranges are -- how many ranges are seg cells on the hill?

A     Three ranges.

Q     And approximately how many cells per range?

A     1-Range, I can't remember the exact number.  Around 20.

Q     There's 24 cells per range.

A     Okay.  So 24, 24, and then either four or five on the 500 range.

Q     So would you say there's substantially more segregation cells on the hill than there is in O-Unit?

A     There are more cells on the hill in segregation than in O-3.

Q     Because in O-3, there's approximately 32 cells; correct? Sixteen upstairs and 16 downstairs?

A     Correct.

Q     So they frequently send people to the hill for segregation?

A     The term "frequently" can mean -- they do send people up there.  But like I said, there has to be approval.

Q     One last question.  There's approximately 32 cells in segregation in O-Unit.  Approximately, just say, 80 cells on the hill.  That's about 110 cells; correct?  Roughly.

A     Correct.

Q     So there were -- out of 110 cells, there are 109 other possibilities of segregation cells the plaintiff could have been housed in besides being next door to offender Brooks?

A     Yes.

NELSON - REDIRECT/WRIGHT                          214

MR. WRIGHT:  That's all as far as the cross [sic].

THE COURT:  Okay.  Are we finished with this witness?

MR. LIPPS:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Mr. Nelson.  You may be excused.

*(Witness excused.)*

MR. WRIGHT:  Thank you, Mr. Nelson.

THE COURT:  All right.  Are you your next witness, sir?

MR. WRIGHT:  So how -- as far as Lieutenant Krul -- and that's my last witness, and then I'm going to go.  So, Lieutenant Krul, him not being here, how do we...?

THE COURT:  You've got his exhibits in.  And when you make your argument, you can get -- everything in those documents you got in evidence is in evidence to be considered.  So when you make your written findings of fact and conclusions of law, you just include whatever your argument is.  Okay?

MR. WRIGHT:  All right.

THE COURT:  So we're going to have the law clerk asking your questions.

MR. WRIGHT:  Okay.

THE COURT:  And then -- let's put him on the witness stand so he can testify.

MR. WRIGHT:  Your Honor, I can take my exhibits, because when I testify --

THE COURT:  Take all your stuff with you.

MR. WRIGHT:  Okay.  I want to enter exhibits as I speak.

THE COURT:  Is it easier for you to testify from your table?

MR. WRIGHT:  I don't mind going to the stand, Your Honor.  That's fine.

THE COURT:  Okay.  All right.

*(Witness sworn.)*

THE COURT:  Mr. Nielson, if you would go to the podium.  For the record, would you state your name, Reader.

MR. NIELSON:  My name is Trent Nielson.

THE COURT:  All right.  And Mr. Nielson, you may examine the witness.

**CARLTON WRIGHT, PLAINTIFF'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. NIELSON:

Q    Can you please state and spell your whole name for the record?

A    My name is Carlton Wright.  C-A-R-L-T-O-N.  W-R-I-G-H-T.

Q    And you are the plaintiff in this case?

A    That is correct, sir.

Q    Mr. Wright, do you understand what the penalties of perjury are and being dishonest under oath?

A    Yes, I do.

Q    Mr. Wright, when did you initially arrive to the annex building at the New Castle Correctional Facility?

A    I initially arrived to the annex in March of 2019.

Q    What is the annex building at the New Castle Correctional Facility?

A    The annex building is, like, a step-down program.

Q    What is O-Unit?

A    The annex is made up of two units.  One is O-Unit, which is general population.

Q    What is M-Unit?

A    M-Unit is also in the annex.  It's protective custody, but they're separated.

Q    When you initially arrived to the annex building at New Castle, were you placed in M-Unit right away?

A    No, I wasn't.

Q    While you resided in O-Unit, prior to moving to M-Unit, did you have a job in O-Unit?

A    Yes, I had a job while I was in O-Unit.

Q    What exactly did your job require you to do as mentor/program aide?

A    I held a job as the mentor in the program -- slash program aide.  I was a mentor.  I taught classes to other offenders. And upon ten weeks of completion, they received a certificate of completion.  So I taught numerous classes.

Q    While you held your job as a mentor/program aide in

WRIGHT – DIRECT/NIELSEN

217

O-Unit, who was your boss?

A    Defendant Unit Team Shane Nelson.

Q    Do you mean the same Unit Team Manager Shane Nelson that's a defendant in this civil case?

A    Correct.

Q    While you lived in O-Unit, prior to being moved to M-Unit, did you ever have any problems with Mr. Nelson?

A    Not at all.  Like I said, I worked for him.  We got along well.  I was one of his best mentors, so we never had any discrepancies.

Q    Did you have any problems with any other staff members while you lived in O-Unit?

A    No.  I got along with everybody, for the most part.  No.

Q    While you lived in O-Unit, prior to being moved to M-Unit, did you ever file any grievances on any staff members for anything?

A    Not at all, no.

Q    Up until that point while you were still living in O-Unit, did you have a history of filing grievances?

A    No.  At that point, 2019, I had been incarcerated almost 11 years.  And in my entire 11 years -- I've only filed a total of four grievances in my entire 11 years.  So, no, I really didn't have a history of filing grievances.

Q    When did you initially move to M-Unit?

A    Around November 2020.

Q    And M-Unit is the protective custody unit; correct?

A    That is correct.

Q    Why did you move to the protective custody unit in M-Unit?

A    Long story short, just -- I was receiving threats from different offenders, and I felt in danger.  And I felt I needed protection, so I requested protective custody.

Q    Did Mr. Nelson recommend for you to be placed on protective custody in M-Unit?

A    Yes, he was my unit team manager.  I quit my job and went to PC, and he recommended me to go on PC.

Q    Is Mr. Nelson the unit team manager for both M- and O-Unit in the annex building?

A    Correct.  He's the unit team manager for both sides.

Q    When you were moved to M-Unit, did you have a different case manager/counselor than you did while you were living in O-Unit?

A    Right.  The unit team manager is the same on both sides, but the counselors are different.

Q    What was your new case manager's name in M-Unit?

A    Jama Jones.

Q    Who was your -- who was case manager Jama Jones' boss?

A    Mr. Nelson.

Q    Was Jama Jones a senior case manager of M-Unit?

A    Yes, she was.  She had been -- she had been at New Castle for nine, ten years, so she had some seniority.

WRIGHT - DIRECT/NIELSEN                          219

Q    Are the cells in M-Unit two-men cells?

A    Yes, they are.  Correct.

Q    What does two-men cells mean?

A    It means that two men -- it houses two offenders in a cell.

Q    Shortly after you arrived to M-Unit, did you begin to have any problems with the case managers of M-Unit?

A    Yes.

Q    With which case manager in M-Unit specifically did you begin to have problems with?

A    Case manager Jama Jones.

Q    Why?  What happened that you started to have problems with case manager Jama Jones?

A    Just, I guess, my demeanor, her attitude, my attitude. She felt like I probably didn't deserve to be in protective custody.  She has a habit of talking real reckless to individuals and, you know, talking down to them.  And my demeanor was just, I guess, abrasive, and she didn't like that. Because I wasn't the typical protective custody inmate, she thought that I didn't belong over there.

Q    So what happened next?

A    It just began to create a contentious relationship.  And she deemed me as a problem, so she started putting me in cells with other people she thought was problems and just started doing things, strategically retaliating against me, moving me

from cell to cell, putting in recommendations for cell moves.

MR. LIPPS:  I'm going to object and ask to strike, as well, Your Honor.  The witness is testifying to the motives of somebody who is not here to testify.  That's outside of his knowledge of why she would do anything.

THE COURT:  How do you know that's why she was moving you, sir?  Did he tell you that?  Did she say something to you?

MR. WRIGHT:  Well, I presented evidence even Mr. Nelson considered me to be a problematic cellmate.  So they try to put other problematic people together to, I guess, cancel each other out.  So, yeah, she's made comments to me, calling me a thug and things of that nature and speaking to me as -- as...

MR. LIPPS:  Well, at that point it's hearsay, then, Your Honor.

THE COURT:  I'm going to overrule the objection.  She called him a thug.

Next question.

BY MR. NIELSON:

Q    Were case manager Jama Jones and Mr. Nelson close friends with one another?

A    Yes, they worked hand in hand, as it were.

Q    Did Mr. Nelson take exception and didn't like your attitude and demeanor towards case manager Jama Jones?

MR. LIPPS:  I'm going to object, Your Honor.

That's -- he can only speculate on what Mr. Nelson felt.

MR. WRIGHT:  I can speak to --

THE COURT:  Hold on.  Read the question again, please.

MR. NIELSON:  Did Mr. Nelson take exception and didn't like your attitude and demeanor towards case manager Jama Jones?

THE COURT:  Okay.  I'll sustain the objection to that question.

MR. WRIGHT:  That mean don't answer it?

THE COURT:  That means don't answer it.

MR. WRIGHT:  Okay.

BY MR. NIELSON:

Q    Did your contentious relationship with case manager Jama Jones subsequently create any tension between you and Mr. Nelson?

A    Absolutely.  He took exception to how I responded to her and he didn't like that, and I guess it looked bad on him that he recommended me for PC.  And I wasn't getting along or -- there's a certain type of people that live in PC that's real docile and whatever, and I guess she seen me, tattoos and thug and all this, so she didn't like that so it created tension between me and Mr. Nelson because I wasn't getting along with his senior counselor.

Q    Prior to this, you and Mr. Nelson never had any known

problems with one another; is that correct?

A    Absolutely not.  I worked for him.  He liked my work.  He used to praise me all the time.

Q    After this contentious relationship was created between you two against case manager Jama Jones and Mr. Nelson, what happened next?

A    They just started bouncing me around from cell to cell, putting me in cells.  As Kyle Brown said, "Oh, you was Parker's cellie, the crazy one?"  Just putting me in cells with people that they thought was other bad people, you know.

So just -- they just started moving me from cell to cell.  Every five or six days, I was getting moved.  So that was their way of strategically retaliating against me because they know I didn't like it.

Q    From when you initially moved to M-Unit in November 2020 until the date of January 13, 2021, how many different times were you moved and assigned to a different cell location in M-Unit?

A    Approximately five times.

Q    Did you being moved so frequently to a different, new cell housing assignment frustrate you?

A    Absolutely.

Q    Did you voice this frustration concerning your frequent bed move assignments to anyone?

A    Yes.  I'm very outspoken.  I absolutely did.

Q    To whom did you express your frustration to?

A    To case manager Jama Jones and to Mr. Nelson.

Q    And how did you go about expressing this frustration to case manager Jama Jones and Mr. Nelson?

A    I would verbally -- when they'd come on the unit, I would verbally tell them.  But then I started filing paperwork because I didn't want to argue and get into it with them.  I'm more confrontational on paper than verbally, so I just started filing grievances on them complaining about it.

Q    Did you do anything else?

A    Yeah, just kept filing grievances on them.  Complaining to people like Captain Gard when I see them.

Q    Who exactly did you begin to start filing grievances on, and when did you start to file those grievances?

A    I started filing my grievances on Jama Jones and on Mr. Nelson.  And I have an exhibit to show my initial grievance when I filed on Jama Jones and Mr. Nelson.

          MR. WRIGHT:  Is it okay if I submit into evidence Exhibit 9?

          THE COURT:  You can offer Exhibit 9.

          MR. WRIGHT:  May I offer Exhibit 9, please?

          THE COURT:  Any objection to Exhibit 9?

          MR. LIPPS:  I just want to pull it up real quick, Your Honor.

          No objection.

THE COURT:  Exhibit 9 is admitted into evidence without objection.

(*Exhibit 9 was received in evidence.*)

MR. WRIGHT:  So my initial grievances start from early as January -- December, but January, December, yeah.

BY MR. NIELSON:

Q   Did you start to get intentionally placed in cells with problematic cellmates by case manager Jama Jones and Mr. Nelson?

MR. LIPPS:  I'm going to object.  That's outside of his knowledge of what Mrs. Jones' intention was.

MR. WRIGHT:  I mean, he spoke to me being a problem, so it's not --

MR. LIPPS:  Well, I'm objecting --

THE COURT:  Hold on.

MR. LIPPS:  -- to the question only.

THE COURT:  Okay.  Yeah, the form of the question is -- I'm going to sustain.

MR. WRIGHT:  Okay.  That's fine.

BY MR. NIELSON:

Q   What makes you say that your cellmates were problematic cellmates?

A   Because they caused problems.  They received write-ups. They was almost unlivable.  No one wanted to cell with some of these cellmates because they was hard to get along with.  They

was deemed problems like, supposedly, I was.

Q    After you began filing grievances on case manager Jones and Mr. Nelson, did you verbally speak to Mr. Nelson again regarding your frustration concerning your frequent bed move?

A    Yes, I did.

Q    When did you speak to Mr. Nelson again about your bed moves?

A    Mr. Nelson, he made frequent rounds on the housing units, and one day he was on a unit and I had an opportunity to speak to him.

Q    And what happened when this conversation transpired between you and Mr. Nelson?  Did anything significant happen?

A    Yeah.  I guess he caught himself embarrassing me or showing that he's alpha dog by speaking to me loudly in the dayroom and telling me, you know, If I was you, I will stop all this bitching and complaining about your bed moves, or I promise you, I will make your stay in M-Unit hard on you -- or hell on you.

Q    What happened?  What precisely did Mr. Nelson say to you in the dayroom area concerning your complaining?

A    Yeah.  "If I was you, I would stop always bitching and complaining about bed moves, or I promise you, I will make your stay here a living hell on you."

Q    Did you perceive Mr. Nelson's comment to you as a threat against you?

226

A     Yeah, because he already had been doing other stuff to me. Absolutely.

Q     What did you then do regarding Mr. Nelson's threat towards you?

A     I filed another grievance on him.

Q     Did any other offenders who were in the dayroom area, too, also hear Mr. Nelson make this threatening comment towards you?

A     Absolutely, several.  Several offenders heard me, because the dayroom area is -- like, the cells are in the dayroom, so, you know, yeah.  And he's on -- around the dayroom area, so several people heard me -- heard him.

Q     Did Mr. Nelson tell you on the date of January 6, 2021, quote, "If I was you, I would stop always bitching and complaining about bed moves and telling me how to do my job, or I promise you, I will make your stay back here rough on you and a living hell"?

MR. LIPPS:  I'm just going to object.  It's been asked and answered three times now, Your Honor.

MR. WRIGHT:  I mean --

THE COURT:  Hold on.  When there's an objection, let me rule.

What's your response to the objection?

MR. WRIGHT:  I mean, I would like to answer the question.  But when I wrote these, I didn't know I was going to ask four or five people; right?  I wrote this in advance prior

to this testimony.  So I didn't know it was going to come out in other people's testimony, so I just --

THE COURT:  All right.  All right.

"Did Mr. Nelson tell you on the date of January 6...'If I was you, I would stop always bitching'"...

You have got that in about five times, so --

MR. WRIGHT:  Okay.

THE COURT:  -- we don't need to repeat it.

MR. WRIGHT:  Okay.  Correct.

THE COURT:  Next question.

BY MR. NIELSON:

Q    Did Mr. Nelson make this threat to you prior to you being attacked and assaulted by offender Dorsey on the rec pad for 37 minutes?

THE REPORTER:  I'm sorry.  Could you slow down.

THE COURT:  Repeat the question.

THE REPORTER:  Thank you.

BY MR. NIELSON:

Q    Did Mr. Nelson make this threat to you prior to you being attacked and assaulted by offender Dorsey on the rec pad for 37 minutes?

A    Yes, he did.

Q    So Mr. Nelson threatened to retaliate against you for, quote, "bitching and complaining," and for filing grievances against him and case manager Jones?

MR. LIPPS:  I'm going to object.  Asked and answered --

MR. WRIGHT:  Okay.

MR. LIPPS:  -- about six times now, Judge.

MR. WRIGHT:  That's fine.

THE COURT:  Okay.  So it's sustained.

Next question.

BY MR. NIELSON:

Q   Did Mr. Nelson keep his word to you and retaliate against you by making your life a living hell?

A   Yes, he did.

Q   Did you ever file a grievance for Mr. Nelson threatening to retaliate against you?

A   Yes, I did.

Q   When did you file that grievance on Mr. Nelson for threatening you?

A   In January, around -- yeah, in January I filed that grievance.  January 2021.

Q   So you filed it over five years ago?

A   Correct.

Q   So you made this statement about Mr. Nelson threatening you five years ago and this is not just something that you are saying and coming up with now today?

A   That is correct.

Q   Shortly thereafter you filed the grievance on Mr. Nelson

for threatening you, were you allowed to move into a cell with a cellmate of your choosing?

A    Yeah.  After I made that comment and I guess me complaining so much, I was allowed to move into a cell with someone of my choosing, but it wasn't from Mr. Nelson.  It was -- if you look at Exhibit B -- I was.

MR. WRIGHT:  And I have an exhibit I'd like to -- it's already presented, I think, but I want to put up the exhibit speaking to that.

THE COURT:  Is it in evidence already?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Which one is it?

MR. WRIGHT:  It's the e-mail -- I didn't bring it up here with me.  It's the e-mail from Mr. Nelson responding to the grievance.

MR. LIPPS:  I believe it's 58, Your Honor.

MR. WRIGHT:  Fifty-eight.

MR. LIPPS:  The e-mail from Nelson to Winingham?

MR. WRIGHT:  Correct.

MR. LIPPS:  Fifty-eight.

THE COURT:  Okay.  Fifty-eight is in evidence.

Next question.

MR. WRIGHT:  Can I see it?

THE COURT:  What do you want to tell me about it?

MR. WRIGHT:  Because it just shows that Mr. Wright

was placed in a cell with an inmate of his choosing and acknowledged that he understood I was in a compatible cell environment.

THE COURT:  Gotcha.

Next question.

BY MR. NIELSON:

Q    When exactly was this that you were allowed to move into a cell with a cellmate of your choosing?

A    I believe it was January 13th, if I'm not mistaken.

Q    So you moved into cell M1-206A on January 13th with offender Schaefer?

A    Correct.  Andrew Schaefer, correct.

Q    Did you and your new cellmate, Mr. Schaefer, get along well together?

A    Yeah, that was my pal, absolutely.

Q    Were you under the impression that you and Mr. Schaefer would remain cellmates?

A    Yes, I was, because even in Mr. Nelson's e-mail he say he seen no reason for future reasons to move me.  So I was under the impression that we was going to stay together.  We signed a piece of paper to live together, so I was under the impression we would remain cellmates.

Q    What gave you that impression or indication that you and Mr. Schaefer would remain cellmates?

A    Because Mr. Nelson said that since I get along with him,

that's fine, we can just stay cellmates.

Q    Had Mr. Nelson ever outwardly said or referred to you as being problematic offenders while you were being housed in M-Unit?

A    Absolutely.

Q    Did Mr. Nelson make this comment about you being a problematic offender prior to you being attacked and assaulted on the rec pad for 37 minutes by offender Dorsey?

A    Yes, he did.  He said it was documented on February 5th, I believe, 2021.  He made this comment in his response to his grievance that I was a problematic offender or cellmate.

Q    How long did you and your new cellmate, Mr. Schaefer, remain cellmates together?

A    Approximately three months.

Q    While you were cellmates with Mr. Schaefer from January 13, 2021 through April 5, 2021, did you file any more grievances on either Mr. Nelson or case manager Jones?

A    Yeah.

Q    Did you happen to file any grievances on any other staff member during the time frame that you and Mr. Schaefer were cellmates?

A    Yeah, I did.

Q    When did you file these two separate grievances on Officer Everett Dunn?

A    In March and the first of April.

WRIGHT - DIRECT/NIELSEN                                          232

Q    Do you currently have a pending federal lawsuit against Officer Everett Dunn stemming from the two grievances that you filed on him while you and Mr. Schaefer were cellmates?

A    Yes, I do, because one of the grievances was -- yeah, very substantial allegations.  It was a PREA allegation.  And he end up getting fired for it -- or resigning, I believe it was.  So, yes.

Q    You said that you and Mr. Schaefer remained cellmates from January 13, 2021 through April 5, 2021; is that correct?

A    That is correct.

Q    What happened?  Why did you and Mr. Schaefer end up not being cellmates anymore?

A    After I filed that grievance in March, I was put in for another bed move on April 5th.

Q    So after you filed those two most recent grievances on Everett Dunn, you were informed on April 5, 2021, that you were yet again being moved to another different cell?

A    That is correct.

Q    Did you request or ask to be moved out of the cell with Mr. Schaefer into another cell?

A    No, I did not.

Q    So why were you then abruptly moved into another different cell with a new cellmate?

A    Out of retaliation by case manager Jones and Mr. Nelson.

          MR. LIPPS:  I'm going to object.  That's speculation,

and it goes to the ultimate issue of the facts, as well, Your Honor.

THE COURT:  Okay.  I'll sustain.

Next question.

BY MR. NIELSON:

Q    Didn't Mr. Nelson personally say in his e-mail he sent on February 5, 2021, that, quote, "He and his current cellmate have requested to live together and meet compatibility requirements.  There should be no reason for future complaints from him," end quote?

A    Yes, he did say that.  And that's already on record, Exhibit 58, I believe.  Yes, he did say that.

Q    So if Mr. Nelson said this in his e-mail/grievance response on February 5, 2021, then why would you be getting moved with a new cellmate 60 days later?  What happened?

A    All I can say is I filed grievances in between them 60 days and this happened after I filed my grievances.

Q    So you're stating that Mr. Nelson was retaliating against you by moving you into a new cell with a new cellmate on April 5, 2021, due to the most recent grievances you filed in March and April on Officer Everett Dunn?

MR. LIPPS:  Same objection, Your Honor.

THE COURT:  He can answer that one.

MR. WRIGHT:  Yes, I am saying that.

WRIGHT - DIRECT/NIELSEN

BY MR. NIELSON:

Q    What cell were you being moved into on April 5, 2021?

A    I was being moved into cell M1-116A.

MR. WRIGHT:  Do I need to show that proof, or no?

THE COURT:  No.

MR. WRIGHT:  All right.

BY MR. NIELSON:

Q    Who authorized your bed move into cell M1-116A on April 5, 2021?

A    Mr. Nelson.

Q    Were you aware of who your new cellmate would be in cell M1-116A?

A    Yes, I was.

Q    And who would your new cellmate be?

A    Offender Dorsey.

Q    Once you became aware that you were being moved into a cell with offender Dorsey in cell M1-116A, what did you do?

A    I was disappointed.  I was upset.  Instantly, my mind refused.  I'm not moving in the cell with him.  I was opposed to moving in the cell with him.

Q    So you immediately notified the floor officer, Foley, of your fear for your safety of being housed in the same cell/living area as offender Dorsey in cell M1-116A?

A    Yes.  When they told me I was moving, I packed my stuff because I didn't want to refuse, but en route to moving to the

cell, I told the officer that I was in fear of moving into a cell with him. I felt in danger. And I notified Officer Foley immediately that I didn't want to move in there, which is -- I don't know if you want me to refer to it, but it's on record. Okay. Go ahead. I'm listening. Go ahead.

Q You did what you were supposed to do under these circumstances by letting a staff member know that you were afraid for your safety?

A Correct. They said, like, you supposed to notify the prison officials if there's a harm or a danger you're afraid of. So I did what I knew to do, and I notified the floor officer immediately.

Q Then what happened next?

A Officer Foley, he told me to wait. And he put me in the shower. And he went directly to the counselor's office and relayed the message of what I told him.

Q Do you have any proof that you notified Officer Foley about your fear of offender Dorsey and that Officer Foley relayed your concerns of fear to the appropriate individuals?

A Yes, I do.

        MR. WRIGHT: Exhibit 1, Your Honor. It's already on record.

        THE COURT: Okay. Got it.

BY MR. NIELSON:

Q Can you please read that for the Court?

THE COURT:  He doesn't need to read it.  Next question.

BY MR. NIELSON:

Q    What is that particular document that you're reading?

MR. WRIGHT:  You can go to the next question.

BY MR. NIELSON:

Q    These Case Notes 2, are these entries from case managers and unit team managers pertaining to an offender?

A    That's correct.

Q    And it was well documented on your Case Notes 2 that on April 5, 2021, you notified the appropriate prison officials of your fear of offender Dorsey?

A    That is correct.

Q    Is this also the same exact Case Notes 2 system that Mr. Nelson uses when inserting various entries pertaining to you personally himself?

A    Correct.  Mr. Nelson does also use Case Notes 2.  So I'm quite sure -- I'm for sure he seen it because he use the same case notes to make his own entries and see other entries made by other staff members, other counselors.

Q    Has Mr. Nelson ever utilized this Case Notes 2 system to personally type an entry pertaining to you?

A    Yes, he has.

MR. LIPPS:  Objection, Your Honor.  It's outside of his knowledge.

MR. WRIGHT:  I have the proof.

MR. LIPPS:  You don't, sir.

MR. WRIGHT:  I do.  When he recommended for me to stay on administration segregation hold, it's on the case notes he agreed that he typed in on June -- June 16th.

MR. LIPPS:  I just think his testimony should stand alone.  This is outside of his knowledge.

THE COURT:  I'm going to let it in.

Next question.

BY MR. NIELSON:

Q    All right.  After Officer Foley informed case manager Jones and Clark about your fear and refusal to move into the cell with offender Dorsey and placed you in the shower, what happened next?

A    Lieutenant Krul was notified, and he came to speak to me in the shower.  And I briefed him on what the situation was.

Q    So once case manager Jones and Lieutenant Krul both refused to reassign you to a different cell housing assignment, what happened next?

A    Once I told them, Ms. Jones, she's very feisty.  She's not trying to hear that.  Right?  And then, "Oh, you're a big guy, you can protect yourself."  That's their words.  Right?  So they refused to move me to a different cell, and Lieutenant Krul and Jama Jones, they wasn't going to reassign me.

Q    So case manager Jones and Lieutenant Krul both threatened

WRIGHT – DIRECT/NIELSEN                     238

to issue a conduct disciplinary report to you and take you to segregation if you refused to move into the cell with offender Dorsey?

A    Correct.  If you refuse a bed housing assignment, that's a conduct report.  So if I would have refused my housing assignment with offender Dorsey, I would have received a conduct report.  And I didn't want to jeopardize that because, at that time, I had been four years conduct clear [verbatim] of all conduct reports.  And I have the exhibit to show.

At that time, I had no conduct reports for four years and I didn't want to jeopardize my possibility of going home early. So I had to choose between going to a cell with Dorsey or risk issuing a refusal of housing and getting a conduct report, and I chose not to take the conduct report.

Q    So in spite of you clearly expressing your fear for your safety to multiple different staff members, you were still forced to move into the cell M1–116A with offender Dorsey on April 5, 2021?

A    Correct.  Absolutely.

Q    Then what happened next?

A    So, like I said, I moved into the cell because I didn't want to get in trouble.  That was probably 3:00 or 4:00 in the afternoon.  So I moved into the cell.  I didn't unpack, and I stayed by the door.  And as soon as shift change came, I pressed the emergency panic button in the cell.

Q   So once you informed Sergeant Turley about you being afraid and in fear for your life regarding living in the cell with offender Dorsey, Sergeant Turley agreed to move you into another cell immediately?

A   Correct.  I pressed the emergency panic button.  I requested to speak to the sergeant.  I conveyed to him the issue I was having.  And I told him, "At this point, I don't even care about seg no more.  I'm not spending a night in here."

Dorsey made it clear to me in the room, "You can't spend the night in here."  You know what I mean?  So at that point, I was willing to go to seg if need be.

So I told Sergeant Turley that, and he took my concern seriously and he agreed to move me without sending me to segregation.

Q   So Sergeant Turley took your concerns for your health and safety serious, the way that Lieutenant Krul and case manager Jama Jones refused to do?

A   Right, he took it serious.

Q   Did Sergeant Turley threaten to issue you a disciplinary conduct report and take you to segregation for refusing to remain in a dangerous situation?

A   No, he didn't threaten to take me to seg or write me up.

Q   Where did Sergeant Turley move you that evening of April 5, 2021?

WRIGHT - DIRECT/NIELSEN                                240

A    He moved me to 2-Range.  M-Unit, 2-Range.

Q    Where is 2-Range at?

A    In M-Unit, the next range over.

Q    So 2-Range is a totally different range than where you were just living at with offender Dorsey; correct?

A    Correct.  I was in a totally different range away from him, no possibility for contact with one another.

Q    Was offender Dorsey a dangerous offender?

A    Yeah.  Yeah.  Yeah, he was.  Yeah.

Q    Why was offender Dorsey a dangerous offender?

A    He had been in multiple fights since he'd been there.  He had the high-profile case pending for allegedly killing an Indianapolis police officer.  So I considered him to be dangerous.  He was facing the death penalty if found guilty. And he moved with the aura of nothing to lose and angry at the world, and I considered him to be dangerous.  He'd had multiple fights being there.

Q    So offender Dorsey had previously been involved in multiple fights with other offenders in M-Unit prior to the date that you were being assigned to live with him on April 5, 2021?

A    Correct.

Q    And were Mr. Nelson and case manager Jones aware of these fights offender Dorsey had in his assaultive history since living in M-Unit?

WRIGHT - DIRECT/NIELSEN                                     241

MR. LIPPS:  I'm going to object.  That's outside of this witness's knowledge.

MR. WRIGHT:  I mean, no, he went to --

THE COURT:  Hold on, there's an objection.  Did you hear the objection?

MR. WRIGHT:  No, ma'am.

THE COURT:  Repeat your objection.

MR. LIPPS:  It's outside of this witness's knowledge.

MR. WRIGHT:  Do I say something?

THE COURT:  How would you know if Jones and Nelson were aware of where you were living?

MR. WRIGHT:  Because offender Dorsey went to segregation and came back to M-Unit multiple times for fighting, so he was caught fighting and received conduct reports.  So the counselors knew because he caught conduct reports that came back and forth to seg for fighting.

THE COURT:  All right.  I'll let him answer that question.

Next question.

BY MR. NIELSON:

Q    So after you were moved out of the cell with offender Dorsey and taken to 2-Range on the evening of April 5, 2021, what happened next?

A    I moved in with my new cellmate.  He embraced me.  He was okay for me to move in there.  And I was cool.  I relaxed.

Q    Did Sergeant Turley have to do any kind of paperwork regarding him moving you to another cell assignment at that unusual time of night?

A    Yeah.  Absolutely.  He has to make a track record of why you're moving me outside of unusual [sic] hours or -- you know what I mean?  It's a record of why you moved this offender and what was the reason for the move.

Q    So the very next day on April 6, 2021, prior to you being assaulted by officer Dorsey, Mr. Nelson and case manager --

THE COURT:  Offender.  Offender Dorsey.

BY MR. NIELSON:

Q    -- assaulted by offender Dorsey, Mr. Nelson and case manager Jones were updated as to why you got emergency moved late at night by a sergeant?

A    Absolutely they was informed.  And even to -- it's on the record.  Ms. Jones even put in her notes Mr. Wright refused housing.

MR. LIPPS:  I'm going to object, Your Honor.  It's outside of his knowledge.  He's testifying to hearsay.

THE COURT:  I'll sustain.

Next question.

MR. WRIGHT:  All right.

BY MR. NIELSON:

Q    Then what happened next?

A    I remained housed on 2-unit and was just relaxed,

chilling.

Q    So about one week later, case manager Jones wrote you a letter on April 12, 2021, acknowledging the problems you were having at 1-Range with offender Dorsey?

A    Correct.

MR. WRIGHT:  Have I already put that on record, Exhibit 5, Mr. Lipps, the letter from Mrs. Jones that she wrote to me on the 12th?

THE COURT:  No.  It's not in evidence.

MR. WRIGHT:  Can I put Exhibit 5 in evidence, please?

MR. LIPPS:  You want to put a letter somebody else who is not here wrote to you?

THE COURT:  No.  Or did he write the letter?

MR. WRIGHT:  No, Ms. Jones wrote a letter to me acknowledging --

MR. LIPPS:  Yeah, I would object, then, Your Honor.

MR. WRIGHT:  Also, she put it in her e-mail, too, from the facility.  And that's more official than a letter saying the same thing; right?

THE COURT:  Where did you get this letter from?

MR. WRIGHT:  Ms. Jones addressed it to me, her signature, her date.  And also to back it up, here's an e-mail also of her saying the same thing about -- in an e-mail.

THE COURT:  Where is your e-mail?

MR. WRIGHT:  Exhibit 3.  And it has her name, and it

has the date she sent it.  And they're both saying one and the same things.

THE COURT:  Do you object to 3?

MR. LIPPS:  I object to that one as well, Your Honor, for the same hearsay reason.

THE COURT:  And I know you don't have a hearsay exception, do you?  Are these business records?

MR. WRIGHT:  Yes, ma'am, this is from the facility.

THE COURT:  I'll overrule the objection and allow 3 and -- well, 3 is definitely a business record.  Three.

(*Exhibit 3 was received in evidence.*)

THE COURT:  Next question.

MR. LIPPS:  Your Honor, I don't believe business exception would apply to No. 5, if that's what the plaintiff is alleging.

THE COURT:  Just 3.

MR. LIPPS:  Thank you, Your Honor.

Is 5 in?

THE COURT:  No, 5 is not in.

MR. LIPPS:  Thank you.

THE COURT:  Next question.

BY MR. NIELSON:

Q   Did case manager Jones also insert a comment into her e-mail regarding you refusing housing on night shift and being moved to 2-Range?

A     Yes, Exhibit 3.

Q     How long did you remain housed on 2-Range in cell M2-206A?

A     I don't have my record.  I believe the -- May 27th, I believe, about a few weeks.  I moved on April 5th, and May 27th, I was moved again.  So it's May 27th.

Q     While you were still being housed on 2-Range in cell M2-206A and prior to being moved off of 2-Range and back to 1-Range on May 27, 2021, did you have the opportunity to personally inform Mr. Nelson about your fear of offender Dorsey?

A     Absolutely.  Like I said, he makes frequent rounds.  Also, when I receive legal mail, I come out and walk past his office, so I have numerous opportunities to see Mr. Nelson.

      And, yes, I told him what was going on.  I didn't want to move back around Dorsey.  I made it clear that I feel in danger around him.  So, yes, I notified Mr. Nelson multiple times personally.

Q     When and how were you able to inform and make Mr. Nelson aware of this?

A     Like I said, when he come on the unit to make rounds or when I'd come out to go to legal mail and walk past his office, I'd stick my head in and let him know, Hey, we good?  Like, this is going on.  So, yeah, I let him know myself personally.

Q     What was Mr. Nelson's response to you once you had personally let him know face to face of your great fear for

your safety being housed around offender Dorsey?

A    He told me not to worry about it, just keep my head low and just keep doing good on 2-Range and it wouldn't be a problem if I remain where I'm at.  I was appropriately housed. I was getting along with my cellmate.  He said I wouldn't have to worry about that.  It's cool.

Q    So Mr. Nelson was absolutely, clearly made fully aware personally by you that you were in fear of offender Dorsey prior to you being attacked on June 2, 2021, by offender Dorsey?

A    One hundred percent, absolutely correct.

Q    Did Mr. Nelson agree to you to not have you placed and housed back around offender Dorsey once you personally spoke to him and told him of your fear?

A    Yes, we agreed to not put me back around him.

Q    Well, if that is the case and Mr. Nelson told you that you didn't have to worry about being housed around offender Dorsey anymore, then how did you eventually end up getting moved back on 1-Range again only two cells away from him?

A    Well, initially --

        MR. WRIGHT:  I'd like to present into evidence -- on April 28th, I filed a grievance on Ms. Jones for her playing with my mail, mishandling my mail -- Exhibit 15.  And then Exhibit 48 is the response to that.  That transpired on April 28th while I was living in 2-Dorm, so I filed a grievance

on Mrs. Jones.

May I enter it into evidence?

THE COURT:  He's offering Exhibit 15.

MR. LIPPS:  And I would object.  That's actually not responsive at all to the question.  And it's about mail that Ms. Jones was handling.  Nothing about Mr. Nelson's --

MR. WRIGHT:  You asked me what happened and I said I filed a grievance on Ms. Jones again.  So that's what transpired when I was living over there, that, once again, I filed another grievance to get their attention to alert them that I was being a thorn in their flesh by filing yet another grievance on Mrs. Jones.

THE COURT:  Okay.  Do you object?

MR. LIPPS:  I maintain the objection, Your Honor.

THE COURT:  I'll overrule.  Fifteen is admitted into evidence over objection.

(*Exhibit 15 was received in evidence.*)

MR. WRIGHT:  And 48 is the response to it.

THE COURT:  Do you want that in?  She said all your allegations were false.

MR. WRIGHT:  Pardon me?

THE COURT:  She said all of your allegations were false.

MR. WRIGHT:  I mean, you don't have to put it in, but just to show that -- I mean, that's fine.  We can stick

with 15.

THE COURT:  Okay.  Next question.

BY MR. NIELSON:

Q    So you filed yet another grievance on case manager Jones on April 28, 2021, for her mishandling your mail while you were still living in cell M2-206A on 2-Range?

A    That is correct.

Q    So is it correct that out of retaliation for you filing yet another grievance on case manager Jones on April 28, 2021, you were moved back over to 1-Range where offender Dorsey was still being housed at?

MR. LIPPS:  I'm going to object.  It's speculation, Your Honor.

THE COURT:  I'll sustain.

Next question.

BY MR. NIELSON:

Q    So once case manager Jones became aware of your newly filed grievance against her, case manager Jones and Mr. Nelson moved you back to 1-Range in cell M1-112A on May 27, 2021; is that correct?

MR. LIPPS:  I'll object as speculation, Your Honor.

THE COURT:  How do you know that, sir?

MR. WRIGHT:  Because once I filed my new grievance, Mr. Nelson made the move.  And on that date, it's authorized by Mr. Nelson.  They authorized my move back to 1-Dorm.  I mean,

it's an authorized move by Mr. Nelson on that date.

MR. LIPPS: He's speculating to what Mr. Nelson knows, Your Honor. That's outside of his knowledge.

MR. WRIGHT: I mean, I know he received the grievance because it's documented, the date.

MR. LIPPS: He was just on the stand.

MR. WRIGHT: I never asked him about this grievance.

MR. LIPPS: I know.

THE COURT: Okay. I'll sustain on this.

Next question.

MR. WRIGHT: All right.

BY MR. NIELSON:

Q    Did Mr. Nelson, once again, authorize this new bed move assignment for you going back to 1-Range in cell M1-212A on May 27, 2021?

A    Yes, Mr. Nelson authorized that move.

Q    You said that you were placed in cell M1-212A at 1-Range; correct?

A    That is correct.

Q    Where is cell M1-212A located at in relation to where offender Dorsey's cell was?

A    M1-212A, that's on 1-Range, but upstairs. It's 2-Pod. And Dorsey was still downstairs on 1-pod on a separate rec line. So I was on the same range but a different pod, different floor.

Q     Okay.  So you were living upstairs on 1-Range in cell M1-212A on a different rec line, and offender Dorsey was still living downstairs on 1-Range in cell M1-116A; is that correct?

A     That is correct.

Q     So at that particular time while you were housed upstairs in cell M1-212A, you all were unable to physically get around one another because you all lived on separate rec lines; is that correct?

A     That is correct.

Q     So how did you end up getting moved downstairs on 1-Range, then, to cell M1-114A on the same exact rec line as offender Dorsey, only two cell doors away from him?

A     Well, of course, when Ms. Jones came on the range, I told her, like, "Why you all move me back to 1-Range?  You know the situation."  I was very upset, and I let her know about it, in so many words, like, "Why am I back over here?"  And, of course, she didn't like that.  So, yeah.

Q     So after you once again challenged case manager Jones' authority out loud in front of other offenders and verbally complained and expressed your frustration to her about being moved back around offender Dorsey, you were then moved downstairs to cell M1-114A, two cells away from offender Dorsey?

A     Yeah.  I got moved upstairs on the 27th of May.  And four days later on June 1st, after I got on her case about it, I was

put in for a bed move two cells away from offender Dorsey downstairs after I confronted her about it.

Q    Did you tell case manager Jones that you did not want to move right by offender Dorsey and that you still were in danger of living around him?

A    Absolutely, I told her, like, almost to the point where it could have been perceived as aggressive.  Yes, I definitely told her.

Q    Did case manager Jones threaten you again with a disciplinary conduct report and to take you to segregation for refusing housing assignments?

A    Yeah, she always falls back on that.  "If you don't like it, then go it seg."  Yeah, she threatened to walk me to seg on the spot for refusing a housing assignment.

Q    Did case manager Jones mock and taunt you about you not wanting to ruin your four years clear of any disciplinary conduct reports?

A    Yeah.  I take pride in not getting in trouble, and it's hard to go four years clear without getting any type of write-up.  And I used to always -- like, that was my call, "I don't get in trouble."  You know what I mean?  "I don't get in trouble."

So she used that against me saying, "Well, you're going to ruin that if you refuse your bed housing assignment."  So she used it against me and made a mockery of, like, Well, what you

going to do about it?

So, yeah, she mocked me about not wanting to get any conduct reports.

Q    Did Mr. Nelson, once again, authorize your new bed move assignment on June 1, 2021, to cell M1-114A, two cells away from offender Dorsey on downstairs 1-Range?

A    Yes, Mr. Nelson, once again, authorized that bed move to two cells away from offender Dorsey.

Q    So in spite of Mr. Nelson fully being aware of the great danger that offender Dorsey posed to you, Mr. Nelson still authorized for you to be moved into cell M1-114A on June 1, 2021?

         MR. LIPPS:  And I have to object to the predicate of the question.  It states that Mr. Nelson was fully aware. That's an ultimate issue of fact that has not been established.

         THE COURT:  I'll sustain to the form of the question.

         MR. WRIGHT:  I didn't hear, Your Honor.

         THE COURT:  I sustained the objection.

         MR. WRIGHT:  Okay.  That means no?

         THE COURT:  That means no.

         MR. WRIGHT:  Okay.

         THE COURT:  Next question.

BY MR. NIELSON:

Q    So out of retaliation towards you for all of the many grievances you filed against case manager Jones and Mr. Nelson,

case manager Jones and Mr. Nelson intentionally and knowingly placed you in danger and was deliberate [sic] indifferent towards your health and safety; is that correct, Mr. Wright?

MR. LIPPS:  Objection, Your Honor, for the same reasons, ultimate issue.

MR. WRIGHT:  I mean, he told me he was going to make my life a living hell.

THE COURT:  Okay.  You can put that in your argument, because this is argument.

MR. WRIGHT:  Okay.

THE COURT:  I'll sustain the objection to the question.

BY MR. NIELSON:

Q    What does it mean to live on the same rec line as another offender?

A    That means -- like I said, there's four ranges and each range has an upstairs and a downstairs.  And there's one rec line per upstairs and one rec line downstairs.  So everybody downstairs come out together, and everybody upstairs come out together.

So if you live on the same floor as an individual, you come out for rec together, shower together, microwave, phone, ice, rec, et cetera, et cetera.  So when you live on the same rec line with somebody, you interact with them every single day whenever you're out of your cell.

WRIGHT - DIRECT/NIELSEN                                                254

Q    How many different rec lines are in there in the M-Unit housing?

A    It's eight.  Four ranges, two rec lines per pod.  So it's a total of eight different rec lines you can live on.

Q    So there are a total of eight different rec lines in M-Unit.  And in spite of that, you somehow managed to end up back on the same exact rec line as offender Dorsey; is that correct?

A    Yes, that's correct.

Q    So after you moved into cell M1-114A on June 1, 2021, two cells away from offender Dorsey, what happened next?

A    The next day -- the very next day on June 2, 2021, I went on the outside rec pad.  I don't know, I call myself [verbatim], I'm gonna go on the outside rec pad.  And I hang out in the dayroom so I won't be seen, you know.  I duck off by myself, man.

     I was on the rec pad and offender Dorsey pulled up on the rec pad, locked the door, and he approached me in an aggressive manner as to bring me harm, and he attacked me.

Q    What happened?  What do you mean that you were attacked by offender Dorsey?

A    I was on the inside rec pad.  And like I say, he came out there.  There's a door, and he locked the door behind him.  And it was just me and him out there.  And he pulled up on me like -- I mean, yeah, in an aggressive manner as to hurt me.

So, I mean, he attacked me.

THE COURT:  Who do you mean attacked you?  What did he do to you?  Did he kick you or hit you?

MR. WRIGHT:  He came at me, like, trying to throw a punch, like -- as, like, trying to punch me.

THE COURT:  He threw a punch?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Did he hit you?

MR. WRIGHT:  I kind of, like, rolled it, but, yeah, it landed.

THE COURT:  Did you hit back?

MR. WRIGHT:  Yeah.

THE COURT:  So you all had a fight?

MR. WRIGHT:  I mean, yeah.  I had to protect myself. It lasted 37 minutes.  Nobody came to help me.

THE COURT:  You all fought for 37 minutes?

MR. WRIGHT:  I have the report.  It was 37 minutes. Nobody never came to help me.  I had to defend myself.

THE COURT:  Okay.

BY MR. NIELSON:

Q    How long did this assault and attack on you by offender Dorsey last?

MR. WRIGHT:  I would like to present this into evidence.

Oh, to answer your question on the record, it lasted

37 minutes and some seconds, but 37 minutes.

THE COURT:  You don't need to ask the next question, that's repetitive:  "Did you say the attack lasted 37 minutes?"

MR. WRIGHT:  Exhibit 14, please.  I'd like to admit it to...

THE COURT:  Do you want to offer 14?

MR. WRIGHT:  Yes, Exhibit 14, I would like to admit into evidence.  It shows the time of the incident, how long it lasted.

THE COURT:  Okay.  Court Reporter, do you need a break?

THE REPORTER:  Yes, please.

THE COURT:  All right.  Let's get this one in evidence, or not, and then we'll take a break.

Any objection to 14?

MR. LIPPS:  No objection.

THE COURT:  Exhibit 14 is admitted into evidence without objection.

(*Exhibit 14 was received in evidence.*)

THE COURT:  Okay.  Let's take about a five-minute recess.  Recess for five minutes.

COURTROOM DEPUTY:  All rise.

(*Recess taken from 3:48 p.m. to 4:02 p.m.*)

THE COURT:  You may be seated.  And we're back on the record.

And Mr. Wright, several of your questions are cumulative, and you're not allowed to ask cumulative questions. So is it okay that if you've already given the answer to that question, he's not going to ask it a second time?  Do you agree with that?

MR. WRIGHT:  I'm okay with that.  So if he read the question and it's already been answered, you can just say "don't answer it"?

THE COURT:  No, we're not going to read it.  We're wasting time reading the same question over and over.

MR. WRIGHT:  Okay.  Does he make a determination of what the --

THE COURT:  I will.

MR. WRIGHT:  Oh, you have it up there, too.  Okay. Cool.  That's cool.

THE COURT:  All right.  Next question.

BY MR. NIELSON:

Q    At any time during the entire 37-minute attack on you by offender Dorsey, did any officers or staff members ever intervene or stop you from being violently assaulted?

A    No.

Q    Were you afraid and in great fear for your life while you were being attacked for 37 minutes straight?

A    Yeah, absolutely.

THE COURT:  What number are we on?

MR. WRIGHT:  149.

THE COURT:  149.  Okay.

MR. LIPPS:  Can I ask:  Does the witness have a copy of the questions and answers as well?

MR. WRIGHT:  There's no answers.  The answers --

THE COURT:  There's no answers.  It's just his questions.

MR. LIPPS:  Understood.

MR. WRIGHT:  So I can keep up and not lose track. The answer is coming from me.

THE COURT:  That's fine.  Go ahead.

BY MR. NIELSON:

Q   Did you feel that offender Dorsey could possibly kill you on the rec pad if you didn't protect yourself and fight for your life?

A   Absolutely.  He's a big fellow.  Right?  Bigger than me and -- absolutely, especially the longer the fight went on. Yeah, I felt like if I don't protect myself, it could end bad for me.  Right?

Q   Was offender Dorsey serving a lot of time in prison?

A   He was faced with a lot of time upon his conviction, if he get convicted.

Q   How did the officers become aware that you had just been attacked by offender Dorsey on the rec pad?

MR. LIPPS:  I'm going to object.  That's outside of

this witness's knowledge.

MR. WRIGHT:  How?

THE COURT:  He needs to rephrase it.

MR. WRIGHT:  How did the officers become -- because I told them.

THE COURT:  Okay.  He told them.  That's fine.

Next question.

BY MR. NIELSON:

Q    Are there cameras on the rec pad where you were attacked by offender Dorsey for 37 minutes?

A    Yes, there is, multiple cameras.

Q    So although the 37-minute attack on you was captured on camera, it was still never stopped or intervened?

A    No, it was not.

Q    So once you made Lieutenant Krul aware that you'd been attacked by offender Dorsey, what happened next?

A    I was put in cuffs and informed -- and made aware that I was being taken to segregation.

Q    So were you assessed for any injuries at medical?

A    Yes.  Before I went to segregation, I was taken to the med station.

Q    Did you sustain any physical injuries from being attacked and assaulted by offender Dorsey?

A    Yes, I did.

Q    What kind of injuries did you sustain?

A    I sustained --

MR. WRIGHT:  Can I present it into evidence?

THE COURT:  Uh-huh.  You can tell us.  What were your injuries?

MR. WRIGHT:  Okay.  Exhibit 24.  I had multiple -- you want the initial assessment?

Can you ask the question again, because I didn't answer the question.  Did I sustain...?

THE COURT:  You can answer the question.  What injuries did you sustain?

MR. WRIGHT:  I had an abrasion to my foot and toe area.  I had an abrasion to my left forearm.  I got punched in the side.  My side was sore.  And my face had an abrasion.  And it ultimately tore a ligament in my wrist.

BY MR. NIELSON:

Q    Did you receive any kind of treatment for your physical injuries that you sustained?

A    Right then and there, I was given an icepack and Tylenol. Over the course of time, I received wrist splints to treat the torn ligaments in my wrist.

Q    Were you also assessed for any mental injuries during your medical evaluation?

A    Yes.

MR. WRIGHT:  Your Honor, was we admitting Exhibit 24?

THE COURT:  Do you want to offer 24?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Any objection to 24?

MR. LIPPS:  No, Your Honor.

THE COURT:  Exhibit 24 is admitted into evidence without objection.

(*Exhibit 24 was received in evidence.*)

MR. WRIGHT:  And I'd also like to admit Exhibit 27.

THE COURT:  Any objection to 27?

MR. LIPPS:  Yes, Your Honor.  This is a -- probably a partial medical assessment that's undated.

MR. WRIGHT:  It's dated at the bottom.

MR. LIPPS:  That's your date of birth, isn't it?

MR. WRIGHT:  No.  6/2/21, 3:29 p.m.  I was taken directly after the fight.

MR. LIPPS:  Okay.  No objection, Your Honor.

THE COURT:  Exhibit 29 is admitted into evidence --

MR. WRIGHT:  Twenty-seven.  I'm looking at 29.

Exhibit 27 is admitted into evidence without objection.

(*Exhibit 27 was received in evidence.*)

MR. WRIGHT:  Yes, I was assessed for some mental injuries.  They asked the questions and -- as far as how was I feeling.  Yes, I was.

BY MR. NIELSON:

Q    Did you suffer any mental or emotional injuries as a

result of being attacked by offender Dorsey for 37 minutes?

A    Yeah, absolutely.  Yes.  I have documentation, yes.  I've since been diagnosed with PTSD.  I take psych medication.  I receive regular monthly mental health sessions.

MR. WRIGHT:  May I submit -- admit some...

THE COURT:  Do you want to offer some medical records?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Go ahead.  What are the numbers?

MR. WRIGHT:  Okay.  Twenty-eight, 29, 30, 31, 32, 33, 34, 35, 36, 37.  Twenty-eight through 37, I believe.

THE COURT:  Any objection to all of his medical records?

MR. LIPPS:  Yes, Your Honor.  These are records that have not been authenticated.  There's no certificate of service.  There's no way for us to cross-examine whoever made these medical records, as well.  The plaintiff himself is not the one making these records, so they're hearsay.

MR. WRIGHT:  Correct, the facility is.  These are facility-issued documents.  It has the facility header on there.

MR. LIPPS:  And, actually, thank you.  That's another objection, too.  They're from Pendleton, not New Castle.

MR. WRIGHT:  Actually, some of them are from New Castle, but I got transferred, and this is my mental

evaluations pertaining to the fight of me being diagnosed with PTSD.  This is my mental health records that come from the facility.

THE COURT:  So you challenge the authenticity of these?

MR. LIPPS:  I do, Your Honor, yes.  They appear to be incomplete, just piecemealed.

MR. WRIGHT:  Some of them are only one pages.  At the bottom, it says page 1 of 1.  Some of them are two pages.

THE COURT:  I'll take the admissibility under advisement for 28 through 37 inclusive, and I'll issue a ruling.

Go ahead.

BY MR. NIELSON:

Q   Did you receive any kind of treatment for your mental and emotional injuries you sustained?

A   Yes.  I was placed on mental health medication to treat PTSD.  It's been upgraded multiple times to where now I receive a pretty hefty dosage.  And my mental health code has been changed, which affects my job ability, because my mental health code is higher now so I can't work certain places.  And I receive therapy sessions every month.

Q   Do you still receive any kind of treatment for your mental and emotional injuries you sustained?

A   Yes.  I receive monthly therapy, my medication, right.

THE COURT:  Do you have a diagnosis?

MR. WRIGHT:  Yes, ma'am.  It's in here.

THE COURT:  Well, in case your records don't get in, tell me what's going on.

MR. WRIGHT:  I've been diagnosed by the doctor, Dr. Lamar, at Pendleton, to have sustained PTSD.  And as a result, I've been put on medication that has steadily increased over time.  So now I'm on high medication because I was diagnosed with post-traumatic stress disorder.

THE COURT:  And you did not have post-traumatic stress disorder before this fight with Mr. Dorsey?

MR. WRIGHT:  No, ma'am.  I had a mental A health code, and now I have a mental C health code because I've been diagnosed.

MR. LIPPS:  I just have to object, Your Honor, and actually move to strike as well.  There's no indication that his diagnosis is from either of these incidents, and he hasn't designated any witness -- any expert witness to establish that.

THE COURT:  He can give his lay opinion.  He can testify as to what he's feeling and what he believes his diagnosis is.

MR. WRIGHT:  And if you read it, it says in here that --

THE COURT:  You may not get your records in.

MR. WRIGHT:  Okay.  Well, inside the records, the

doctor has said that prior to these events, Mr. Wright did not have a --

MR. LIPPS:  I would move to strike as hearsay.

THE COURT:  You can tell me how you felt and what was going on.  Prior to this event, you didn't have a mental health code?

MR. WRIGHT:  Prior to this event, I did not take any mental health medication.  I did not have a mental health health code.  But after these events transpired, I started experiencing night terrors, cold sweats, panicky, always on edge if I'm going to be attacked, feeling as if COs are going to conspire to put me in danger.  So that affected me on how I responded to people.  And I was diagnosed with PTSD, in constant fear, wondering if I'm going to be attacked or assaulted again.  Or if I am in a dangerous situation, how do I go about getting help for it.

THE COURT:  Okay.

BY MR. NIELSON:

Q    After you were done being assessed at medical for your injuries, what happened next?

A    I was taken to segregation.  Segregation in O-Unit on 3-Range.

Q    So you were taken to segregation as a punishment for defending yourself for being attacked by offender Dorsey?

A    Yes.  They told me I should have laid on the ground and

just balled up until they came to get me.

MR. LIPPS:  Objection to hearsay.

MR. WRIGHT:  I'm saying what --

THE COURT:  He's not offering it for the truth of the matter, he's offering it to say why he did what he did.

Okay.  So they told you to lay in a ball?

MR. WRIGHT:  They told me to -- I'm not supposed to fight back and I'm supposed to wait for the calvary, so to speak, to come get me.  But I couldn't have done that for almost 37 minutes, I would have probably been really, really beat to a pulp.  So, yes, I did go to seg for protecting myself.

THE COURT:  Okay.

BY MR. NIELSON:

Q    Where were you taken to segregation at?

A    In 3-Range in O-Unit.

Q    Is O-Unit the general population unit?

A    Yeah, O-Unit is considered the general population unit in the annex.

Q    Once you were taken to segregation on 3-Range in O-Unit, what happened?

A    I was placed in cell 214A by Lieutenant Krul.

Q    Which staff member authorized for you to be placed in cell 3-214A on June 2, 2021, the day the attack occurred on you by offender Dorsey?

A    Lieutenant Krul.  He approved my placement in segregation. It's already submitted into evidence.  I believe Exhibit B.  He approved my housing location there.

Q    Did he also personally walk you over to segregation and place you into cell 3-214A himself?

A    Yes.  He walked me to segregation.  Once I told him, he didn't -- I ain't going to say he didn't care, but once I told him, he instantly handcuffed me and walked me to seg.

Q    What cell was offender Brooks in?

A    Offender Brooks was in cell 03-215A next door to me.

Q    Were there any other open, available cells in segregation that Lieutenant Krul could have placed you in rather than directly next to offender Brooks?

A    Yes, there were multiple open cells on 3-Range.

Q    And you had just come to segregation from protective custody in M-Unit; correct?

A    That is correct.

Q    And you were classified as a protective custody offender; correct?

A    That is correct.

Q    Did Lieutenant Krul know that you were a protective custody offender?

A    Absolutely.

Q    Was offender Brooks a general population offender?

A    Yes, he was.  I wanted to -- I can wait.  I can wait.  Go

ahead.

Q    Did Lieutenant Krul know that offender Brooks was a general population offender?

MR. LIPPS:  Objection to speculation.

MR. WRIGHT:  How is it speculation?  He know I didn't come from M-Unit.

THE COURT:  I'll sustain the form of the question.

MR. WRIGHT:  I can't reword it?

THE COURT:  You can ask yourself another question.

MR. WRIGHT:  Okay.  Was offender Brooks a protective custody inmate?

No, he wasn't.

Was offender Brooks a general population inmate?

Yes, he was, and Mr. Nelson confirmed that in his testimony.

THE COURT:  Okay.  Next question.

BY MR. NIELSON:

Q    Does Lieutenant Krul know that protective custody and general population offenders aren't allowed to be housed together?

A    Yes.

Q    So after you were placed in cell 3-214A directly next to offender Brooks, what happened?

A    It was only a matter of time, a day or so, before he found out who I was and more -- when you come from M-Unit, period,

WRIGHT - DIRECT/NIELSEN                                    269

they're going to harass you, let alone -- you know, I used to be in O-Unit, and, you know, why I got sent to M-Unit.

So once he found out who I was and I'm back over there on PC, yeah, it got bad.  Yeah.  So, yeah, he found out who I was, and I was a person who had checked off the range in O-Unit and got sent to M-Unit and all these allegations of me.  So, yeah, he found out who I was.

Q    Which staff members did you exactly notify about offender Brooks threatening and harassing you?

A    Captain Gard, Lieutenant Krul, Sergeant Lee, and Mr. Shane Nelson.

Q    And when did you inform those four different staff members about offender Brooks' threats?

A    As Sergeant Lee said, they make good rounds -- I mean, they make rounds.  They good about that in seg.  They make frequent 30-minute rounds.  So as you can imagine, sometimes I am repetitive and bugging them.

So every time they walked past the range, "Hey, hey, Captain Gard, woo-woo."  Or, "Lieutenant Krul, I'm having this problem."  So, repeatedly.  Every time I saw them on their shift, I told them and expressed it to them.

Q    Prior to being assaulted with bodily fluids by offender Brooks on June 24, 2021, did you personally inform Lieutenant Krul that offender Brooks had been threatening to assault you?

A    Yes, I did.

Q    How did you exactly go about informing Lieutenant Krul that offender Brooks had been threatening you?

A    I'd stop him on his walk, on his count, and tell him face to face through the door window that Mr. Brooks is threatening me.  I don't feel safe.  So I verbally told him myself.

Q    Did you notify Lieutenant Krul about this more than once?

A    Numerous times.  Like I say, I can be very redundant sometimes, so very frequently.

Q    Did you ever ask Lieutenant Krul to be moved to a different cell in segregation away from offender Brooks?

A    Multiple times.

Q    And what was Lieutenant Krul's response to you asking to be moved away from offender Brooks?

A    "I'm not moving you.  This is not a hotel.  This is not a Hilton.  If you don't like it, stop coming to prison."

Like, I wasn't the greatest, like, person.  So they're a community there.  They stick together.  So I feel [verbatim] one person, they all seem to have a grudge towards me, so --

MR. LIPPS:  Object and move to strike to the last portion of his comments, Your Honor.

MR. WRIGHT:  No, he was not going to move me.  If I don't like it, stop coming to prison.

THE COURT:  All right.  And I'll strike the last part.

Next question.  We can skip 193, that's cumulative.

Next question, 194.

BY MR. NIELSON:

Q    Is this the same Lieutenant Krul that forced you to move inside the same cell as offender Dorsey in M-Unit, even after you informed him the danger offender Dorsey posed to you prior to you eventually getting assaulted by offender Dorsey?

A    Yes, that is the same Lieutenant Krul who I told -- who I spoke to in the shower, who threatened to walk me to seg if I didn't go in the cell with Dorsey, correct.

Q    Is there a pattern of Lieutenant Krul showing total disregard towards your safety in failing to protect you from a known danger that he's been warned about?

        MR. LIPPS:  Objection, Your Honor.  That comes to the ultimate question for the trier of fact.

        MR. WRIGHT:  I believe he did it to me twice.

        THE COURT:  Okay.

        MR. WRIGHT:  And they both resulted in me being assaulted.

        THE COURT:  I'll let him say that he did it to him twice.

        Okay.  Next question.

BY MR. NIELSON:

Q    Is Lieutenant Krul a defendant on another separate pending lawsuit that you currently filed in federal court?

A    Yes, he is.

Q   On your other pending federal lawsuit that Lieutenant Krul is a defendant on, is he also accused of showing deliberate indifference towards your health and safety?

A   Yes, he is.

Q   And what is the current status of that lawsuit in which Lieutenant Krul is a defendant?

MR. LIPPS:  I'm going to object.  There's no relevance at this point, Your Honor.

THE COURT:  Why is this relevant, sir?

MR. WRIGHT:  Because it shows a pattern because the same day I was released from segregation, I was placed into the cell to which this lawsuit -- the new one is related to, and they ruled on a summary judgment that he was --

THE COURT:  Okay.  I don't think it's relevant.  I'll sustain.

MR. WRIGHT:  Okay.  It was just showing a pattern of him.  Okay.

THE COURT:  Okay.

MR. WRIGHT:  Thank you.

BY MR. NIELSON:

Q   Prior to you being assaulted with bodily fluids by offender Brooks on June 24, 2021, did you personally inform Sergeant Lee that offender Brooks had been threatening to assault you?

A   Yes, I did.

THE COURT:  Tell me about the assault with bodily fluids.  How did that happen?  What happened?

MR. WRIGHT:  On June 24, 2021, they was passing out chow with Officer Foley at lunchtime.  And I'm in 14, Brooks is in 15, 215.  And when he gave him his tray, he refused to let Officer Foley close the food slot.  He stuck his arm out the food slot and he held it hostage.

Officer Foley couldn't get him to close it, so the next chain of command, he went and got Sergeant Lee. Sergeant Lee came up there, talked to him.

THE COURT:  You were in your cell.  Tell me how he got bodily fluids on you.

MR. WRIGHT:  Okay.  After that happened, lieutenant walked up there, and then Gard came up there, Captain Gard.

And then it's showers and rec day.  And the reason why he was holding his cuff hostage is because they wouldn't give him a shower.

So after he had it for, like, three hours, Officer Foley came up there.  And, like, we get showers two or three times a week.  He said, right, "This is your rec and this is your shower time."

THE COURT:  Your shower time?

MR. WRIGHT:  Right.  Correct.  This was rec and shower day.  Me, I was in 14, so they made their rounds, it was my turn.  And he said, "Either you're going to take a shower or

rec now or you're not getting it for the next few days."

So I took my shower. And when I came out of my cell, even trying to avoid him, he still was able to get me coming and going. He stuck -- he had his cuff port held hostage, so he was able to stick his arm out.

And he had, at first, like a bowl of, like -- I'm going to say bodily fluids, and he threw it out the cuff port on me. And then I was trying to go back in my cell, and he had another round, so to speak, and he hit me with it again because his cuff port was down.

THE COURT: Okay.

BY MR. NIELSON:

Q   How did you exactly go about informing Sergeant Lee that offender Brooks had been threatening you?

A   The same thing, doing his rounds, pulling him to the side and let him know, verbally telling him.

Q   Did you notify Sergeant Lee about this more than once?

A   Absolutely. Every time I had an opportunity to.

Q   Did you ever ask Sergeant Lee to be moved to a different cell in segregation away from offender Brooks?

A   I did.

Q   And what was Sergeant Lee's response to you asking to be moved away from offender Brooks?

A   Similar to -- the foundation was no. He may have stated it a little more creative, but, "No, you don't get to have your

way, no."

Q    Did Sergeant Lee ever personally witness and hear offender Brooks threaten to harm or assault you prior to you being assaulted by Offender Brooks on June 24, 2021?

A    Yes.

        MR. LIPPS:  I'll object.  That's just outside of this witness's knowledge what another individual, who has already testified, can say what he's heard or witnessed or observed.

        MR. WRIGHT:  You asked me did I hear him say it, and I heard him say it because --

        MR. LIPPS:  Let her rule.

        MR. WRIGHT:  Oh, my bad.

        THE COURT:  He can say what he heard or saw.

        MR. WRIGHT:  Yes, I did hear it because --

        THE COURT:  What did you hear?

        MR. WRIGHT:  By me telling Sergeant Lee that offender Brooks was threatening me, by him being my neighbor, he can hear me telling him.  So he's, like, "You bitch-ass snitch. Now I'm really going to get your ass."  So he can hear me telling Lee because the door was so close in proximity, he hear me telling on him.  So that enraged him even more by me telling on him.

BY MR. NIELSON:

Q    Did Sergeant Lee ever personally witness and see offender Brooks spit on your cell door window?

A    Yes.  On one occasion, he was taking offender Brooks to the shower.  And we had glass like a rectangle on the thing. And he walked past my door talking shit and (indicating) "Bitch, when I see you, I'm going to stab you."  Like, yeah, so he seen him.  That's offender Brooks.  He talks shit.  He's aggressive.  He's a big fellow.  Yeah, he absolutely seen him do that.

Q    So even after Sergeant Lee personally witnessed offender Brooks do that to you, he still refused to move you away from offender Brooks?

A    That is correct.

Q    Is this the same Sergeant Lee that former officer Everett Dunn used to work alongside with in O-Unit?

A    Correct.

Q    Was Sergeant Lee Officer Everett Dunn's supervisor?

        MR. LIPPS:  I'm going to object to relevance, Your Honor.

        THE COURT:  Why is this relevant?

        MR. WRIGHT:  Because it shows -- like I said, I have two, like, sensitive lawsuits against Everett Dunn.  Because of my PREA allegation, he was -- no longer works there.  So it's -- like I said, there's a buddy system that they take offense to things I do to their staff members.

        So it shows that he could have disregarded my safety because he personally may not care for me for what I did to one

of his coworkers.  So it give him reason to, sort of speak, turn a blind eye or even laugh at me being harassed.

THE COURT:  All right.  I'll let him testify to that.

BY MR. NIELSON:

Q    And is it true that you filed multiple grievances on Officer Everett Dunn, one of those grievances being a PREA back in March and April of 2021 prior to you being assaulted by offender Brooks?

A    Yes.  PREA, as Mr. Nelson said, is a Prison Rape Elimination Act that I filed on Mr. Dunn, which I have a pending case against.  And like I said, it resulted in him no longer being there, correct, and this is prior to me coming to seg.

Q    Is it true that Sergeant Lee and Officer Everett Dunn were not only just coworkers, but also friends as well?

MR. WRIGHT:  I'm not -- may I allowed to answer that? I mean, speculation.

THE COURT:  Okay.  We'll strike that one.

MR. WRIGHT:  Yeah, I figured you'd say something.

BY MR. NIELSON:

Q    Prior to you being assaulted with bodily fluids by offender Brooks on June 24, 2021, did you personally inform Captain Gard that offender Brooks had been threatening to assault you?

A    Absolutely.

Q    How did you exactly go about informing Captain Gard that offender Brooks had been threatening you?

A    He's good for making rounds.  You know, he'd come on the unit.  The captain would sign the book, make his rounds, see if offenders in seg is okay, if you need anything.  So, you know me, I'm Mr. Bug-You-To-Death, so absolutely.

Q    Did you notify Captain Gard about this more than once?

A    Every time I seen him, every time he made a round.

Q    Did you ever ask Captain Gard to be moved to a different cell in segregation away from offender Brooks?

A    That is correct, I did.

Q    And what was Captain Gard's response to you asking to be moved away?

A    If I don't like it, take it up with my case manager.  No, but just a different way of saying no.  No, he wasn't going to move me.

Q    Did Captain Gard ever personally witness and hear offender Brooks threaten to harm or assault you prior to you being assaulted by offender Brooks on June 24, 2021?

A    Absolutely.

Q    When and how did Captain Gard witness offender Brooks threaten you prior to you being assaulted?

A    The same way as Sergeant Lee, speaking to him and him responding to me and Brooks hearing me tell on him.  So when he hear me telling on him, you know, "You a rat, you a bitch, I'm

going fuck you up when I catch you."  Things of that nature. So he heard me telling Captain Gard, and that just made him more enraged.

Q    Is Captain Gard a defendant on another separate pending lawsuit that you currently have filed in federal court?

A    Yes, he is.

Q    On your other pending federal lawsuit that Captain Gard is a defendant on, is he also accused of showing deliberate indifference towards your health and safety?

A    Yes, he is.

Q    What is the current status of that lawsuit?

A    It's still pending right now.  It's pending summary judgment.

Q    Prior to you being assaulted with bodily fluids by officer -- or offender Brooks on June 24, 2021, did you personally inform Mr. Nelson that offender Brooks had been threatening to assault you?

A    Yes, I did.

Q    How did you go about informing Mr. Nelson that offender Brooks had been threatening you?

A    When he make his rounds.  Yeah, when he make his weekly rounds.  Like, they walk.  They good at walking.  So just telling him when I seen him.

Q    Did you notify Mr. Nelson more than once?

A    Every time I saw him.

Q   Did you ever ask Mr. Nelson to be moved to a different cell in segregation away from offender Brooks?

A   Yes, I did.

Q   What was Mr. Nelson's response to you being asked to move away?

A   You can imagine.  No.  I was already in seg for him putting me in a situation before, so he wasn't too enthused to move me to -- so, no, he didn't move me.

Q   Is Mr. Nelson a defendant on another separate pending lawsuit that you currently have filed in the federal court?

A   Yes, he is.

Q   And on your other pending federal lawsuit that Mr. Nelson is a defendant, is he also accused of showing deliberate indifference towards your health and safety?

A   Yes, he is.

Q   And what is the current status of that lawsuit?

A   They just ruled in summary judgment in my favor.

Q   How many segregation cells are there --

         MR. LIPPS:  As an officer of the Court, I have to inform:  The plaintiff did not file summary judgment and get a judgment in his favor.

         THE COURT:  All right.

         MR. WRIGHT:  Oh, did I say it wrong?

         THE COURT:  Yes, you said that you got summary judgment.

MR. WRIGHT:  I apologize.  They denied you all claims.  However you're supposed -- yeah, they denied it. Okay.  I apologize.

THE COURT:  So it survived summary judgment.

MR. WRIGHT:  It survived summary judgment, correct.

THE COURT:  Okay.

BY MR. NIELSON:

Q    How many segregation cells are there in segregation on 3-Range in O-Unit?

A    Thirty-two.

Q    Is there also another segregation housing unit at New Castle?

A    Yes, there is, on the hill.

Q    And how many segregation cells are there in segregation on the hill?

A    Probably 70.  About 60.  It's 25 per range, plus 5, so about 55.

THE COURT:  All right.  Go to 239.  Oh, these are different answers.  Okay.

BY MR. NIELSON:

Q    So in spite of there being 80-plus different cells in segregation that you could have been easily moved to, you somehow still remained housed next to offender Brooks; is that correct?

A    That is correct.

Q    Mr. Wright, on the date of June 24, 2021, were you indeed assaulted with bodily fluids by offender Brooks in the segregation O-Unit on 3-Range?

A    One hundred percent absolutely correct.  I was indeed assaulted by offender Brooks with bodily fluids.

Q    All four defendants deny any knowledge of this happening. Why are they claiming that this never actually transpired?

            THE COURT:  He can't know that.

            Next question.

BY MR. NIELSON:

Q    Was this assault on you by offender Brooks on June 24, 2021, captured on camera?

A    Yes, it was.

Q    Did you file a grievance regarding you being assaulted in segregation by offender Brooks?

A    Yes, I did.

Q    What date did you file that on?

A    I filed it, I believe, on -- no, I'm going to tell you exactly, pardon me.  I filed it on July 2, 2021.

Q    Did you request for the video camera footage of you being assaulted by bodily fluids by offender Brooks on June 24, 2021, to be saved and preserved in your grievance?

A    Yes, I absolutely did.

            MR. WRIGHT:  May I present this to evidence?

            THE COURT:  What is it?

MR. WRIGHT:  This is the grievance that I filed regarding the assault that I asked for the video camera footage to be preserved.

THE COURT:  What exhibit numbers are those?

MR. WRIGHT:  Sixteen.

MR. LIPPS:  I would object, Your Honor.  The issue for this would be was there prior knowledge to -- for these defendants about that assault, not whether the plaintiff asked for video camera footage next -- the following month.

MR. WRIGHT:  Do I get a response?

THE COURT:  You may respond to the objection.

MR. WRIGHT:  All defendants deny that this assault happened, which I believe is very relevant if this assault happened and that they didn't do anything about it.  They're trying to say there wasn't deliberate indifference because it never transpired, but I believe my evidence supports that it did happen.  So it is relevant to me asking for video camera footage.  It would be even more relevant, the response of the grievance lady regarding that request for my evidence to indicate that it happened.

THE COURT:  So yours is Exhibit 16?

MR. WRIGHT:  Exhibit 16.

THE COURT:  I'll admit, over the defendants' objection, Exhibit 16.

(*Exhibit 16 was received in evidence.*)

BY MR. NIELSON:

Q     How do you know for sure that the assault was indeed captured on camera?

A     Because when I wrote and asked for the -- I asked for the video camera footage to be preserved of this incident at the time frame, and the response to my grievance was, "Per custody" --

          MR. LIPPS:  Objection, Your Honor.  That's hearsay.

          MR. WRIGHT:  This is a document that I've been using for all my other grievances I've been submitting thus far. This is a state-issued form from the grievance counselor, which Mr. Nelson already verified that this is a grievance form -- or response.

          THE COURT:  I'm sorry.  Say that -- so the question is:  "How do you know for sure that the assault was indeed captured on camera?"  How do you know that?

          MR. WRIGHT:  Because of her response to my request for the saving of the footage, which it says, "Per custody supervisors policy and procedures was followed, I have requested the camera footage be saved that you asked for in your grievance."

          That's the response that correlates with my grievance request for it to be saved.  So I'm quite sure she's not going to say she saved video footage of something that didn't exist.

          THE COURT:  Okay.  What document is that?

MR. WRIGHT:  Eighteen.

THE COURT:  Any objection to 18?

MR. LIPPS:  Same objection, Your Honor.

THE COURT:  Over the defendants' objection, I will allow 18.

(*Exhibit 18 was received in evidence.*)

BY MR. NIELSON:

Q   Mr. Wright, what happened on the date of June 24, 2021, that eventually led up to you being assaulted with bodily fluids by offender Brooks?

A   I kind of touched on that already, that he held the cuff port hostage at lunch, wouldn't allow it to be closed and secure, but you can ask the other questions so I can explain. But, yeah, that's what happened.

THE COURT:  You've explained that to me already.

Okay.

BY MR. NIELSON:

Q   What is a cuff port?

A   Yeah, the cuff port, which is a food slot, was open.  They was unable to secure it.  He held it hostage.

And instead of them taking certain measures to gain control of it, Sergeant Lee spoke to him, Captain Gard, Lieutenant Outlaw, all spoke to him while he had his cuff port open.  They all walked away while he had it open.  No action was taken to secure it, and they left it open.  And then they

sent Officer Foley to come get me for my shower.

THE COURT:  Okay.  Go down to 54, because he already told me what happened.

MR. WRIGHT:  All right.

BY MR. NIELSON:

Q   Are the doors in segregation on 3-Range in O-Unit solid cell doors or are they bars?

A   There's -- not bars.  There's a solid door with a window and a food slot.  Solid doors.  So there's no other opening except through the food slot.  So an offender can't get to you unless the food slot is open.

Q   So after offender Brooks had his cuff port held hostage and refused to allow Officer Foley to close it back, what happened next?

A   I went through the -- oh.  He tried to get him to close it back.  He couldn't get him to close it, so he went to inform the sergeant, which was Sergeant Lee on shift that day.

Q   Did Sergeant Lee personally come to offender Brooks' cell to see what the problem was?

A   Yes.  I mean, like he said, he's used to dealing with Brooks.  So he came in there, I guess, to try to talk to him, surrender the food slot when he came in there.  And I'm his neighbor, so I'm looking out the window.  I can see the whole interaction, him talking to offender Brooks about closing the food slot.  So he came up there and talked to him while he had

it held hostage.

Q    Was Sergeant Lee successful at getting offender Brooks to stop holding his cuff port hostage?

A    No, he was not.

Q    What happened next?

A    Then, since he didn't work, he went and got Lieutenant Outlaw to come, follow the step of command, the next person in charge.

Q    And what does the next level chain of command mean?

A    The next person: sergeant, lieutenant.  So the sergeant couldn't do it, so the lieutenant had to come and try.

Q    So did Sergeant Lee show back up at offender Brooks' cell door with Lieutenant Outlaw?

A    Yeah, he was accompanying him while Lieutenant Outlaw was speaking to him.

Q    While Lieutenant Outlaw was talking to offender Brooks, did Brooks still have his cuff port held hostage?

A    Correct, he had it held hostage.

Q    And once Lieutenant Outlaw walked away from offender Brooks' cell door, was Brooks' cuff port still being held hostage?

A    Yes, it was.

Q    Was Lieutenant Outlaw successful in getting offender Brooks to stop holding his cuff port hostage?

A    No, he was not.

WRIGHT - DIRECT/NIELSEN                                288

Q    And what happened after that?

A    Then he went to the next chain of command.  He went and got Captain Gard.

Q    And was the next chain of command followed?

A    Yes, Captain Gard did come up there.

Q    While Captain Gard was talking to offender Brooks at his cell door, did Brooks still have his cuff port held hostage?

A    Correct.  He still had his arm in the cuff port while he was speaking to Captain Gard and Lieutenant Outlaw.

Q    Was Captain Gard successful at getting offender Brooks to stop holding his cuff port hostage?

A    No, he was not.

Q    Is it correct that all four officers: Captain Gard, Lieutenant Krul, Sergeant Lee, and Officer Foley were unsuccessful at getting offender Brooks to surrender his cuff port?

A    That is accurate.  This is correct.

Q    How long did this go on of offender Brooks having his cuff port held hostage?

A    Approximately, like, lunch.  And this all happened at around 2:30, so about three, three and a half, four hours.

Q    Was there any attempts of force used of any kind to attempt to get offender Brooks to surrender his cuff port?

A    No, they -- no.

Q    Is it a common occurrence for offenders in segregation to

hold their cuff port hostage?

A    Yeah, it happens.

Q    And why did offender Brooks have his cuff port held hostage?

A    It was shower day, and he was acting -- acting -- I ain't going to say "ass," but he was acting how he act.  And he was being combative so they said they wasn't taking him out of his cell.  And he didn't take too kind to being refused a shower. He held the cuff port -- because it's a negotiation tactic like, "Hey, I'm not releasing this until you do this."  So he was denied a shower for being abrasive.

Q    And how did you end up being assaulted by offender Brooks?

A    I was second to last on the list.  It was my shower time. It was, Take a shower now or wait two or three days later.  And Officer Foley told me, "You want your shower?  You want your rec?"  And he cuffed me up, took me out of my cell.  And en route to the shower, he got me.

Q    Was Officer Foley the only officer present at the door to take you to your shower and rec?

A    Yeah, Officer Foley came up there by hisself.

Q    Is it common for there to only be one officer escorting an offender in and out of his cell in segregation by themselves?

A    No, it's not.  And Sergeant Lee, and I believe Captain Gard testified to it.  In segregation there's supposed to be a two-man escort at all time.  But at this time, it was just --

coincidentally, just Officer Foley.

Q    When Officer Foley was taking you out of your cell, did offender Brooks still have his cuff port held hostage?

A    Yes.

Q    So what happened next?

A    He threw God knows what on me: feces, urine.  Yeah, he gunned me down.  He -- the technical term, he assaulted me with bodily fluids.

Q    So he assaulted you with bodily fluids through his open, unsecured food slot?

A    Correct.  He threw it out the opening of his door, and it got in my face and my hair, my mouth, my hair, and over my clothes.  Yeah, he got me.

Q    Did Officer Foley witness you getting assaulted with bodily fluids by offender Brooks?

A    Yeah, he was my escort.

Q    Then what happened next?

A    After I got assaulted, I'm not going to rec covered in sh- -- mess.  And he took me back to my cell.  He had to respond like it was an assault, so he had to stop the movement and take me immediately back to my cell and, I guess, notify the superiors what happened.  So he made me go back to my cell.

    I'm like, "Man, just take me to the shower.  I'm already out.  Let me" -- he was like, "It's an assault," so he had to take me back to my cell immediately.

Q    After you were back inside your cell after being assaulted, did offender Brooks still have his cuff port held hostage?

A    Yes, he did.

Q    Did you see Sergeant Lee again that day after you had been assaulted by offender Brooks?

A    Yeah.  He came back up there again and -- trying to get this cuff closed before he leave for the day.  So he came back up to offender Brooks' cell to, I guess, negotiate.

Q    Did you make Sergeant Lee aware that you had just been assaulted with bodily fluids by offender Brooks?

A    Absolutely.  Absolutely.  I'm very adamant.  I'm banging on my door -- well, on the window right there, because he's talking to Brooks.  Absolutely.

Q    So in spite of Sergeant Lee clearly seeing you covered in offender Brooks' bodily fluids, Sergeant Lee still denied you a shower?

A    Absolutely.  I asked, "Can I take a shower?"  I asked Foley, and Foley said he'll ask the sergeant.  And Sergeant Lee came up there.  I asked Sergeant Lee, and, no, he wouldn't allow me to take a shower.

Q    Did Sergeant Lee, Captain Gard, Lieutenant Outlaw, or either Officer Foley take any pictures of you having been assaulted by offender Brooks?

A    No.  No pictures were taken of me.

Q    Did Sergeant Lee, Captain Gard, Lieutenant Outlaw, or either Officer Foley ever take you to receive any medical attention after you were assaulted by offender Brooks?

A    No, they did not.

        MR. WRIGHT:  What number are you on?  I lost count.

        THE COURT:  297 is the next one.

        MR. WRIGHT:  Okay.  Thank you.

BY MR. NIELSON:

Q    Were there any incident reports written commenting --

A    Documenting.

Q    -- documenting you being assaulted by offender Brooks?

A    No.  Everybody -- everybody acted like it didn't happen.

Q    Did offender Brooks eventually surrender his cuff port and allow for it to be closed?

A    Yes, he did.

Q    And when did he do that?

A    When he negotiated with Sergeant Lee to take him to the shower.  When he came back from the shower and put him in his cell, he closed his cuff port, because that's all he wanted from the beginning.  And once he got that, he came back and closed the cuff port.

Q    Did you ever receive a shower?

A    No.

Q    What did you do in order to clean yourself up?

A    You know, the best I can with the little low pressure

water, try to watch my -- you know, my hair is long, I couldn't get it out.  I'm -- as best as I can in my sink because, you know, I wasn't able to cleanse myself properly, but I had to try.

Q    How long did you have to wait before you were able to take a shower?

MR. LIPPS:  I'm just going to object.  There's no relevance to this.  This is a failure to protect claim. Anything that happened afterwards in his cell by himself does not relate to these defendants' failure to protect.

THE COURT:  I'll let him tell me how long it took before he was able to take a shower.

MR. WRIGHT:  That was shower day.  So you get a shower every three days.  So I had to wait another three days to get a shower, because that was shower day.  So approximately three days.

BY MR. NIELSON:

Q    Did you ever receive a disciplinary conduct report for the incident that transpired on the rec pad when offender Dorsey assaulted you on June 2, 2021?

A    Yes, I did.

MR. WRIGHT:  I did.  And it's Exhibit 4.  Do I need to submit it into evidence?  I would like to submit it into evidence, because I want to speak to it.

THE COURT:  Any objection to Exhibit 4, that's the...

MR. LIPPS:  No, Your Honor.

THE COURT:  Exhibit 4 is admitted into evidence without objection.

(*Exhibit 4 was received in evidence.*)

BY MR. NIELSON:

Q    What was the punishment that you received as a result of that disciplinary conduct report?

A    Before I answer that, I would like to point something out that's on this form.

THE COURT:  You can't do that.  Answer the question.

MR. WRIGHT:  It's not complicated, but I came back there June 2nd.  I saw the hearing on June 16th.  So when I saw them, it was time served.  So I received whatever days I was already in seg.  I didn't get sanctioned a number of days. Just, by the time I saw them, in two weeks, they gave me time served.  They said two weeks was sufficient.

So from the day I got back there on the 2nd to when I first seen them on the 16th, that's how much time I was sentenced to segregation.

BY MR. NIELSON:

Q    So does that mean that you should have been released from segregation immediately because your time was completely served?

A    Correct.  Time served meant I should have been released immediately, correct.

Q    However, Mr. Wright, you did not get immediately released from segregation as you should have, did you?

A    No, I did not.

Q    When did you eventually get released from segregation?

A    June 29, 2021.

Q    Why did it take so long past your time served to be finally released from segregation?

A    I was put in, by Mr. Shane Nelson, on his report, on his case notes, to be held for administration -- to be held under an admin hold and put in to move to PC.

MR. LIPPS:  Your Honor, I'm going to object.  This is cumulative to what Mr. Nelson said.  And this is outside of Mr. Wright's knowledge.  He's just saying what documents have said already.  They're already inside the record as well.

MR. WRIGHT:  He confirmed it, though.

THE COURT:  But he can tell me where it is.

So that's in the record already?

MR. WRIGHT:  Yes, it's -- it's Exhibit 19, which Mr. Nelson confirmed that he put in the record himself.

THE COURT:  Okay.

Next question.

BY MR. NIELSON:

Q    What date did Mr. Nelson initiate and do this to you?

MR. LIPPS:  Cumulative, Your Honor.

THE COURT:  He can answer it.

MR. WRIGHT:  He typed in on June 18th, but the meeting was held on June 16, 2021.

THE COURT:  Next question.

BY MR. NIELSON:

Q    Why would Mr. Nelson do that to you?

MR. LIPPS:  Objection, speculation.

THE COURT:  Do you know why Mr. Nelson did that to you?

MR. WRIGHT:  I believe so, Your Honor, yes.  Because I had just filed another grievance.  I filed a grievance regarding the fight I was in with Dorsey that day he failed to protect me from, on the 7th.

And once he became aware that the grievance was filed on the 7th, coincidentally, as he says, this appeared to hold me on segregation past my out date, on the day I was supposed to be released.

MR. LIPPS:  I move to strike on the speculation, Your Honor.

THE COURT:  I'll allow that answer.

Next question.

BY MR. NIELSON:

Q    So you filed a grievance on Mr. Nelson and case manager Jones on June 8, 2021?

A    Correct.

MR. WRIGHT:  I would like to put that into evidence,

which is Exhibit No. 25, showing that June 8, 2021, I filed a grievance on Mr. Nelson and case manager Jones regarding the attack on me by Dorsey, which is Exhibit 25.

THE COURT:  Any objection to 25?

MR. LIPPS:  Yes, Your Honor.  It's just not relevant.

MR. WRIGHT:  It shows that there was a grievance filed prior to the extension of my seg time to explain --

MR. LIPPS:  I'll withdraw the objection, Your Honor.  It's fine.

THE COURT:  Exhibit 25 is admitted into evidence without objection.

(*Exhibit 25 was received in evidence.*)

BY MR. NIELSON:

Q    Are you saying that the grievance you filed on the date of June 8, 2021, on Mr. Nelson and case manager Jones, while you were still serving your segregation time regarding Nelson and Jones housing you around offender Dorsey and the attack on you by him in M-Unit, is the reason why Mr. Nelson retaliated against you by further detaining you in segregation past your time served?

MR. LIPPS:  Objection, Your Honor.  Calls for the ultimate question.

THE COURT:  I'll sustain.

MR. WRIGHT:  What number are you on again, sir?

THE COURT:  Now we're on 324.

BY MR. NIELSON:

Q    So that grievance you filed on June 8, 2021, on Mr. Nelson prior to you being released from segregation was Mr. Nelson's motivating factor to retaliate against you?

MR. LIPPS:  Objection, Your Honor.  This calls for the ultimate --

THE COURT:  Well, that's his theory, so...

Is that your theory?

MR. WRIGHT:  Yes, ma'am.

THE COURT:  Okay.

MR. WRIGHT:  Correct.  That is correct.

THE COURT:  Okay.

Next question.

BY MR. NIELSON:

Q    Is Mr. Nelson a member of the RHU Multidisciplinary Review Committee?

A    Yes, and he has affirmed he is, too.

Q    Is this the same RHU review committee that recommended you be held under administration hold on the date of June 16, 2021, which ultimately led to you serving nearly an extra two weeks in segregation?

A    That is correct.

Q    Do you know why Mr. Nelson would all of a sudden recommend to have you removed from protective custody?

MR. WRIGHT:  Do you want me not to answer?

Mr. Lipps?

THE COURT:  Do you know why?

MR. WRIGHT:  Yeah.  Yes, because retaliation towards me.

THE COURT:  Okay.

Next question.

BY MR. NIELSON:

Q    Isn't Mr. Nelson the individual who initially recommended for you to be placed on protective custody back in 2020?

A    Yes, he is.

Q    What has changed between now and then other than the abundance of grievances that you filed on him, case manager Jones, and other New Castle staff?

A    Since he did -- since his initial request for me to go on protective custody, I thus filed countless grievances against him, case manager Jones, and other staff in M-Unit.  So that's the only difference between now, I filed grievances on them.

Q    What date were you finally released from segregation?

A    On June 29, 2021.

Q    When you were released from segregation on June 29, 2021, what cell were you placed in?

A    I was placed back in M-Unit in cell M1-113A.

Q    Did the toilet in that cell -- was the toilet in that cell already broken and malfunctioning and overflowing with feces and water when you first moved in there?

MR. LIPPS:  Objection.  Relevance, Your Honor.

THE COURT:  Why is that relevant?

MR. WRIGHT:  Because it's -- first because he's a defendant in that case and to show --

THE COURT:  Who?  Who's a defendant?

MR. WRIGHT:  Mr. Nelson.  He's a defendant in this case I'm speaking of.  And I was placed in that cell immediately upon my release the next -- immediately upon my release by him, authorized by him.  And it shows further acts of retaliation toward me by putting me in a cell that is malfunctioning to further retaliate against me.

THE COURT:  Okay.  That's retaliation in another lawsuit.  Am I correct?

MR. LIPPS:  Yes, Your Honor.

THE COURT:  All right.  I'll sustain the objection.

MR. WRIGHT:  All right.

THE COURT:  You cannot ask "out of curiosity."

The next one is 335.

BY MR. NIELSON:

Q   Didn't you file a request to sep- -- a separate --

A   Separatee.

Q   -- separatee on offender Dorsey?

A   Yes, I did.

Q   And didn't Mr. Nelson state in his grievance response to you that he filed the appropriate paperwork for it?

A   Yes, I did.

MR. WRIGHT:  And can I enter that into evidence, Your Honor, showing that Mr. Nelson said he would file it for me?

THE COURT:  What's your number?

MR. WRIGHT:  Seventeen.

THE COURT:  Do you want to offer 17?

MR. LIPPS:  Isn't that already in?

MR. WRIGHT:  I'm not for sure.

THE COURT:  Is 17 in, Sarah?

Okay.  I think you talked about it.  It wasn't admitted.

Any objection to 17?

MR. LIPPS:  No objection, Your Honor.

THE COURT:  Seventeen is admitted into evidence without objection.

(*Exhibit 17 was received in evidence.*)

BY MR. NIELSON:

Q   Did Mr. Nelson ever file that separatee for you like he said he would to make sure that you'd be kept separate from offender Dorsey?

A   No, Mr. Nelson didn't.

MR. WRIGHT:  And I also have another exhibit of a letter I wrote to classification requesting if I have any separatees.  And they responded by saying, "You do not have any separatees," which led to me being placed back around offender

Dorsey in January of 2022.

So he never filed the separatee as he said he would. Even after that and even after I requested, he never filed it. And I would like to present Exhibit 20, if possible, into evidence.

THE COURT:  Any objection to 20?

MR. LIPPS:  Yes, Your Honor.  It's irrelevant to any claim in this lawsuit.

MR. WRIGHT:  But it speaks to the further mind state of failure to protect after he said he was going to file a separatee.  After he knew I was assaulted, he still chose not to act to assist me, which led to me going back around offender Dorsey again.

THE COURT:  What date was this?

MR. WRIGHT:  Which what?

THE COURT:  Your 20.

MR. WRIGHT:  The 20 -- I wrote Ms. Cecil -- and she may be one of his people he call -- on January 30, '22.  And I wrote, and her response is at the bottom saying, "You do not have any current separatees.  If you did, I would have been notified of them."  So no one has ever submitted it on my behalf.

THE COURT:  All right.  It looks like an official business record.  I'll admit 20 over the defendants' objection.

(*Exhibit 20 was received in evidence.*)

THE COURT:  Okay.  Those are your questions.  All right.

MR. WRIGHT:  Wait, I've got 20 more.

THE COURT:  No.  Okay.  Thank you.

MR. WRIGHT:  Hey, thank you.

THE COURT:  All right.  You may cross-examine.

MR. LIPPS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. LIPPS:

Q   Well, Mr. Wright, let's pick up on the separatees.  How come you didn't file one on Mr. Brooks when you said that you filed one -- or requested one for Mr. Dorsey?

A   Actually, I did, I just didn't put it in there.  It was in my summary of judgment.  I did file one.  It's on my summary judgment record.  I filed one on him.  I filed one on Officer Foley.  I filed one on offender Dorsey.  I absolutely did, I just don't have it in here.

And the odds of me seeing Mr. Brooks again, he's a PC -- I'm a PC inmate, I probably would never see him again.

Q   So while you were in the cell next to him, we're to believe you that all of these threats and you were in fear at that time, you're waiting until cross-examination to reveal that you requested a separatee on offender Brooks?

A   No, it wasn't no waiting to reveal.  You asked about it and I mentioned it.  After the assault, I left five days later.

So even if I had filed one, it wouldn't have made me move quicker.

And I had asked -- even after I got assaulted, I continued to ask to be moved and they still wouldn't move me.  And I'll probably never see him again, anyway, so -- he's GP.  I'm PC.  We'll probably never cross paths again.

Q    Well, you brought binders full of grievances and other written documents.  Where are those to show that you requested a separatee against Brooks prior to the incident?

A    I didn't say I requested a separatee prior to the incident.  That's not what I said.  I didn't request a separatee on no one prior to either one of them.

Q    Perfect.  Thank you.

A    I didn't have a reason to request a separatee --

Q    I'm not asking that question.

A    Okay.  I just want to make sure you got it clear.

Q    You never asked Mr. Nelson, while you were asking him questions, about how he felt about the relationship with Jama Jones and yourself, yet you were here to testify on it.  Why so?

A    I absolutely did.  You told me that was speculation.  I absolutely did ask him about his relationship as far as -- yeah, absolutely.  How it made him feel that me and her had contention.  And I believe you objected to that.

Q    You testified, as well, about you being unhappy with your

cell placement on April 5, 2021?

A     Correct.

Q     Knowing -- being savvy enough to wait until the shift change to hit the panic button to be removed as well; right?

A     Correct.

Q     So you knew that in April of 2021; right?

A     Knew what?

Q     How to get out of the cellblock in April of 2021.

A     Oh, yeah, I know -- I mean, yeah, okay.  That's safe to say.

Q     No punishment came to you at all; right?

A     No, Sergeant Turley didn't.

Q     Right.  June 1, 2021, you knew you were being placed back in proximity to inmate Dorsey; right?

A     Correct.

Q     And you knew you could have just pressed the button the day before and been away from offender Dorsey?

A     It's not that simple.  It depends on the staff member you're dealing with, if they're willing to do that for you. Because, primarily, if you refuse housing, it's called a refusing housing assignment.

Q     Sir, that's not the question I'm asking you.  Did you press the button and request to be removed?

A     I told you I notified case manager Jones that day.  And she already had informed me that if I do not go to my cell,

that they're going to take me to segregation.

Q    So did you do the process that you did on April 5th of waiting until the shift to change, finding a sympathetic guard to remove you from the cell, did you go through that process on June 1, 2021?

A    I tried that day and I was threatened to go to segregation.

Q    Who did you ask?  Is it just Jama Jones?  Is that the only person you're telling us?

A    Yeah, when she was telling me I was being moved?  Yeah, because I couldn't tell the floor officer because she trumps him.

Q    Thank you.  So you did wait for the shift to change and then tell the next guard on shift?

A    No, because I wasn't in the cell with him.  I'm still trying to campaign to get out of the cell the correct way. It's not that simple, because people actually get moved.  So it takes a sergeant or somebody who is empathetic to how you're feeling or to moving.  Because apparently Lieutenant Krul wouldn't do it without taking me to segregation.  So if it hadn't been for Sergeant Turley, I would have remained in that cell overnight.

Q    Did you choose -- on June 2, 2021, did you choose to go to the rec pad to have a fight with inmate Dorsey?

A    Absolutely not.  And I wanted to present something that --

MR. LIPPS:  Your Honor, this is nonresponsive.  I asked a question and he's --

THE COURT:  We can try to introduce whatever on your redirect.  Okay?

MR. WRIGHT:  Okay.  Say that again and I'll answer your question.

BY MR. LIPPS:

Q   Did you choose and intentionally try to go into a fight with inmate Dorsey on June 2, 2021?

A   Hell, no.  If I'm going to do that, we can fight in the cell.

Q   Sir, you answered the question.

A   No, absolutely not.

Q   Did you know you were going to get in a fight with inmate Dorsey on June 2, 2021?

A   Absolutely not.  I thought the right thing to do was to stay out of his way by going on the rec pad and not be -- no, I did not know.

Q   I'm not asking for explanations.  It was a --

A   I'm giving my answer.

THE COURT:  Hold on.  Slow down.  Both of you take a breath.  Let him answer the question before you ask the next one.

MR. WRIGHT:  No, I did not.  I thought I was being smart by avoiding being around him.

THE COURT:  Next question.

MR. LIPPS:  Thank you, Your Honor.

BY MR. LIPPS:

Q    So you did not know that the fight was going to happen June 2, 2021?

A    Hell, no.  I mean, no.  Pardon me.

Q    Then how were these defendants supposed to know there was going to be a fight June 2, 2021?

A    Well, they knew it was a potential danger by me letting them know.  It could have been a killing.  It could have been a stabbing.  So it's not about what they knew.  The degree of what they knew was a potential harm of me being in danger, because I repeatedly told them, went out of my way to tell them, went out of my way to check out of the cell.  So whether they knew I was going to be stabbed, spit on, whatever, raped, whatever, they were aware of that.  It was potential.

Q    So they should have known that a prison is a dangerous place and there's a general fear out there that you have?

A    You know, you say that a lot in your summary judgment.  Yes, prison is a dangerous place, but the penalty of your crime is not getting assaulted.  Prison is a dangerous place --

Q    I did not ask that.

A    Okay.  But you made the reference that prison is a dangerous place, as if assaults are -- you know, correspond with prison being a dangerous place.  If I bring it to your

attention, as I'm supposed to do, it's the prison officials to protect me from being assaulted and definitely not intentionally put me in harm's way.

Q    What did you specifically say, "I don't want general"? "This is everything I could have said"?

What did you specifically say to Shane Nelson to tell him that Dorsey was going to fight you or beat you up on June 2, 2021?

A    Well, I mean, we had multiple conversations.  So I've told him different things relatively -- it was never the same exact thing, but I talked to him multiple times prior to.

THE COURT:  Just tell us.  Tell me some of the things you said to them.

MR. WRIGHT:  I told Mr. Nelson that I'm afraid to be around offender Dorsey.  See, it correlates to offender Dorsey thinking I'm a snitch and having an open case.  So he made it clear that he wanna F me up, because he think I'm a felon with an open case.

So I let Mr. Nelson know, because I came to O-Unit with that stigma that I'm supposed to be a snitch, and Dorsey knew that.  So I told Officer -- I mean, Mr. Nelson that I am afraid and in danger being around Mr. Dorsey.  He's threatened to harm me.  He's threatened to stab me.  And if I go around him, I feel like my life is in danger.

BY MR. LIPPS:

Q    And this is in January?

A    No, it's not in January.  This is in -- this is after April 5th, once I checked out of his cell.  Dorsey wasn't, per se, the issue in January.  This is after April 5th, once I checked out of his cell and got moved to 2-Range, I told Mr. Nelson why I did not want to be housed back around Dorsey again, and this is when these conversations transpired.

Q    Of all the paperwork you got here, anything to support that?

A    Yes, absolutely.

Q    From that time period that says, "Mr. Nelson, I'm afraid of Mr. Dorsey"?

A    I mean, how would I have paperwork to show that?  But it's documented on case notes that he reads.  The prison officials was alerted of that in Exhibit 1, the same case notes he said that he has access to, the same case notes that he says he reads.

MR. LIPPS:  I'd move to strike for being nonresponsive, Your Honor.

MR. WRIGHT:  I don't know, what type of paperwork would I have?  I've had a verbal conversation.

MR. LIPPS:  Would you let the judge rule, please.

THE COURT:  I don't think it's nonresponsive.  He says it's in Exhibit 1.

Okay.  Next question.

BY MR. LIPPS:

Q    After your fight with Dorsey when you were put into segregation, was it Lieutenant Krul who placed you in the cell?

A    Yes.  It was Lieutenant Krul who walked me to segregation and who authorized the bed move to that cell at that time.

Q    So he physically placed you in cell --

A    Yes, he escorted took me over there.

Q    But Brooks did not make any threats to you --

A    What did you say?

Q    Inmate Brooks did not make any of those threats or start harassing you until the next day?

A    Correct.  He didn't do it initially when Krul took me over there.

Q    Okay.

A    He didn't know who I was.

Q    On the day of the alleged assault from Brooks, none of the defendants were present when Brooks actually threw stuff on you, if that's what happened?

A    No, the person who was escorting me was Officer Foley.

Q    Great.  Did you know that Brooks -- I'm sorry, let me start over.

Did you know that Brooks was going to fling whatever he flung on you?

A    I'm going to answer your question, because it's funny, if

I ask that, you'll call it speculation.  But, no, I did not.

Q    Okay.  So it wasn't planned?

A    No.

Q    You had no idea it was going to happen?

A    Who the hell plans to throw shit on them?  No, it was not planned.  I didn't know it was going to happen.

Q    You had no idea it was going to happen?

A    Absolutely not.

Q    Did you have any way to protect yourself from it?

A    Meaning what?  How?  Yeah, to move me.

Ask the question so I can give you a more clear answer.  What do you mean protect myself?

THE COURT:  You can't ask him questions.  Just answer the question.

MR. WRIGHT:  So what do you mean -- oh, my bad.  Yeah, if I would have got moved, I could have protected myself.

BY MR. LIPPS:

Q    If none of the defendants were there, how could they have known he was going to do that to you?

A    By me telling him -- first of all, Krul never heard him threaten me, but by Sergeant Lee hearing him verbally threaten me, by Captain Gard hearing this person they say is known to make threats, is known to be combative, who is known to assault officers, by him saying this and them hearing this, that should be taken seriously that he's going to make good on what he say.

And also by me telling them that he threatened me on multiple occasions.

Now, what they took serious is on them, but what else am I supposed to do besides inform them?

Q   Well, you heard their testimony saying they never heard that.  You were here today when you heard that; right?

A   I don't expect them to say they did.  No incident report was documented.  I don't expect them to now come here and say that this transpired without them documenting it.

Q   Sir, on Exhibit 4, which is the report of disciplinary hearing -- and this is a yes-or-no question.  It's going to be easy for you.

Did you plead guilty to having a fight with inmate Dorsey? The offense of fighting on June 2, 2021, did you plead guilty?

A   I mean, that's the charge to get time served.  Yes, I pled to get time served.  Yeah, that's the charge.

Q   Thank you for as little words as possible for a yes-or-no question.

A   I mean, you can't tell me, because words are powerful.

THE COURT:  All right.  Both of you.

MR. WRIGHT:  Yes, I pled guilty to time served.

Can I comment on this while he's here?

THE COURT:  No, just wait.

MR. LIPPS:  Okay.  I don't have any further questions, Your Honor.

MR. WRIGHT:  You can leave that up there, if you don't mind.

THE COURT:  You want to leave which one up?  Four is up.

MR. WRIGHT:  Yes.  While you're here speaking on this, you say you want a reference to the conduct report, if you want to pay attention to it --

THE COURT:  Now, don't talk to him.  You have to testify to me.  What do you want to -- what's your testimony?

MR. WRIGHT:  Your Honor, the hearing officer who gave me time served and seen me on this charge, he made a note to write on the conduct report, "I did not see Wright start the fight."  And he was the person who reviewed the fight in order to call me for my sanction.  And he made a note to write on there, "I did not see Wright start the fight."  So he can say it was a fight.  I didn't initiate contact.

THE COURT:  Okay.  All right.

MR. WRIGHT:  I don't think I have no cross-examine [sic] for myself.

THE COURT:  All right.  Now, your Exhibit 1 is not in evidence.  Did you want to move that one into evidence?

MR. WRIGHT:  Yes, ma'am.  Every piece of evidence I talked about, I don't know if I said it, but I would like that to be presented, please, in evidence.

THE COURT:  Well, you can't do that way.  You have to

go to the number.

MR. WRIGHT:  Yes, I would like Exhibit 1 in evidence.

MR. LIPPS:  One I objected to because of the hearsay that's in this.  This is from only non -- nobody testified at all today that was here.

MR. WRIGHT:  But Mr. Nelson testified to the authenticity of the case notes being authentic case notes from counselors' inserts.

MR. LIPPS:  As an officer of the court, that's just not true, Your Honor.  He said he had access to them.

THE COURT:  Okay.  I'm going to -- it looks like it is a business record, so -- from the department.  So I'm going to admit Exhibit 1 over defendants' objection.

*(Exhibit 1 was received in evidence.)*

THE COURT:  All right.

MR. WRIGHT:  I don't have any cross-examine [sic].

THE COURT:  All right.  You may return to your seat.

MR. WRIGHT:  Thank you.

*(Witness excused.)*

THE COURT:  Do you have any other evidence to present?  Do you rest?

MR. WRIGHT:  Yes, I rest, Your Honor.  The plaintiff rests.

THE COURT:  Okay.  How many witnesses do you have?

MR. LIPPS:  I've got two left, Your Honor.  I want to

save the Court and everybody else's time.  I can just call one.

THE COURT:  Okay.  Let's call that one.

MR. WRIGHT:  Excuse me.  So how do I do about Lieutenant Krul?  I forgot about that.  How do I talk about him?

THE COURT:  You're going to put that in writing.  His documents are in the exhibits.  And when you do your findings of fact and conclusions of law, you can put that in there.  Okay?

MR. WRIGHT:  That's fine.  Thank you.

THE COURT:  All right.

MR. LIPPS:  Did you want me to get my witness, Your Honor?

THE COURT:  Yes, get your witness.  We'll go ahead and do your witness.

*(Witness sworn.)*

**LASHAWNA DUNLAP, DEFENDANTS' WITNESS, SWORN**

**<u>DIRECT EXAMINATION</u>**

BY MR. LIPPS:

Q    Good afternoon, ma'am.

A    Hi.

Q    Would you please state your name and spell your last name for the record, please.

A    Lashawna Dunlap, D-U-N-L-A-P.

Q    Okay.  Where are you currently employed?

A     At the jail in New Castle.

Q     Okay.  So is that the New Castle Correctional Facility?

A     Yes.

Q     What is your role at the New Castle Correctional Facility?

A     Correctional officer.

Q     How long have you had that job?

A     Since 2018.

Q     And were you working as a CO --

      MR. WRIGHT:  Objection, Your Honor.  Before he goes further, this is -- I mean, I don't know what 2he's going to testify to, but this is not a defendant on the case so I'm just making that clear.

      THE COURT:  She's a witness.  She's on his witness list.

      MR. WRIGHT:  All right.

      THE COURT:  Okay.

      MR. LIPPS:  Thank you, Your Honor.

BY MR. LIPPS:

Q     What was your role at New Castle Correctional Facility in June of 2021?

A     A correctional officer.

Q     Okay.  What are the duties of a correctional officer?

A     I was a bubble officer at the time.  So I was in the bubble answering calls.

Q     And by "answering calls," are those calls from inmates?

A     Yes.

Q     In your role as a correctional officer in that 2021 time period, did you have an occasion to come across the plaintiff in this case, inmate Carlton Wright?

A     Yes.

Q     And do you remember Mr. Wright?

A     Yes.

Q     Is he the same individual sitting down over here at the table next to us?

A     Yes.

Q     Okay.  What do you remember about him?

A     He was a complainer.

Q     Okay.  Fair.  Did he ever complain about his safety?

A     Not that I remember.

Q     Okay.  Had he complained about his safety, is there any steps that you would have taken?

A     Yeah, I just would have told, like, a case manager or a sergeant.

Q     Do you recall ever telling a case manager or a sergeant about the plaintiff giving complaints of fear?

A     No.

Q     Was your impression of the plaintiff, in June 2021, that he was in fear?

        MR. WRIGHT:  Objection.  That's speculation.

        THE COURT:  She can tell me about her impression.

MR. WRIGHT:  What date did you say?

MR. LIPPS:  In June 2021.

THE WITNESS:  No.

MR. WRIGHT:  What day?

THE COURT:  You're going to get a chance to cross-examine her.  You can ask her.  Okay?

BY MR. LIPPS:

Q   So what part of the New Castle Correctional Facility did you work at in June of 2021?  Was there a specific unit or pod?

A   Annex.  And it was their protection M-Unit.

Q   Annex M-Unit.  Okay.  Did you become aware at some point that on June 2, 2021, Mr. Wright and an inmate named -- with the last name Dorsey, got into a fight?

A   Yes.

Q   Were you aware of that fight occurring as it was happening or later?

A   Later.

Q   Okay.  And how did you become aware?

A   I think somebody hit the button and told me that there was a fight going on in there.

Q   Was it one of the participants in the fight or somebody else?

A   Someone else.

Q   Okay.  And then once you were informed of the fight, what was the next action that you took?

DUNLAP - CROSS/WRIGHT                                  320

A    I want to say I called the sergeant.  I'm not...

Q    Who would that sergeant have been?

A    At the time, it was Nyadi.

Q    It was not Sergeant Lee then?

A    I don't know if Nyadi was off of work, but if he was, it would have been Lee.  It could have been Lee.  I could have called him.

Q    Now, you said that the plaintiff complained a lot.  Did he ever complain and ask for what's called a separatee?

A    If he did, he wouldn't have asked me because I have nothing to do with separatees.

        MR. WRIGHT:  Objection, she doesn't know.

        THE COURT:  She said she has nothing to do with separatees.

        Okay.  Next question.

        MR. LIPPS:  Okay.  Nothing further, Your Honor. Thank you.

        THE COURT:  You may cross-examine the witness.

                    **CROSS-EXAMINATION**

BY MR. WRIGHT:

Q    You said that Mr. Wright was known for complaining all the time; correct?

A    Correct.

Q    What did he complain about?

A    Everything.  If someone was in his cell that he didn't

DUNLAP - CROSS/WRIGHT

321

like, he complained about that.  Medical, food, everything.

Q   So it's safe to say that Mr. Wright was known for complaining and voicing his dislikes.  He had no problem expressing what he didn't like; correct?

A   Correct.

Q   Have you ever referred to Mr. Wright as being a problematic inmate?  Have you personally ever referred to Mr. Wright as being a problematic inmate?

A   No.

MR. WRIGHT:  Could I have Exhibit 12, please.

On page -- could you refer to page 8, please.  Hold on.

Just for the record, I'd like to introduce this into evidence.

MR. LIPPS:  I don't believe a foundation has been laid yet, Your Honor.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q   Once again I'm going to ask:  Have you ever referred to the plaintiff as being a problematic inmate?

A   No, not to me, other than complaining.

MR. WRIGHT:  Okay.  I would like to enter this into evidence to impeach the witness.

MR. LIPPS:  It doesn't impeach her, Your Honor.  The plaintiff --

MR. WRIGHT:  I'm going to get to it.

MR. LIPPS:  The plaintiff calls himself a problematic offender.  It's not impeachment.

MR. WRIGHT:  It says -- this is my questions to -- Response to Plaintiff -- this is my question to Officer Dunlap.  In my question I asked:  "Would you personally consider the plaintiff to be a problematic offender?"  And her answer was, "Yes."

THE COURT:  This is her responding to the interrogatories?

MR. WRIGHT:  Yes, ma'am.  This is Officer Dunlap, signed by Officer Dunlap.  This is her sworn document.  And I asked her in Question 15, I believe it is B, and I asked her:  "Would you personally consider the offender to be a problematic offender?"  And her answer was, "Yes."

MR. LIPPS:  Yes, Your Honor, that's true, but the question was:  "Do you refer to the plaintiff as a problematic inmate," not do you consider him to be a problematic inmate.

THE COURT:  Okay.  I'm going to allow the question.

All right.  So what's your question?

BY MR. WRIGHT:

Q    So why did you perceive the plaintiff as being a problematic offender?

A    I just said you were a complainer.  Towards me, period, you've never been a problem to me.

Q   So the fact that Mr. Wright just was a complainer, nothing physical but he was a complainer, he was perceived to be problematic?

A   Right.  Like, if someone would go in there and try to talk to you, you will always make it a bigger problem than what it should have been.

Q   Okay.  Right.  So because of Mr. Wright complaining about whatever, he was deemed to be a problematic offender, not through physical or volatile action because he complained about the sky is green, whatever the case may be.  Because he complained frequently, he was considered a problematic offender?

A   In my opinion.

Q   Okay.  Were you working on June 2, 2021?

A   I don't know.

Q   You just told Mr. Lipps you was.

A   Okay.  Then I was there.

Q   Was you working the day --

      MR. LIPPS:  I'm going to object.  I never even asked if she was working then.

      THE COURT:  He can ask.  Were you working on June --

      MR. WRIGHT:  I'll make it clearer.

BY MR. WRIGHT:

Q   Were you working on the day that the physical altercation transpired between Mr. Wright and offender Dorsey?

A     Yes.

Q     And what was your position -- where was you working at that day?  Was you working in M-Unit?

A     In the bubble, yes.

          THE COURT:  What is the bubble?  What's that mean? Let her answer, I'm asking the witness.  What's the bubble?

          THE WITNESS:  It's an area where I sit.  They have doors that I have to open up for the inmates to come out and the officers to go through.

          THE COURT:  Okay.

BY MR. WRIGHT:

Q     Are there cameras in the bubble?

A     Yes.

Q     And what -- the cameras in the bubble, what are them cameras monitoring?

A     When you guys come out for rec, when I let people through the doors.

Q     So them cameras in the bubble, does it have monitoring of the rec pad where the incident transpired with me and Dorsey?

A     Yes.

Q     And you say you work in the bubble as a bubble officer. And as a bubble officer, what is your responsibility in the bubble?

A     To look through the cameras.  But they have four pods, and it only comes up one pod at a time.  I don't see all four pods

at a time. So if I'm looking at this camera, I don't see what's going on in this camera.

Q   Okay. So it is your job as a bubble officer to frequently, as much as you can, review the camera footage?

A   Correct.

Q   Okay. Are you aware or since been aware that the attack on Mr. Wright lasted 37 minutes long on the rec pad?

A   Yeah, that's what you've said.

Q   Okay. So within the entire 37 minutes the fight took place, you never once observed it as being a bubble officer?

A   No.

Q   But it's your duty to watch the cameras, correct, as they come and go?

A   And the doors and watch everything else, just not that camera. The cameras are there, but I'm not just there to just watch the camera focusing on your area for 37 minutes.

Q   From your experience as being an officer at New Castle, is a 37-minute attack, fight, whatever you want to call it, is that unusual?

A   No.

Q   It's not unusual?

A   No.

Q   So fights that happen in M-Unit, they commonly last that long?

A   I don't know how long they last, but fights happen all the

time.

THE COURT:  Are the people fighting for 37 minutes?

THE WITNESS:  I don't know how long they normally last, but there's fights all the time.  All the time.

BY MR. WRIGHT:

Q    I understand.  I'm not disputing that there are fights.  So for 37 minutes, that's unusually long.  Okay.

So if fights happen all the time, it requires you all to be more alert and aware of the possibility of a fight taking place, if they happen all the time and they're frequent occurrences; correct?

A    Correct.

Q    All right.  And when a fight usually takes place, what typically happens as officers?  Do you usually intervene, break up a fight?

A    Yeah.  As an officer, you normally go in.  You call a signal.  They come in and they intervene, yes.

Q    Could you turn to page 7, please, on the same document.

THE COURT:  Of Exhibit 12?

MR. WRIGHT:  Yes, ma'am.

BY MR. WRIGHT:

Q    I asked -- could you read number 14, please.

MR. LIPPS:  I'm going to object.  That's asked and answered already, Your Honor.

THE COURT:  Not of this witness.

Go ahead.

BY MR. WRIGHT:

Q    Number 14 on the screen, please, Ms. Dunlap.

A    "Is it a common regular occurrence for fights and assaults on offenders by other offenders to not get stopped or intervened by officers in the protective custody unit?"

Q    And what was your response to this?

A    I don't remember.

Q    Your response is right there, ma'am, under "Response." The first one on the response, that's your response.

        MR. LIPPS:  Your Honor, in the interest of saving time, we would just stipulate to allow this exhibit to come in.

        THE WITNESS:  "It always gets stopped, but fights, assaults are common."  That's what I said.

BY MR. WRIGHT:

Q    Okay.  You said that fights always get stopped?

A    And fights are common.

Q    Correct.  How come a fight -- attack with Mr. Dorsey did not get stopped and it was captured on camera?

A    Didn't it get stopped after that?

Q    No, you said --

A    How did it get stopped?

Q    How did you become informed of the fight?

A    That's two different questions.  They get stopped, right.

Q    Was Mr. Wright and offender Dorsey's fight stopped?

DUNLAP - CROSS/WRIGHT                                328

A     I don't remember if they actually came in and stopped or you guys just stopped your own.  I don't remember exactly how the fight --

Q     Did an officer or staff member stop or intervene a fight, assault, whatever you want to call it, the physical altercation between --

A     Yeah, they stepped in.  They came in there whenever they were aware of it, yes.

Q     I'm making sure I'm asking the right question.  Are you saying that a staff member stopped the fight?

A     I don't remember exactly how that fight stopped.

Q     That's okay.  I have your answer.

          THE COURT:  Mr. Wright, the defense counsel says that they will stipulate to the admissibility of Exhibit 12.

          MR. WRIGHT:  Oh, so -- okay.

          THE COURT:  So do you accept that stipulation?

          MR. WRIGHT:  That means what, Your Honor?

          THE COURT:  That will mean it's in evidence.

          MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q     Well, in here you said that --

          THE COURT:  Hold on.  Do you accept the stipulation?

          MR. WRIGHT:  Yeah, I accept it coming in.

          THE COURT:  Exhibit 12 is admitted into evidence by stipulation of the parties.

DUNLAP - CROSS/WRIGHT

329

(*Exhibit 12 was received in evidence.*)

MR. WRIGHT:  Shall I continue?  Okay.

THE COURT:  Yes.

BY MR. WRIGHT:

Q    When I asked you and your --

MR. WRIGHT:  Can I refer to Exhibit 55, her affidavit?  I apologize.  May I please enter Exhibit 55, which is Officer Dunlap's affidavit?

THE COURT:  He wants to offer 55.  Any objection?

MR. LIPPS:  I just want to verify, Your Honor.

No objection, Your Honor.

THE COURT:  All right.  Exhibit 55 is admitted into evidence without objection.

(*Exhibit 55 was received in evidence.*)

BY MR. WRIGHT:

Q    Is this your affidavit that you gave on March 27, '25?

A    Yes.

MR. WRIGHT:  May I refer to page 3.  Could you scroll it down, please.

BY MR. WRIGHT:

Q    Could you read what 13 says, please, Ms. Dunlap.

A    "Had I or any of the other correctional officer defendants submitting this motion for summary judgment been aware of the plaintiff being involved in a fight, we would have intervened and broke up the fight."

Q   Right.  So the fact that you didn't break it up means that you wasn't aware that it was taking place or you'd done [verbatim] stop it?

A   I'm in the bubble.  I couldn't have broke it up anyway.

Q   No, I'm not speaking specifically to you.  I was asking any officer or staff member, period, stopped the physical interaction with me and Mr. Dorsey.

A   You asked how that goes, and I just said that's how it goes normally.  With yours, I don't know if they went in there. I don't remember, actually.

Q   That's what I was referring to.

A   I don't remember if they actually came in there and broke it up or you guys stopped fighting on your own.

Q   I mean, I know it's been five years.

A   Exactly.  I don't remember exactly the details.

THE COURT:  All right.  Next question.  Stop having a conversation.  Just ask questions.

MR. WRIGHT:  Okay.

BY MR. WRIGHT:

Q   Did other officers or staff -- was it a general consensus that Mr. Wright was a problem or problematic?

MR. LIPPS:  I'm going to object, Your Honor.  This is just improper questioning for this witness.

MR. WRIGHT:  She made the comment that, yes, he was a problem.

THE WITNESS:  I said that was my opinion.  I stated, in general, my opinion.

THE COURT:  All right.  Slow down.  She said it's her opinion.

Next question.

BY MR. WRIGHT:

Q    Do you know if Mr. Wright -- do you know if Mr. Wright had, like, a contentious -- did Mr. Wright get along well with case manager Jones?

A    I have no idea.

Q    Okay.  Besides you, who -- how do you know Mr. Wright was always complaining about things?

A    Because you complained to me.  You hit the button and you complained every time I got out of the bubble.  And if I walked through, you complained.  You complained.

Q    Do you know if I complained to any other staff?

A    I don't know if you did.  I don't know.

Q    Okay.  So it's just your opinion I was a problematic offender?

A    That's what I said.  I stated my opinion.

THE COURT:  That's been asked and answered.

THE WITNESS:  Yes, five times.

THE COURT:  So move on.

BY MR. WRIGHT:

Q    So you said when you walked or you was in the bubble,

there was no problem with me letting you know if I had an issue with anything; correct?

A    Correct.

Q    Okay.  I just want to make the fact that --

THE COURT:  Sir, no comment.  What's your next question?  Do you have any other questions?

BY MR. WRIGHT:

Q    When you gave this response where you say, "Yes, all the time, he was always saying he didn't like this person, that person," what was that in reference to?  Who do you mean --

A    I don't remember what I gave that response to.  What was the question?

Q    The question was:  Have the plaintiff, Carlton Wright, been causing problems and having problems with different staff members at M-Unit since he been housed in M-Unit?

And your response was:  "Yes, all the time, and he always saying he didn't like this person, that person."  What does that response mean that you gave?

A    You were always saying you didn't like this offender or that offender or this staff member or that staff member.

Q    Okay. All right.  I just wanted clarity of what you meant.

A    Okay.

MR. WRIGHT:  That's all, Ms. Dunlap.

THE WITNESS:  Thank you.

THE COURT:  All right.  Do you have any redirect for this witness?

MR. LIPPS:  I do not, Your Honor.

THE COURT:  Okay.  Ms. Dunlap, thank you.

THE WITNESS:  Thank you.

THE COURT:  You may be excused.

*(Witness excused.)*

MR. WRIGHT:  That's cool, Ms. Dunlap.  Have a good day.

THE COURT:  Okay.  Do you have any other witnesses, Mr. Lipps?

MR. LIPPS:  No, Your Honor.  We would rest.

THE COURT:  Okay.  Do you have any rebuttal?

MR. WRIGHT:  Who would I rebuttal to with the witness not being here?

THE COURT:  I'm not going to tell you how to try your case.  Do you have any rebuttal witnesses or evidence to present?

MR. WRIGHT:  Oh, do I want to call somebody else?  Sergeant Lee already left, didn't he?  The only one left is Mr. Gard?  That's the only witness you have left?

MR. LIPPS:  You called him as a witness.

MR. WRIGHT:  No, I said:  Is that the only witness you have that's left?  Are your witnesses all gone?

THE COURT:  Who might you want to call?

MR. WRIGHT:  It's okay, Your Honor.  I rest.

THE COURT:  Okay.  All right.  So that's the conclusion of the evidence.

Is anyone -- are you going to order a transcript?

MR. LIPPS:  We are, Your Honor.  And however long it takes, I know it's been a long day.

THE COURT:  Put in your transcript request.  The court reporter says she can have your transcript for you within two weeks.

Sarah, let me have a calendar so I can tell them when I need proposed findings of fact and conclusions of law.

MR. WRIGHT:  Do I need to put in a request for a transcript?

THE COURT:  No, we'll get -- I think you get a copy.  We'll get you a copy.

MR. WRIGHT:  Thank you.  And the transcript is what happened today, the back-and-forth conversation?

THE COURT:  It's the transcript of the trial proceedings.  So if you get those within two weeks, that would be -- you'll have it by -- let's see, today is the 17th.  You'll have it -- that's very soon.  You'll have it by March 2nd.

Your proposed findings of fact and conclusions of law are due by March 16th.  Okay?

MR. WRIGHT:  I would just like to remind Your Honor

the Westville mail system is tremendously slow.  So even if you mailed it out, it may take a week to get to me.  Then when I send it back out, I got to go through the process of getting back to you.  I just don't want to miss a deadline.

THE COURT:  Well, if you don't get it, you file something.  Okay?  Don't you have access to electronic filing?

MR. WRIGHT:  I'm in segregation.

THE COURT:  You're still in segregation?

MR. WRIGHT:  I'm on PC for all this.  I can't go back to population.

THE COURT:  Okay.  Well, we're going to do our best.  We'll get it to you as soon as we can.  And you may have to start writing without it.  Okay?  Just get started writing.

MR. WRIGHT:  So it's my closing argument?

THE COURT:  It's your closing argument.

MR. WRIGHT:  Okay.  And my facts of findings [sic]?

THE COURT:  Right.  Is due Monday, March 16th.  And if you have some delays, file something.  Okay?

MR. WRIGHT:  All right.

THE COURT:  Do you get to go to the library?

MR. WRIGHT:  No.  You will be seeing a lawsuit soon, but, no.  No.  We don't.

THE COURT:  All right.  If she can get the transcripts to you sooner, she will, but we'll get -- work with those deadlines right now.  Okay?

All right.  We are adjourned.  Thank you very much, DOC gentlemen, for your patience and bringing him here today for court.  And thank you to my CSO, my wonderful CSOs.  And thank you to all of the witnesses.

MR. WRIGHT:  Thank you for your patience.

THE COURT:  Okay.  We are adjourned.

COURTROOM DEPUTY:  All rise.

THE COURT:  I'm glad we finished in one day.

*(Proceedings adjourned at 5:34 p.m.)*

CERTIFICATE OF COURT REPORTER


I, Laurie M. Morgan, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.


/s/ Laurie M. Morgan                    March 2, 2026
LAURIE M. MORGAN, RPR                      Date
Official Court Reporter
Southern District of Indiana
Indianapolis Division