UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CARLTON WRIGHT,<br>Plaintiff,<br><br>vs.<br><br>SHANE NELSON,<br>KRUL,<br>LEE,<br>GARD,<br>and SEYE,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:23-cv-00459-TWP-MKK |

**DEFENDANTS' FINDINGS OF FACT AND CONCLUSION OF LAW**

Plaintiff Carlton Wright appears in person and *pro se*, and defendants Shane Nelson, Lieutenant Krul, Captain Gard, and Sergeant Lee appear by counsel Joseph Lipps at bench trial at the Indianapolis Courthouse on February 17, 2026.

After preliminary matters regarding the defendants' proposed and belated motions in *limine* are heard, the Court denies those requests. *Dkt. 126*. The Court next directs that the plaintiff's hands be uncuffed only during the trial, with an admonishment that safety and security are a priority; if he causes any issues, he will be recuffed.

The Court next informs the parties that the plaintiff's recent addition of Inmate Kyle Brown as a witness has been secured by Court staff, with Mr. Brown scheduled to testify remotely at 11:00 a.m. from CIF. The plaintiff then informs the Court of his witness order, being Captain Gard, Sergeant Lee, Lieutenant Krul, Shane Nelson, and himself lastly. However, Lieutenant Krul was not issued a subpoena and is now residing in Florida, out of state, and is unavailable for trial. The parties agree to an offer of proof, to be taken under advisement, regarding the proposed testimony of Lieutenant Krul.

After a brief recess, the parties provide opening statements. The plaintiff began briefly describing his first allegation of failure to protect: he filed multiple grievances and notified Shane Nelson of threats, which the defendant failed to address and retaliated against the plaintiff. Next, the plaintiff states that Captain Gard, Sergeant Lee, and Lieutenant Krul failed to protect him, despite notifying them of threats to harm him, which they did not take seriously. The plaintiff states that Mr. Nelson retaliated against him.

The defendants proceeded with their opening statement, outlining that the plaintiff must now prove the allegations in his lawsuit, not rely solely on allegations and arguments, but rather meet his burden of proof. Additionally, the defendants point out that the plaintiff is proceeding *pro se*, despite the Court's efforts to urge him to request that an attorney be recruited for his benefit. The defendants characterize the first attack, about which the plaintiff brought a claim, as a fight rather than an attack. The defendants also point out that the evidence will show the plaintiff did not ask to be kept away from the inmate with whom he had fought until one week *after* the fight. The plaintiff was then taken to a single-person cell segregation unit, issued a conduct report, to which he pled guilty for fighting, and accepted his time-served punishment. Although the plaintiff claims that a neighboring offender, Brooks, threatened him during his time in segregation, the plaintiff was not assaulted, if he was assaulted at all, until sometime later, while none of the defendants were present or responsible for an escort. The defendants' opening boils down to the following: the plaintiff is a constant complainer; he did not make any alleged threats known to the defendants; the defendants do not believe he was ever actually assaulted; and the plaintiff cannot meet his burden of proof.

The plaintiff then began calling witnesses, entering evidence, and he rested his case. The defense called one witness, former defendant Lashawna Dunlap. The defense rested its case, and

the Court took the matter under advisement. For the reasons set forth below, the plaintiff has failed to meet his burden of proof, and judgment is entered in favor of the defendants.

## TESTIMONY AND EVIDENCE

Captain Voyle Gard testified in person and regarding his Affidavit of March 28, 2025, marked as Exhibit 41. Captain Gard was employed at New Castle Correctional Facility ("NCCF") for 11 years. He worked in the O-Unit at the Annex building on June 24, 2021. He recalls Offender Brooks, from the O-Unit in 2021, and everyone in that unit was there for disciplinary behavior. Captain Gard testified that an inmate taking a cuff port hostage is an act of defiance and immaturity, but not an act of aggression. In this situation, a correctional officer would try to talk the inmate out of taking control of the cuff port and, if unsuccessful, wait out the inmate. The cuff port is a slot that opens for food and medicine, part of the solid metal door that houses segregation inmates. If necessary, there is a plastic shield that covers the door so nothing can get through the cuff port, which correctional officers sometimes use when a cuff port cannot be secured.

Captain Gard does not know if the plaintiff was assaulted by Offender Brooks on June 24, 2021; no officer ever relayed a message that he was assaulted. Captain Gard does not know if Offender Brooks held his cuff port hostage on that day. Additionally, in this unit, inmates are housed in individual cells, and there is no way for them to get to each other. If an inmate felt he was in danger, he would speak to his case worker, but Captain Gard did not conduct bed moves or move inmates as that was not his job.

Captain Gard remembers the plaintiff as a very vocal, combative, argumentative inmate during this period. If inmates are involved in an assault, they are separated, placed in different

cells, taken to the medical department for evaluation, and have photographs taken. The plaintiff did not introduce evidence of an assault, separation of Offender Brooks and the plaintiff, that either inmate was taken to the medical department, or any photographs after an alleged assault on June 24, 2021.

On cross-examination, Captain Gard testified that he has no recollection of the plaintiff ever complaining about Offender Brooks either threatening him or assaulting him on June 24, 2021, or before. Further, because there was no incident report, that is clear evidence that the assault just never happened.

The plaintiff next called Defendant, Sergeant Joseph Lee, as a witness. Joseph Lee is no longer employed at NCCF, but was employed there during June 2021. Joseph Lee remembers Inmate Brooks, who was a combative inmate with whom he had several physical altercations. Joseph Lee testified that in the segregation cells, offenders are locked individually, with no way to interact with each other. Joseph Lee does not recall the plaintiff ever complaining about being assaulted or threatened by Offender Brooks. Joseph Lee also testified that if there were an assault, there would be photographs taken, and the inmates would go to medical as well. Also, the offender would be written a conduct violation, and an incident report would be taken. Further, in the segregation unit, it does not matter if a protective-custody offender is housed next to a general population offender, because they are always separated and isolated by their cells.

Joseph Lee has reviewed the plaintiff's Amended Complaint and specifically the allegation that "Sergeant Lee was escorting Brooks to the shower and he cursed, threatened, and spit on Wright's cell door window." Joseph Lee does not recall any of those events, and if they had occurred, he would remember them. Specifically, he had many interactions with Inmate Brooks, the first being the first day he worked in the segregation unit, and Offender Brooks

fought him. Because of this, he never cut Offender Brooks any slack for any of his conduct behaviors. Had he seen Offender Brooks curse, threaten, and spit on the plaintiff's cell door window, he would have written him a conduct violation. At no time prior to June 24, 2021, was he ever informed of any threats of any kind towards the plaintiff. The plaintiff himself never relayed any fear or threats from Inmate Brooks. Offender Brooks never showed any kind of indication to him that he would assault the plaintiff, and that would have been almost impossible in the segregation unit anyway. He never knew of any specific threats from Brooks to the plaintiff in any sort of way at any time, even before June 24, 2021.

The Court specifically inquired of Joseph Lee regarding the cuff port being down on June 24, 2021. Joseph Lee testified that Brooks could throw something out of it, but the cells are side by side, and he doesn't know how he would be able to throw something into another cell, just onto the floor. Further, if he threw something out of his cell's cuff port, it would just end up on the shield. There would be no danger to the plaintiff.

Next, the parties stipulated to enter Lieutenant Krul's Affidavit into the record, marked as Exhibit 42, and his interrogatory responses, marked as Exhibit 13. The parties additionally stipulated to the admissibility and authenticity of Exhibit 2, showing that on June 2, 2021, Lt. Krul authorized the plaintiff's bed move as a "custody decision." Although the testimony up to this point involved the second alleged assault, and although the plaintiff did not articulate it, the exhibits relating to Lieutenant Krul appear to involve the plaintiff's incarceration in the M-Unit. The questioning and answers in Exhibit 13 specifically involve the M-Unit, and the video of the fight this witness saw only after the fact. Specifically, in question 13, the plaintiff asks Lt. Krul why the fight wasn't stopped or intervened, and Lt. Krul stated that he did not see it live. In his Affidavit, exhibit 42, Lt. Krul testified to the following:

The plaintiff never alleges in his complaint that Lt. Krul had prior knowledge of any type of assault that would occur against the plaintiff. (¶ 5) He had "no prior knowledge of any threats of harm to the plaintiff's safety prior to the plaintiff's fight with Offender Dorsey and the subsequent alleged assault by Offender Brooks." (¶ 6). The plaintiff never asked for protection prior to either the Dorsey fight or the alleged Brooks assault (¶ 7), he never received prior information that the plaintiff would get into a fight or be assaulted (¶ 9), and he never disregarded any known risk to the plaintiff for any incidents described in the Amended Complaint. (¶ 11). Lt. Krul never knew the plaintiff requested or needed any separation from Offender Dorsey until he filed a Separatee request on June 9, 2021 – one week after his fight with Offender Dorsey. (¶ 12). In the plaintiff's segregation unit, there is no opportunity for any of the offenders to physically interact with one another. (¶ 20).

Offender Kyle Brown was next called as a witness. Mr. Brown was housed in the M-Unit at NCCF in January 2021. He remembers the plaintiff, Counselor Jones, and Shane Nelson. He remembers the plaintiff complaining to Counselor Jones and to Shane Nelson about various things. He recalls Shane Nelson stating, "If I were you, I would stop bitching and complaining about bed moves and telling me how to do my job, or I promise you, I will make your stay back here rough on you and a living hell." Upon cross-examination, the plaintiff stated that his cell and the dayroom are the same thing in response to questioning about obvious discrepancies between his previous affidavit and live testimony.

During his testimony, Mr. Brown did not recall the exact date he heard Shane Nelson make the statement to the plaintiff, but admits that he signed his statement on January 15, 2021. Mr. Brown was sentenced for a felony fraud conviction on August 17, 2016, out of Adams County, Indiana, in Cause No. 01D01-1604-F6-0067. Additionally, since January 2021, he has

been released from prison and returned to the Indiana Department of Corrections one month prior to his testimony. He was housed at NCCF in August 2025, where Shane Nelson was the PREA investigator. Mr. Brown pleaded guilty to filing a false PREA accusation involving Mr. Nelson.

Shane Nelson was called as the plaintiff's next witness. He has worked at NCCF for 12 years. Exhibit 7 was entered into evidence, showing the plaintiff's job as a program aide and mentor in the O-Unit in 2020. While the plaintiff was housed in the O-Unit, Mr. Nelson does not recall if the plaintiff filed any grievances against him. Mr. Nelson recommended the plaintiff for protective custody and he was transferred to the M-Unit. The plaintiff was moved 5 times between December 2020 and January 13th, 2021, which is considered frequent, but was common in the M- Unit. Mr. Nelson does not remember the plaintiff complaining about these frequent bed moves.

Further, in response to the plaintiff's questioning on grievances he filed against Mr. Nelson, Mr. Nelson stated that if a grievance was filed against him, it would go to his supervisor to answer; he shouldn't know about the grievance. Mr. Nelson recalls that the plaintiff was confrontational with staff, complained, and was a problematic cellmate. Exhibit 58, Mr. Nelson's interrogatory responses, were entered into evidence.

Prior to the June 2, 2021 incident involving Offender Dorsey, Mr. Nelson was not informed of an issue; had he been, he would have separated the two. Mr. Nelson was part of a larger process involved in bed moves; his approval was not absolutely necessary, but he could deny them. The plaintiff's complaint about bed moves was not uncommon, as many inmates did so. However, Mr. Nelson did not personally plan bed moves.

Mr. Nelson described himself as someone who does not get frustrated easily, and he denies making the statement that Offender Kyle Brown claims he made. The plaintiff was known at that time for being argumentative with staff and other inmates. However, the plaintiff never complained of fear or of threats from Offender Dorsey.

At one point, Mr. Nelson was part of a committee that recommended the plaintiff's removal from protective custody while he was housed in segregation. This recommendation was based on the plaintiff's fight with Offender Dorsey, not out of any retaliation. He was never removed from protective custody.

Mr. Nelson was not involved in the day-to-day operations of the segregation unit and never heard any allegation about Offender Brooks threatening or assaulting the plaintiff. While the plaintiff was sentenced to time served in segregation for his fight with Offender Dorsey, he remained in segregation for a short while later because the reviewing committee needed to determine whether he would be removed from protective custody and where to place him. The plaintiff's prolonged stay was not just clerical; it was for weekly reviews due to conduct reports, and the separatee that was requested between the plaintiff and Offender Dorsey.

Shane Nelson's previous Affidavit, Exhibit 39, was also admitted into evidence, showing that Mr. Nelson had no prior knowledge of any threats of harm to the plaintiff's safety prior to the fight with Dorsey or the alleged assault by Brooks. (¶ 6). The plaintiff never requested any safety-related protection prior to either incident. (¶ 7). Mr. Nelson never disregarded any known risk to the plaintiff. (¶ 11). When the plaintiff's segregation for fighting conduct violation was completed on June 14, 2021, he was briefly held on an administrative hold pending his transfer back to the M-Unit on June 29. (¶ 22). This brief delay is not unusual and a natural result of the penological and administrative process when housing inmates, which is rendered even more

challenging by the plaintiff's continual inability to interact appropriately with other offenders and even custody staff. (¶ 23). In fact, the plaintiff was eventually transferred out of NCCF because of his inability to be housed in any of the protective custody populations and as a result of his fighting with other offenders, and not for any other reason. (¶ 25).

The plaintiff next called himself as a witness. The plaintiff's testimony was that he complained to every defendant about fear prior to his fight/assault with Offender Dorsey and prior to the alleged assault by Offender Brooks. Additionally, the plaintiff testified that Shane Nelson was his boss in the O-Unit and that they had a good rapport, but when the plaintiff was in the M-Unit, where Counselor Jones worked, Mr. Nelson took issue with their relationship and began retaliating by causing frequent bed moves and disregarding threats to his safety.

The plaintiff admitted that he threw punches and hit Offender Dorsey back during their fight. He claimed he was protecting himself, and the fight lasted 37 minutes. Exhibit 14 was admitted into evidence showing Wright and Dorsey met outside on the recreation pad, squared off, got into boxer's stances, and began sparring until they were separated. The plaintiff's injuries were an abrasion on his foot and toe, left forearm, a sore side, facial abrasions, and ultimately a torn wrist ligament. Exhibits 27 and 29 were admitted into evidence. Exhibits 28 through 37, which consist of medical excerpts, presumably relating to the plaintiff, from multiple correctional facilities. The Court now admits these records into evidence.

A complete list of exhibits offered and/or admitted into evidence at the February 17, 2026, bench trial is available at Docket 128. All exhibits are admitted.

Upon cross-examination, the plaintiff testified that he entered a Separatee against Offender Dorsey, but he did not include it among his exhibits. He also failed to state when, how,

or to whom he filed the Separatee. The plaintiff testified that prior to the assault, he did not have any reason to file a Separatee.

The plaintiff testified that he did not know that he was going to get in a fight with Offender Dorsey on June 2, 2021. As such, the plaintiff was asked that if *he* did not know that a fight was going to happen, then how could the *defendants* know that a fight would happen and prevent it. The plaintiff testified that it was only a potential danger. Further, the plaintiff stated that he never expressed any hesitancy to be around inmate Dorsey until April 2021, well after and several bed moves after the alleged January 2021 statements testified to by inmate Kyle Brown. Finally, the plaintiff pled guilty to the offense of fighting Offender Dorsey on June 2, 2021.

The plaintiff testified that after his fight with Dorsey, Lt. Krul took him to segregation personally and placed him in a cell next to inmate Brooks. The plaintiff testified that it was not until the next day that inmate Brooks began verbal conversations and harassing him. The day of the alleged assault, none of the defendants were present, only Officer Foley. The plaintiff next testified that he did not plan or know that inmate Brooks was going to assault him, he did not know it was going to happen. Upon being asked if none of the defendants were there and it was not planned or known that an assault would happen to the plaintiff, then how were the defendants supposed to protect him from this unknown harm, the plaintiff's only response is to reiterate the allegation that he told them of generalized fears.

After his own testimony, the plaintiff rested, and the defense called its only witness, Officer Lashawna Dunlap. Officer Dunlap has been a corrections officer at NCCF since 2018. Officer Dunlap worked in the "bubble," answering inmate calls, making her very familiar with the plaintiff. She remembers him as a complainer. However, she does not recall him ever

complaining about his safety. Had he ever complained about his safety, she would have told his caseworker or a sergeant, and she never had to. Upon cross-examination, Officer Dunlap testified that the plaintiff complained about his cell, medical food, and everything. The plaintiff elicited from Officer Dunlap that the plaintiff would make anything a bigger problem than it should be. The plaintiff admitted Exhibit 55, Officer Dunlap's previous affidavit, into evidence, specifically showing that the defendants did not have any prior knowledge of the fight with Offender Dorsey, or they would have intervened and broken it up.

**FINDINGS OF FACT**

The Court finds that the plaintiff was an incarcerated individual at New Castle Correctional Facility ("NCCF") during all relevant periods pertinent to this lawsuit. The evidence is abundantly clear that he can advocate for himself and has a reputation as a problematic inmate who constantly and unnecessarily complains. Further, all defendants were employed at NCCF in various capacities at all relevant times and had occasions to be in proximity to the plaintiff.

The Court further finds that the first instance of failure to protect, the incident with Mr. Dorsey, was only a claim against Mr. Nelson, as all other then-defendants were dismissed on summary judgment in relation to this claim (Dkt. 102). The evidence has not established that Mr. Nelson was aware of a potential threat against the plaintiff from Mr. Dorsey. Further, the allegations of retaliation against Mr. Nelson remain unproven and fail.

Mr. Nelson was known to the plaintiff before the alleged events described in the plaintiff's Amended Complaint. During those periods, Mr. Nelson was helpful to the plaintiff and even assisted the plaintiff in receiving "protective custody", meaning that Mr. Nelson aided

the plaintiff in receiving protection from all general population inmates. The fact that Mr. Nelson did so is relevant to show that he takes the plaintiff's safety seriously. Although the plaintiff has presented evidence that he is a serial complainer and that he had many disagreements with Counselor Jama Jones, he has not presented evidence that those incidents elicited any ire or retaliation from Mr. Nelson.

The plaintiff's evidence relating to grievances against Mr. Nelson is unpersuasive, as even if he did file grievances indicating problems with Mr. Nelson, the evidence shows that those complaints would go to Mr. Nelson's supervisor, and Mr. Nelson himself would not be aware of them. The alleged January 2021 incident, wherein inmate Kyle Brown testified, did not support the plaintiff's arguments and, in fact, discredited the alleged incident. Kyle Brown, a previously convicted felon for crimes of dishonesty and a self-admitted false accuser of Shane Nelson in a separate PREA matter, was not persuasive or credible. The discrepancies between his previous affidavit, admitted during direct examination, and his live testimony do not provide a basis for this Court to issue a reliable ruling.

The evidence is clear that Mr. Nelson was not aware of any threats or need to separate the plaintiff and Offender Dorsey prior to their June 2, 2021, fight. The evidence is clear that this was a fight, not an attack. The plaintiff's burden was to show that a specific and credible threat existed, and that Mr. Nelson was aware and failed to act. However, the evidence shows otherwise. The evidence, as stated by the plaintiff, was that even he was not aware that an altercation would take place on June 2, 2021. The evidence, as stated by the plaintiff, was that he fought Offender Dorsey in the absence of any NCCF staff. Mr. Nelson cannot be shown to have been present during the altercation, nor to have been aware that it was taking place or imminent to take place.

Following the Dorsey fight, two other claims against Mr. Nelson remain. First, the retaliation claim that Mr. Nelson kept him in segregation for approximately two weeks after he should have been released. Second, that he failed to protect the plaintiff from the Offender Brooks assault.

Regarding the retaliation, the plaintiff fails to prove his case. It is frequent for inmates to be moved while in the M-Unit, so the plaintiff has not shown any adverse action based upon protected activities. Second, the plaintiff's complaint about bed moves is similarly not uncommon, and Mr. Nelson is not easily frustrated, as demonstrated by his demeanor during his direct examination. As for the June 2021 additional two-week stay in segregation, it is clear that the plaintiff's stay was due to a protective custody review. That committee, meeting only once a week, did not unduly delay its finding that the plaintiff should ultimately stay in protected custody. As such, coupled with the plaintiff's separatees, need for protective custody housing, and the facility's own needs, called for the appropriateness of the two-week delay in removing the plaintiff from the segregation unit. This delay was not unusual and a natural result of the administrative process when housing inmates, which is even more challenged by the plaintiff's continual inability to interact appropriately with other offenders and even custody staff. Additionally, the plaintiff did not demonstrate that Mr. Nelson was responsible for the two-week delay; he was only shown to be part of the reviewing committee.

The last claim to be presented at trial was the failure to protect claim against all defendants for the Brooks assault. The plaintiff has failed to show that they failed to protect him. First, no evidence at all supports the notion that Lt. Krul was ever aware of any harm that could occur to the plaintiff from Offender Brooks. In fact, the evidence shows that while Lt. Krul was the individual who placed the plaintiff in the segregation cell, there were never any threats or

interactions between the plaintiff and Offender Brooks until the next day. Secondly, Mr. Nelson had little involvement in the segregation unit operations and never heard any allegations about Offender Brooks threatening or assaulting the plaintiff. The evidence shows that Mr. Nelson was not in the chain of command to do anything about the alleged threats either. Third, defendants Gard and Lee are only alleged to have heard threats from Offender Brooks and not to have moved the plaintiff. However, the evidence is clear that the segregation unit consists of single-man cells with no way for offenders to reach one another. These defendants do not have the ability to move inmates either. Thus, any threats made by Offender Brooks, even if these defendants did hear them, would not be credible or imminent. Further, the plaintiff himself stated he did not know of the attack by bodily fluids from Offender Brooks beforehand and could not explain then how he, at all times in a cell right next to Offender Brooks, could be unaware of the attack yet the defendants were supposed to be aware. Additionally, these defendants were not present during this attack; Officer Foley was the only NCCF staff present. The plaintiff has not demonstrated how these officers could have protected him from an attack that is highly disputed to have even occurred.

## CONCLUSIONS OF LAW

### a. Failure to protect

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Officials incur liability for the breach of that duty when they are "aware of a substantial risk of serious injury to [an inmate] but nevertheless fail to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also*

*Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, a plaintiff must show that (1) Defendants were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Further, damages are unavailable for fear of an unrealized attack. *Babcock v. White*, 102 F.3d 267, 270 (7th Cir. 1996).

Although the plaintiff has previously presented some evidence that Mr. Nelson had knowledge of a fear of an assault by Offender Dorsey, this evidence is contradicted directly by the exhibits and the testimony presented during trial. The duty under the Eighth Amendment to protect a prisoner from assault "does not lead to absolute liability." *Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992) (quoting *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991)). Rather, under the Eighth Amendment, the officials must "want[ ] harm to come to the prisoner," or, at least, must possess "total unconcern for a prisoner's welfare" in the face of "serious risks." *Id.* Thus, a prisoner must show, at the least, "recklessness," which, for purposes of the Eighth Amendment, entails "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Id.* (quoting *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir. 1985)).

At best, the plaintiff has shown that he had previously, months earlier, complained about his bed assignments, but never that Mr. Nelson wanted harm to come to him, nor a total unconcern for the plaintiff's welfare. In fact, the evidence shows that Mr. Nelson placed the plaintiff in protective custody specifically because he did not want harm to come to him. No actions of Mr. Nelson have been shown to be "reckless", with him having "actual knowledge of

impending harm easily preventable." A prisoner who merely establishes negligence but does not show either actual knowledge of the danger, or danger objectively so great that actual knowledge of the danger can be inferred, cannot prevail. *Id.* The plaintiff has failed to meet his burden of proof, and Mr. Nelson is entitled to judgment in his favor on the failure to protect claim pertaining to Mr. Dorsey.

Regarding the Brooks assault, the evidence does not support that this event ever occurred. However, even if it did, the only evidence in the record is that the plaintiff complained of generalized threats to his safety. The evidence, however, also shows that, despite the plaintiff alleging in his Amended Complaint that Sgt. Lee witnessed a specific threat from Brooks to the plaintiff, that in fact did not occur. Sgt. Lee was very clear that, from his first encounter with Brooks, when they engaged in an altercation, he was never going to cut Brooks any breaks. As such, it is evident that this alleged threat and subsequent assault likely did not occur, but even if it did, none of the defendants were present and able to prevent it from occurring.

The evidence established at trial showed that correctional officers on the floor would have placed a shield up in front of Brooks' cell had he held the cuff port hostage on June 24, 2021. None of the named defendants was a floor officer; rather, they were a Sergeant, a Lieutenant, a Captain, and a Unit Team Manager. The actions of Officer Foley and whoever else was working the floor in the segregation unit do not impute upon their superiors or Mr. Nelson. Even if the plaintiff's theory that these defendants were aware of threats to the plaintiff from Offender Brooks was true, the evidence is very clear that there were no reasonable means for them to take to prevent any harm to the plaintiff. The plaintiff was in a single-man cell, with no access to any other inmates. The action of Officer Foley transporting the plaintiff by Offender Brooks' cell, and Offender Brooks bypassing the shield, or the non-defendant floor officers not

setting up a shield, does not impute liability upon these defendants. The plaintiff has failed to meet his burden of proof and Mr. Nelson, Sergeant Lee, Lieutenant Krul, and Captain Gard are entitled to judgment in their favor on the failure to protect claim pertaining to Mr. Brooks.

**b. Retaliation claims**

To succeed on a First Amendment retaliation claim, the plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). If the defendant(s) can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

For the first element, the engagement in protected First Amendment activity, the plaintiff has met his burden. The evidence and testimony show that the plaintiff did file grievances and very vocally made complaints about his incarceration.

For the second element, that the plaintiff suffered a deprivation that would likely deter future First Amendment activity, the plaintiff has failed to meet his burden. The plaintiff's retaliation claims are against Mr. Nelson and pertain only to two acts: the placement near Mr. Dorsey and his being held in segregation beyond the time ordered in his disciplinary hearing.

The plaintiff never established any evidence to suggest that Mr. Nelson placed the plaintiff in the M1 M114A cell for any reason other than penological reasons. The plaintiff had previously been placed in the M1 housing area multiple times, with only bed moves to M3 (for 7 days) and

M2 (for less than 2 months). Additionally, the plaintiff established that he was aware of the process for "campaigning" for bed moves and was actively doing so in June 2021. Exhibit 2 specifically shows that the plaintiff was frequently moved, which is not uncommon in the M-Unit. The plaintiff did not spend any significant time in his opening statement, in his direct examination of Mr. Nelson, or during his own testimony, eliciting evidence to prove that his placement in M1 in June 2021 was intended to deter future First Amendment activity. The evidence additionally shows, through the plaintiff's cross-examination, that he knew on June 1, 2021 that he was being placed in proximity to Inmate Dorsey, that he previously was able to get a bed move within hours of a bed move without any adverse action against him, and he could have just pressed the button and been moved out of that cell and away from Offender Dorsey.

The plaintiff never presented any evidence suggesting that his extended stay in segregation was a deprivation that would likely deter future First Amendment activity. First, the 7th Circuit has previously held that two weeks in a segregation setting is not such a departure from the usual conditions of confinement to require pre-deprivation hearings. *See Jones v. Farley*, 7th Circuit Court of Appeals, 1997 U.S. App. LEXIS 2059. Second, the plaintiff never established any type of adverse action as a result of being in his single-man cell for the two additional weeks. The plaintiff pled guilty to engaging in the fight with Mr. Dorsey; he should have expected, not just accepted, that he would be in segregation until he could be housed in a different, albeit one of the limited, protective custody housing locations available.

The plaintiff failed to establish any evidence to show that his protected activities were a motivating factor in either his placement near Dorsey or his brief extension in segregation. "The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence,

which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013); *cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (probable cause usually defeats retaliatory arrest claim but not if plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals who did not engage in the same sort of protected speech were not).

No evidence was presented to suggest that the plaintiff's placement in M1, near Dorsey, was out of retaliation for any purpose. Rather, the evidence as presented by the plaintiff himself was that he requested protective custody and Mr. Nelson assisted him in getting protective custody, which necessitated his moving to the M-Unit. Further, there are only 4 ranges for the plaintiff to have been placed on in the M-Unit. Dorsey, being in M1, was not the only place where the plaintiff had conflicts, or as the evidence demonstrates, where the plaintiff was the problematic cellmate. As such, coupled with the plaintiff's failure to show that Mr. Nelson placed him in M1 out of retaliation, the plaintiff has failed on this element of his case.

Likewise, no evidence was presented to suggest that the plaintiff was kept in segregation for an extra two weeks for any purpose other than to review his protective custody status. This was necessary and ordinary, as the plaintiff admitted guilt to engaging in a fight with Offender Dorsey. As someone who engages in fights, he is not someone normally appropriate for protective custody – only offenders who involuntarily engage in fights need protective custody. The plaintiff's own admission of Exhibit 4 shows that the plaintiff not only pled guilty to engaging in the fight, but the reason was "C.O. Dunn told him I was a well known snitch, and that he mite want to watch talking about his case around him." (errors in original). This exhibit

bears the plaintiff's signature and his own theory on why the fight happened, which is not anything to do with Defendant Shane Nelson nor retaliation.

For these reasons, the plaintiff has failed to establish a *prima facie* case as to retaliation by Mr. Nelson. The burden has not shifted to Mr. Nelson to show that deprivation would have occurred anyway, but for the foregoing reasons, it is evident that such occurrences would have occurred anyway. For these reasons, Mr. Nelson is entitled to judgment against all retaliation claims of the plaintiff.

**CONCLUSION**

The plaintiff has voluntarily taken it upon himself to pursue this claim *pro se*. He has elicited testimony and entered evidence at trial on his own behalf. He has failed to establish the necessary elements by a preponderance of the evidence that he is entitled to judgment. As such, judgment is entered in favor of the defendants.

WHEREFORE, Defendants respectfully tender these proposed Findings of Fact and Conclusions of law.

Respectfully submitted,

By: /s/ Joseph T. Lipps

Joseph T. Lipps, Atty. No. 35936-89
BBFCS ATTORNEYS
27 North 8th Street
Richmond, IN 47374
Telephone: (765) 962-7527
jlipps@bbfcslaw.com
*Attorneys for Defendants.*

CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of March, 2026, I electronically filed the foregoing Motion with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. N/A

Further, I hereby certify that I have provided a copy of the foregoing to the following non-CM/ECF participant via United States Mail, first-class, postage prepaid, on this 16th day of March, 2026:

Carlton Wright, DOC #208902
Westville Correctional Facility
Inmate Mail/Parcels
5501 South 1100 West
Westville, IN 46391

By /s/ Joseph T. Lipps
Joseph T. Lipps