UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CARLTON WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00459-TWP-MKK |
| | ) | |
| SHANE NELSON, | ) | |
| KRUL Lieutenant, | ) | |
| GARD Captain, | ) | |
| LEE Sergeant, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND RULING FOLLOWING BENCH TRIAL**

The Court conducted a bench trial in this action on February 17, 2026. Plaintiff Carlton Wright ("Wright") appeared in person and represented himself. Defendants Shane Nelson, Lieutenant Krul, Captain Gard, and Sergeant Lee (collectively, "Defendants") appeared by counsel Joseph Lipps. Captain Gard attended as Defendants' assisting witness. Laurie Morgan was the Court Reporter. Wright, who is incarcerated in the Indiana Department of Correction, brought this action after he was assaulted on two occasions by other inmates when he was incarcerated at New Castle Correctional Facility ("NCCF"). Defendants moved for summary judgment, and that motion was granted in part and denied in part. (Dkt. 102). The claims that remained for trial were that: (1) Unit Team Manager Shane Nelson ("Nelson") failed to protect Wright from assault by inmate Elijah Dorsey ("Dorsey"); (2) Lieutenant Michael Krul ("Lt. Krul")[1], Nelson, Sergeant Joe Lee ("Sgt. Lee"), and Captain Voyle Gard ("Captain Gard") failed to protect Wright from assault by

---

[1] Lt. Krul was not present in person at the trial. The Court admitted his affidavit and interrogatories into evidence by stipulation of the parties. (Tr. Exhibits 13, 41; Dkt. 129 at 96–97).

inmate Brooks (first name unknown)[2]; and (3) Nelson retaliated against Wright by placing him near Dorsey and later by keeping Wright in segregation beyond the time of his disciplinary sentence. The Court now issues findings of fact, conclusions of law, and its ruling pursuant to Federal Rule of Civil Procedure 52(a)(1). Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

## II.   FINDINGS OF FACT

The following facts are based on the Court's credibility determinations of the various witnesses' testimonies, the parties' Joint Stipulated Facts for Trial, and the exhibits admitted into evidence.

### A. The Parties

Captain Gard worked at NCCF for 11 years, and in June 2021, he worked in the O-Unit at the annex building. (Dkt. 129 at 26–27). Joe Lee was employed at NCCF as a Sergeant in June of 2021. *Id.* at 69. Michael Krul worked as a Lieutenant at NCCF in June of 2021. (Tr. Exhibit 42). Shane Nelson has worked at NCCF for 12 years, and between 2019 and 2022, he was a Unit Team Manager over the M-Unit and O-Unit in the annex. (Dkt. 129 at 115–17).

### B. Wright's Move to M-Unit

Wright arrived at the annex at NCCF in March of 2019 and was initially placed in the O-Unit where he had a job as a mentor. (Dkt. 129 at 216). He was moved to the M-Unit in the annex, which is a protective custody unit, around November of 2020. *Id.* at 217. Wright was known as a snitch and was moved to M-Unit because he had been receiving threats from other inmates. *Id.* at 217, 309. In his role as the unit team manager, Nelson recommended Wright's move to protective

---

[2] There was no evidence presented regarding Mr. Brooks' first name.

custody. *Id.* Shortly after his move to the M-Unit, Wright began to "have problems" with case manager Jama Jones ("Jones"). *Id.* at 219. Wright believes that his contentious relationship with Jones contributed to the tension between him and Nelson. *Id.* at 221. Nelson and Jones began to move Wright's cell assignment frequently. *Id.* at 222. Between November of 2020 and January of 2021, Wright was moved about five times. *Id.* Nelson testified that, while these moves were frequent, such frequency is not uncommon in the M-Unit. *Id.* at 126. As a Unit Team Manager, Nelson had the authority to authorize or deny bed moves in the M-Unit but he did not personally plan bed moves. *Id.* at 123–24, 144–45. However, his name appears as the authorizing officer for several of Wright's bed moves in the document recording those bed moves. (Tr. Exhibit 2).

In late 2020 and early 2021, Wright began to file grievances challenging the frequent bed moves. (Dkt. 129 at 223). Nelson testified that he would not know about grievances filed against him, but he does recall Wright complaining regularly. *Id.* at 126–28. Later, though, Nelson acknowledged that he responded to an email from the grievance administrator about a grievance Wright had filed against him complaining about the bed moves. *Id.* at 136; *see also* (Tr. Exhibit 9) (grievance number 122186 complaining about Nelson changing his cell assignments); (Tr. Exhibit 58) (email to Nelson asking for a response to grievance number 122186). Wright had a conversation with Nelson in which he complained about the frequent bed moves, and Nelson told him "If I was you, I would stop always bitching and complaining about bed moves, or I promise you, I will make your stay here a living hell on you." (Dkt. 129 at 225). While Nelson denies making this statement, *id.* at 152, inmate Kyle Brown ("Brown") testified that he overheard it. *Id.* at 104–05.[3]

---

[3] Nelson attempts to impeach Brown's testimony, pointing out that Brown has a 2016 conviction for fraud and that Brown admitted in a prison disciplinary proceeding to making a false report under the Prison Rape Elimination Act. Brown explains that he chose to plead guilty to the false report charge to avoid losing a year of credit time. (Dkt. 129 at 111). Nelson also points out that in Brown's affidavit in this case, which was signed in January of 2021, Brown

Wright was moved to a cell with a cellmate he got along with on January 13, 2021. *Id.* at 230. In Nelson's email to the grievance administrator about Wright's complaints about bed moves, Nelson responded, "[Wright] and his cellmate have requested to live together and meet compatibility requirements. There should be no reason for future complaints from him." (Tr. Exhibit 58).

### C. Dorsey Assault

Nonetheless, on April 5, 2021, Wright was informed that he was going to be moved again to share a cell with inmate Dorsey. (Dkt. 129 at 233). Dorsey had been in several fights since his arrival at NCCF and was held in M-Unit pending charges for murdering an Indianapolis police officer. *Id.* at 240. Dorsey had received several conduct reports and spent time in segregation for those fights. *Id.* at 241.

Nelson approved this move. (Tr. Exhibit 2). Wright told Officer Foley, who was moving him, that he feared for his safety, and Officer Foley placed Wright in the shower and wrote a case note explaining that Wright was refusing the housing assignment. *Id.* at 235; (Tr. Exhibit 1) (Case Note stating that Wright refused housing). The Note also stated that "Offender Wright told Ofc. Foley that he was in fear of his life being moved into cell M1-116." *Id.* Lt. Krul visited Wright in the shower, and Wright explained the situation. (Dkt. 129 at 237). Lt. Krul threatened to issue a conduct report and send Wright to segregation if he refused to move into the cell with Dorsey. *Id.* at 237–38. Wright moved to the cell, but later, after shift change, pressed the emergency panic button in the cell. *Id.* at 238. He told the officer who responded about his concerns and the officer agreed to move Wright without issuing a conduct report. *Id.* at 239. A non-party officer moved

---

averred that he was in his cell during the interaction between Nelson and Wright, but at the trial Brown testified that he was in the dayroom. *Id.* at 107–08. Brown explains that the cell and the dayroom are so close to each other, they are often described the same. *Id.* at 108. Because Brown's testimony at trial is largely consistent with his 2021 affidavit, and based on his demeanor at the trial, the Court credits Brown's testimony.

Wright to a different range where there was no chance of interaction with Dorsey. *Id.* at 240. Wright was comfortable with the new location and cellmate. *Id.* at 241. During his time in this range, Wright told Nelson that he did not want to be moved back near Dorsey because he felt in danger. *Id.* at 245. Nelson told Wright not to worry about it and that he was appropriately housed. *Id.* Nelson does not recall Wright telling him that he was in fear of Dorsey, but that if he had, the two men would have been separated. *Id.* at 139–40.

On May 27, 2021, Wright was moved to a cell on the same range as Dorsey, but on a different floor. *Id.* at 249. With this placement, they still were unable to interact with each other. *Id.* at 250. However, on June 1, Wright was moved two cells away from Dorsey on the same recreation line. *Id.* at 251. Nelson authorized this move. (Tr. Exhibit 2). Inmates on the same recreation line interact with each other every day, because they go to recreation activities at the same time and use the same showers, microwave, and telephone, among other things. (Dkt. 129 at 253). There are a total of eight recreation lines on the M-Unit. *Id.* at 254.

The day after Wright's move, when he was out for recreation, Dorsey punched him and the two engaged in a fight that lasted 37 minutes. *Id.* at 255. No staff intervened during this time. *Id.* at 257. After the altercation, Wright was taken to the medical department for assessment. *Id.* at 259. He had abrasions on his foot, forearm, and face. *Id.* at 260. His side was sore from being punched, and he tore a ligament in his wrist. *Id.* He was given an icepack and Tylenol and was later given wrist splints. *Id.* Wright testified that he suffers from Post-Traumatic Stress Disorder. *Id.* at 262. He takes medication and has monthly therapy and cannot work certain jobs because of his mental health code. *Id.* at 263.[4] Since this incident, Wright has experienced night terrors, cold

---

[4] Wright sought to admit Tr. Exhibits 28–37, which are pages of records of Wright's medical care, over the Defendants' objection. The Court took the matter under advisement. (Dkt. 129 at 263). In their proposed findings of fact and conclusions of law, the Defendants appear to concede the admissibility of these documents, stating "[t]he Court now admits these records into evidence," (Dkt. 132). The Court now admits into evidence Tr. Exhibits 28–37.

sweats, and is always on edge and in fear of being attacked. *Id.* at 265. Before this assault and fight with Dorsey, Wright had been free of conduct reports for four years. *Id.* at 238.

### D. Brooks Assault

Wright was taken to segregation for his role in the fight with Dorsey and was placed in a cell next to inmate Brooks. *Id.* at 266. Brooks was known by staff and inmates to be a combative inmate. *Id.* at 31 (Captain Gard); *id.* at 70–71 (Sgt. Lee); *id.* at 158 (Nelson). Wright testified that he was a protective custody inmate, while Brooks was a general population inmate. *Id.* at 268.

Captain Gard testified that if an inmate in segregation told him he felt he was in danger, he would probably not take that concern seriously because the cells in segregation are single-man cells. *Id.* at 37. Sgt. Lee testified that if an inmate brings to his attention that another inmate is threatening him, that is taken seriously, but he agreed that inmates in segregation do not have physical interaction with each other. *Id.* at 77. Nelson also testified that if an inmate in segregation complains of a threat from another inmate, that should be taken seriously. *Id.* at 176. If an inmate complains that another inmate in the same pod has threatened him, Sgt. Lee can move him if there is another cell available. *Id.* at 80.

A short time after this placement, Brooks became aware that Wright was a protective custody inmate—which indicated that Wright was likely a snitch—and Brooks began to threaten and harass him. *Id.* at 269. Wright told Lt. Krul, Captain Gard, Sgt. Lee, and Nelson that Brooks was threatening and harassing him when they made their rounds. *Id.* at 269, 274, 278, 279.[5] But these Defendants each told Wright that they would not move him. *Id.* at 270, 274, 278, 280. Wright

---

Notwithstanding this admission, the Court relies largely on Wright's testimony regarding his mental and physical experiences.

[5] The Defendants deny any memory of Wright telling them about his fear of Brooks. (Dkt. 129 at 47) (Gard's testimony that "I don't remember if he did or not."); 76 (Lee testimony: "it's been a long time ago so I don't remember that"). However, based on its assessment of the evidence, the parties' demeanor, and their inability to recall practically anything, the Court credits Wright's testimony that he did so.

testified that Brooks' location was such that Brooks could overhear Wright notifying Sgt. Lee that Brooks was threatening him, which made Brooks angrier. *Id.* at 275. Brooks called Wright a snitch and told him he really was going to get him. *Id.*

On one occasion when Sgt. Lee was taking Brooks to the shower, Brooks threatened to stab Wright. *Id.* at 276. Sgt. Lee denies a specific memory of Brooks threatening Wright, but Sgt. Lee testified that Brooks "was always threatening people" and Brooks was always in cuffs when outside his cell. *Id.* at 87–89. Nelson does not recall Wright complaining to him about Brooks. *Id.* at 177.

The cell doors on this range are solid doors with a window and a food slot, also known as a cuff port. *Id.* at 286. On June 24, 2021, which was shower day for that range, Brooks held the cuff port of his cell door "hostage" by sticking his arm out the food slot and not letting it close. *Id.* at 273, 285. This violates NCCF rules. *Id.* at 54. When an inmate holds his cuff port open, there should not be movement around the cell. *Id.* at 74. Officers can use a shield to cover the door so nothing can get through it. *Id.* at 57. Captain Gard testified that the decision to use the shield is made on a case-by-case basis. *Id.* at 57. Sgt. Lee testified that when a cuff port is held hostage "first of all, you put the shield up." *Id.* at 74.

While Brooks held the cuff port open, Sgt. Lee and Captain Gard spoke to Brooks, but did not secure the cuff port nor did they put up a shield. *Id.* at 285, 288. When Wright's shower time came, Officer Foley came to escort him to the shower. *Id.* at 289. As Wright was leaving his cell and heading to the shower, Brooks threw bodily fluids at Wright through the open cuff port. *Id.* at 290. Wright asked to take a shower after this assault, but because there was an incident, this request was denied, Wright was returned to his cell and he was not able to shower for three days. *Id.* at 293. After the assault, Wright filed a grievance concerning the incident and asking for the video

footage of it to be maintained. (Tr. Exhibit 16, 25). The Defendants deny memory of this incident. (Dkt. 129 at 34 (Captain Gard)); *id.* at 79 (Sgt. Lee); *id.* at 129 (Nelson). However, in a response to Wright's grievance, he was told "[p]er custody supervisors' policy and procedures was followed, I have requested the camera footage be saved that you asked for in your grievance." *Id.* at 284. (Tr Exhibit 18).

After these two incidents, Wright filed a formal request to separatee against Dorsey and Brooks. (Dkt. 129 at 304).

### E. Retaliation Claim

Wright filed a grievance on June 8, 2021, alleging that Nelson and Case Manager Jones intentionally placed him in harm's way, resulting in the fight with Dorsey. (Tr. Exhibit 25). Wright received a disciplinary report for the altercation between him and Dorsey on the recreation pad. (Dkt. 129 at 293). At his disciplinary hearing, held on June 16, 2021, Wright was sentenced to time served in segregation, meaning that he should have been released from segregation that day. (Tr. Exhibit 4; Dkt. 129 at 166). But he was not released from segregation until June 29, 2021. (Dkt. 129 at 295).

Nelson is a member of the Restrictive Housing Unit ("RHU") Multi-Disciplinary Review Committee. *Id.* at 169. As part of his duties, Nelson prepared a note on June 18 stating:

> On 6/16/2021, the RHU Multi-Disciplinary Review Committee met and reviewed the status of Offender Carlton Wright. The decision was made for the offender to remain in RHU under administrative hold. Offender Wright has been recommended to be removed from protective custody status and submitted for transfer.

(Tr. Exhibit 19). Nelson entered a note in Case Notes on June 25 stating:

> The RHU Multi-Disciplinary Review Committee met and reviewed the status of Offender Carlton Wright. The decision was made for the offender to be released from O3 to the population of M-Unit. He will remain on protective custody status and will work with Unit Team staff to complete appropriate BITS and CAREY guides to improve his behavior and attitude toward staff and inmates.

8

*Id.* Nelson testified that Wright's stay in protective custody was "under review to remove the protective custody. The committee met the next week, and he was not removed from protective custody." (Dkt. 129 at 182). Nelson denies that he did anything to cause Wright to remain in segregation longer than he should have. *Id.* at 195. Nelson was, however, a part of the committee that decided Wright would remain in segregation. *Id.*

Wright exhausted his administrative remedies before timely filing this lawsuit.

### III.  CONCLUSIONS OF LAW

Before beginning its analysis, the Court notes that despite the knowledge that they were defendants in a federal trial, Defendants Nelson, Sgt. Lee, and Captain Gard, appeared to be woefully unprepared. Each repeatedly testified "I don't remember if he did or not", "I don't know," or "I don't recall," despite the existence of exhibits and reports which could have refreshed their memories concerning the claims against them in this case.

In evaluating the testimony of any witness, the trier of fact may consider, among other things: the ability and opportunity the witness had to see, hear, or know the things that the witness testified about; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all the evidence in the case. *See* Federal Civil Jury Instructions of the Seventh Circuit, 1.13. Additionally, it is proper for a lawyer to meet with a witness in preparation for trial, if the witness is willing to do so. *See Porter v. Boodry*, No. 17-cv-726, 2021 WL 4521128, at *14 (W.D. Wis. Oct. 4, 2021). Here, the numerous disputes in the testimonies of witnesses presents straightforward credibility questions for the Court to resolve as the finder of fact. *See Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009). The witnesses' failure to recall, and their demeanor at trial, diminished their credibility.

### A. Failure to Protect Claims

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "'aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger.'" *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Wright must show that (1) Defendants were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Further, damages are unavailable for fear of an unrealized attack. *Babcock v. White*, 102 F.3d 267, 270 (7th Cir. 1996).

### 1. Dorsey Attack

Wright's first claim is that Nelson knew that he was at risk of assault by Dorsey and Nelson placed him near Dorsey anyway. Between December 2020 and January 13, 2021, Wright was moved five times, and he filed a grievance concerning the frequent moves. In February of 2021, before Wright was moved near Dorsey, Wright had been placed with a cellmate with whom he got along well, and Nelson had emailed the grievance specialist explaining that with his current location, there should be "no reason for future complaints." (Tr. Exhibit 58). Nonetheless, Nelson authorized Wright's move to share a cell with Dorsey on April 5, 2021. (Tr. Exhibit 2). The record shows that Wright told Officer Foley about his fears and Officer Foley held Wright in the shower to wait for Lt. Krul. (Tr. Exhibit 1). After meeting with Lt. Krul, Wright consented to being moved

10

into the cell with Dorsey, but later pressed the panic button in his cell and asked again to be moved. (Dkt. 129 at 239). Wright was then moved to a cell where he was comfortable. *Id.* at 241.

Although Nelson denies recollection of such a conversation during this time, the Court credits Wright's testimony that he told Nelson that he did not want to be around Dorsey. *Id.* at 245. Nonetheless, in May of 2021, Nelson authorized Wright's move to a cell on the same range as Dorsey, but on a different floor. (Tr. Exhibit 2; dkt. 129 at 249). A few days later, Nelson again authorized Wright's move to a cell two cells away from Dorsey. (Tr. Exhibit 2). There are eight recreation lines in the M-Unit, but the move approved by Nelson placed Wright on the same recreation line as Dorsey. (Dkt. 129 at 253–54). Nelson provides no explanation for this move other than his general testimony that there could be "numerous reasons for moves." (Dkt. 129 at 134). *But see* (Tr. Exhibit 58 (email stating that the reason for Wright's bed moves is that he is a problematic cellmate)). The next day, Dorsey attacked Wright for 37 minutes. And, although the Defendants seek to characterize this altercation as a fight, the Court credits Wright's testimony that Dorsey initiated it, and he fought back to defend himself. *Id.* at 255.

To establish the liability of a prison official, a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing. *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). Here, it is undisputed that Dorsey was known to be a violent inmate, and the Court has found that Wright told Nelson that he was afraid of Dorsey, but Nelson nonetheless continued to authorize Wright's moves near Dorsey. The Court finds that Nelson knew that Wright was at risk of assault from Dorsey but disregarded that risk, in violation of Wright's Eighth Amendment rights.

### 2. Brooks Attack

Wright's next claim is that Lt. Krul, Nelson, Sgt. Lee, and Captain Gard each knew that Brooks had threatened him but failed to protect Wright from assault.

After the fight with Dorsey, Wright was held in segregation and placed in a cell next to Brooks, who was known to be combative. (Dkt. 129 at 31, 70–71, 158, 266). Although the Defendants have no recollection, the Court credits Wright's testimony that he told each of the Defendants that Brooks had threatened him. *Id.* at 269, 274, 278, 279. Captain Gard testified that Brooks would often hold his cuff port hostage, and an incident report is not issued when an inmate refuses to close the cuff port.

The Court further credits Wright's testimony that Sgt. Lee observed these threats on at least one occasion. *Id.* at 276. And the Court credits Wright's testimony that, on June 24, 2021, Brooks held his cuff port "hostage" by sticking his arm out of the slot. *Id.* at 273, 285. Although officers can use a shield to cover the cuff port so that nothing can be thrown out of the opening, Sgt. Lee and Captain Gard did not do so. *Id.* at 285, 288. Then, when Wright was taken out of his cell to go to the shower, Brooks threw bodily fluids on Wright through the open cuff port. *Id.* 290.

Having found that (1) Brooks was known to be combative and to make threats against Wright; (2) Wright told the Defendants about these threats; and (3) Brooks held his cuff port open and Sgt. Lee and Captain Gard did not secure the cuff port before Wright was escorted to the shower, the Court finds that the Defendants were aware of a serious risk to Wright and disregarded it in violation of his Eighth Amendment rights.

**B. Retaliation Claim**

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable trier of fact to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir.

12

2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

Wright bases his retaliation claim on two alleged retaliatory acts—his placement in a cell near Dorsey and being held in segregation beyond the time ordered in his disciplinary hearing. Nelson agrees that Wright engaged in protected First Amendment activity by filing grievances but argues that Wright has not satisfied the remaining elements of his retaliation claim.

First, as to Wright's claim that Nelson placed him near Dorsey in retaliation for filing grievances, the Court finds that placing Wright near Dorsey when Wright was afraid of him could deter a person of ordinary firmness from participating in First Amendment activity. In addition, the Court credits the testimony that sometime before this placement, Nelson told Wright that if he did not quit complaining he would make his "stay a living hell." (Dkt. 129 at 225–27). Nelson continued to authorize Wright's placement near Dorsey even after Wright's complaints of fear. And after another officer moved Wright away from Dorsey, Nelson moved him back. *Id.* at 241, 249, 251; (Tr. Exhibit 2). Based on this testimony, the Court finds sufficient direct and circumstantial evidence of retaliation, when Nelson moved Wright to the same recreation line as Dorsey, because he had been filing grievances against him in violation of his First Amendment rights.

Next, as to Wright's claim that Nelson kept him in segregation beyond the period in which his stay should have ended, the Court credits Nelson's testimony that this decision was made by the entire RHU Multi-Disciplinary Review Committee and was based on their review of Wright's protective custody status, not retaliatory reasons. (Tr. Exhibit 19; dkt. 129 at 182, 195). Nelson is

therefore entitled to judgment on this claim, and Wright's First Amendment claim on this issue is denied.

## IV.  DAMAGES

Wright seeks both punitive and compensatory damages. As discussed above, based on its evaluation of the evidence and testimony presented at the bench trial, the Court finds that Defendant Nelson was aware of a serious risk that Dorsey would assault Wright and disregarded this risk; that Defendants Nelson, Lt. Krul, Sgt. Lee, and Captain Gard were aware of a risk that Brooks would assault Wright and disregarded that risk; and that Nelson retaliated against Wright when he authorized his placement near Dorsey. Wright is therefore entitled to damages on these claims.

In considering damages, the Seventh Circuit Court of Appeals has held that three factors guide its analysis: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (citing *G.G. v. Grindle,* 665 F.3d 795, 798 (7th Cir.2011)).  The required "rational connection" between the evidence and the award does not imply mathematical exactitude, especially where the compensatory damages are for pain and suffering.  "Such damages are very difficult to quantify, leaving it to the [trier of fact] to select a dollar amount that it believes will fairly compensate the plaintiff."  *Hendrickson v. Cooper*, 589 F.3d 887, 892–93 (7th Cir. 2009) (citing *Fenolio v. Smith,* 802 F.2d 256, 259–60 (7th Cir.1986))

Neither party presented any argument or authority concerning a dollar amount for damages. But this Court previously awarded an inmate Ten Thousand Dollars ($10,000.00) when defendant

correction officers were deliberately indifferent, and the diabetic inmate was injured and suffered a cut and a 4-inch scar which remained clearly visible three years later. *See Dake v. United States*, 1:13-cv-961 TWP-DML.

Considering a rational connection between the evidence of Wright's injuries and the award, the Court awards Wright $7,000.00 in compensatory damages against Nelson for the assault by Dorsey. Wright's physical injuries were not severe, but he did suffer an abrasion on his foot and toe, left forearm, a sore side, facial abrasions, and ultimately a torn wrist ligament. Of significance is the fact that the assault and resulting fight lasted 37 minutes, before the guards intervened. Wright suffers from post-traumatic stress disorder and anxiety, and his anxiety was exasperated following the incident with Dorsey.

The Court awards $1,000.00 against all Defendants for the assault by Brooks. The bodily fluids consisted of feces and urine, and Wright testified that afterwards, he was not allowed to take a shower for three days. Liability on this claim is joint and several.

The Court awards no punitive damages. Punitive damages are appropriate only if the defendants' conduct was malicious or in reckless disregard of Wright's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring Wright. Conduct is in reckless disregard of Wright's rights if, under the circumstances, a defendant simply did not care about Wright's safety. Committee on Pattern Jury Instructions of the Seventh Circuit, Pattern Jury Instructions (Civil Cases) 7.28 (2009 Rev.). The Court finds that Wright did not show that Defendants Sgt. Lee, Captain Gard, and Lt. Krul acted maliciously or with more than deliberate indifference to warrant punitive damages. Although the Court found that Nelson threatened to make Wright's life difficult, the Court nonetheless finds that punitive damages are not warranted against him. The total damages award is $8,000.00 in compensatory damages.

## V.    CONCLUSION

For the reasons stated above, the Court finds in favor of Plaintiff Carlton Wright and against Defendant Shane Nelson on Wright's claims that (1) Shane Nelson failed to protect Wright from assault by inmate Elijah Dorsey; and Defendants Lieutenant Michael Krul, Shane Nelson, Sergeant Joe Lee, and Captain Voyle Gard failed to protect Wright from assault by non-party Brooks. The Court finds in favor of Wright on his claim that Nelson retaliated against Wright by placing him near Dorsey. The Court finds that Defendant Shane Nelson is entitled to judgment on the claim that he retaliated against Wright by wrongly extending his stay in segregation.

Wright is awarded a total of Eight Thousand Dollars ($8,000.00) in compensatory damages.

Judgment consistent with this Order and the Order on the Defendants' motion for summary judgment, (Dkt. 102), shall now issue in a separate Order.

**SO ORDERED.**

Date:    3/30/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

CARLTON WRIGHT
208902
WESTVILLE - CF
WESTVILLE CORRECTIONAL FACILITY
Inmate Mail/Parcels
5501 South 1100 West
WESTVILLE, IN 46391

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com